# In the United States Court of Federal Claims

No. 08-1981
No. 07-4262
(Filed: August 5, 2013)
(Reissed: April 2, 2014)

* * * * * * * * * * * * * * * * * * * * * * * *

NATHAN and DEBORAH    *
CHILDERS, et al.,    *
   *
     Plaintiffs,    *
   *
     v.    *
   *
THE UNITED STATES,    *
   *
     Defendant.    *
   *

* * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * *

CALUSA LAKES COMMUNITY    *
ASSOCIATION, et al.,    *
   *
     Plaintiffs,    *
   *
     v.    *
   *
THE UNITED STATES,    *
   *
     Defendant.    *
   *

* * * * * * * * * * * * * * * * * * * * * * * *

Fifth Amendment Taking; Rails-to-Trails, 16 U.S.C. § 1241 et seq.; Just Compensation; Fair Market Value of Property Pre- and Post-Taking; Severance Damages; Conversion Land Damages; Cost to Cure; Buffering; Loss of Access; Unit Rule; Noneconomic Remainder; Highest and Best Use; Private Deed Restrictions; Public Use Restrictions; Zoning; Covenants, Conditions, and Restrictions; Expert Disclosures; Striking Expert Testimony.

Mark F. (Thor) Hearne, II, Lindsay S.C. Brinton, and Meghan S. Largent, Arent Fox LLP, 112 S. Hanley Road, Suite 200, Clayton, MO 63105; Debra J. Albin-Riley and Joseph L. Cavinato, III, Arent Fox LLP, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013, for Plaintiffs.

Ignacia S. Moreno, Carol L. Draper, Lary Cook Larson, and Jason A. Hill, United States Department of Justice, Environment & Natural Resources Division, 601 D Street, N.W., Washington, DC 20044; Kristine S. Tardiff, United States Department of Justice, Environment & Natural Resources Division, 53 Pleasant Street, 4th Floor, Concord, NH 03301, for Defendant. Charlotte M. Youngblood, United States Department of Justice, Environment & Natural Resources Division, 601 D Street, N.W., Washington, DC 20044, of Counsel.

# OPINION AND ORDER

## <u>Contents</u>

Findings of Fact ......................................................................................................... 6

Discussion ................................................................................................................... 8

  Jurisdiction ................................................................................................................ 8

  Legal Standards Governing Just Compensation ...................................................... 8

  Appraisals of the Subject Properties ...................................................................... 10

  The Experts' Methodologies ................................................................................... 10

    Quantitative Versus Qualitative Comparable Sales Analysis ............................ 10

  Appraisal Principles ............................................................................................... 12

    The Propriety of Applying a Large-Lot Discount ............................................. 12

    The Propriety of Considering Use Restrictions ................................................ 14

    The Efficacy of a Private Deed Restriction ....................................................... 17

    Public Use Restrictions and the Ability to Rezone Property in Sarasota County in    2004 .............. 20

  The Taking's Effect on the Fair Market Value of Properties Adjacent to the Trail ............................. 25

    Plaintiffs' Paired Sales Analysis ....................................................................... 25

    Plaintiffs' Anecdotal Evidence .......................................................................... 26

    Plaintiffs' Evidence on Potential Future Uses of the Legacy Trail .................... 27

    Defendant's Paired Sales Analysis .................................................................... 27

    Defendant's Trail Impact Studies ...................................................................... 27

    Defendant's Anecdotal Evidence ....................................................................... 28

    Defendant's Evidence on Future Uses of the Legacy Trail ............................... 29

  The Court's Assessment of the Experts' Opinions on Whether the Legacy Trail Negatively Impacted Property Values .................................................................... 29

  The Diminution in Value to the Remainder Due to the Trail ................................. 31

    The Width of the Buffer ..................................................................................... 31

    The Cost of Buffering ........................................................................................ 33

  Just Compensation for Plaintiffs' Individual Properties ........................................ 35

  Mission Valley ........................................................................................................ 35

    Plaintiffs' Expert's Valuation of Mission Valley .............................................. 35

    Defendant's Expert's Valuation of Mission Valley ........................................... 39

What Is the Proper "Before Value" of Mission Valley? .................................................. 42

Just Compensation for Mission Valley ......................................................................... 44

Stoneybrook ................................................................................................................... 44

Plaintiffs' Expert's Valuation of Stoneybrook .............................................................. 44

Defendant's Expert's Valuation of Stoneybrook .......................................................... 48

What Is the Proper "Before Value" of Stoneybrook? ................................................... 51

Just Compensation for Stoneybrook ............................................................................ 53

TPC-Prestancia ............................................................................................................... 55

Plaintiffs' Expert's Valuation of TPC-Prestancia ......................................................... 55

Defendant's Expert's Valuation of TPC-Prestancia ..................................................... 60

What Is the Proper "Before Value" of TPC-Prestancia? ............................................... 63

Just Compensation for TPC-Prestancia ....................................................................... 64

Arielle ............................................................................................................................. 64

Plaintiffs' Expert's Valuation of Arielle ....................................................................... 66

Defendant's Expert's Valuation of Arielle ................................................................... 70

What Is the Proper "Before Value" of Arielle? ............................................................. 73

Just Compensation for Arielle ...................................................................................... 75

JMC ................................................................................................................................. 76

What Is the Proper "Before Value" of JMC? ................................................................ 76

Just Compensation for JMC .......................................................................................... 76

Palmer Ranch ................................................................................................................. 78

Plaintiffs' Expert's Valuation of Palmer Ranch ........................................................... 79

Defendant's Expert's Valuation of Palmer Ranch ....................................................... 83

What Is the Proper "Before Value" of Palmer Ranch? ................................................. 86

Just Compensation for Palmer Ranch .......................................................................... 86

Pine Ranch East ............................................................................................................. 90

Plaintiffs' Expert's Valuation of Pine Ranch East ........................................................ 90

Defendant's Expert's Valuation of Pine Ranch East .................................................... 94

What Is the Proper "Before Value" of Pine Ranch East? .............................................. 97

Just Compensation for Pine Ranch East ....................................................................... 98

Calusa Lakes .................................................................................................................. 99

Plaintiffs' Expert's Valuation of Calusa Lakes ............................................................ 100

Defendant's Expert's Valuation of Calusa Lakes ....................................................... 103

What Is the Proper "Before Value" of Calusa Lakes? ............................................... 106

Just Compensation for Calusa Lakes ....................................................................... 108

The Childers Property ..................................................................................................... 108

What Is the Proper "Before Value" of the Childers Property? ................................ 109

Just Compensation for the Childers Property .......................................................... 109

The Marlin Property ........................................................................................................ 109

What Is the Proper "Before Value" of the Marlin Property? .................................. 110

Just Compensation for the Marlin Property ............................................................. 110

The Davids Property ........................................................................................................ 110

Plaintiffs' Expert's Valuation of the Davids Property ............................................. 111

Defendant's Expert's Valuation of the Davids Property .......................................... 114

What Is the Proper "Before Value" of the Davids Property? .................................. 116

Just Compensation for the Davids Property ............................................................. 117

The Mirman Property ...................................................................................................... 117

Plaintiffs' Expert's Valuation of the Mirman Property ........................................... 118

Defendant's Expert's Valuation of the Mirman Property ........................................ 121

What Is the Proper "Before Value" of the Mirman Property? ................................ 124

Just Compensation for the Mirman Property ........................................................... 124

The Glueck Property ....................................................................................................... 125

What Is the Proper "Before Value" of the Glueck Property? ................................. 125

Motion to Strike Expert Testimony Regarding Buffering on the Glueck Property ......... 125

Just Compensation for the Glueck Property ............................................................. 130

Conclusion ........................................................................................................................... 133

Appendix A: Northern Segment of Palmer Ranch DRI ................................................ 135

Appendix B: Southern Segment of Palmer Ranch DRI ................................................ 136

Appendix C: Aerial View of TPC .................................................................................... 137

Appendix D: Aerial View of Arielle ............................................................................... 138

Appendix E: Arielle Conceptual Development Plan ...................................................... 139

Appendix F: Plat for Arielle ............................................................................................ 140

Appendix G: Aerial View of JMC ................................................................................... 141

Appendix H: Aerial View of Palmer Ranch ................................................................... 142

Appendix I: Aerial View of Pine Ranch East ................................................................. 143

Appendix J: Aerial View of Calusa Lakes ...................................................................... 144

Appendix K: Aerial View of the Glueck Property ................................................................... 145

**WILLIAMS**, Judge.

This Fifth Amendment taking case comes before the Court following a trial on damages. Plaintiffs, landowners of 13 separate properties in Sarasota, Florida, seek just compensation stemming from the imposition of a recreational trail across their properties pursuant to the Rails to Trails Act.[1]   Specifically, Plaintiffs seek $8,703,800, representing $4,938,200 for the encumbrance of the trail and $3,765,600 in severance damages.   Defendant asserts that compensation should be limited to the encumbrance, which it claims is properly valued at $2,220,900.   The Court awards just compensation in the amount of $5,701,579.73 representing $4,706,047.56 for the land encumbered by the corridor plus severance damages of $995,532.17.

## Findings of Fact[2]

On April 2, 2004, the Surface Transportation Board ("STB") issued an order authorizing a "rail-to-trail" conversion of a railroad right-of-way in Sarasota County, measuring 12.43 miles long.   Plaintiffs' land abuts this right-of-way, and the conversion resulted in a recreational trail easement on Plaintiffs' properties measuring 50 feet wide.[3]   No railroad traffic had moved over this railroad line since March 2002.  Rogers v. United States, 90 Fed. Cl. 418, 421 (2009).

After the STB authorized the conversion, the railroad tracks and ties were removed, the rail line was graded, and the County paved an asphalt trail.   The resulting trail is known as the Legacy Trail.   There are benches and public restrooms at various points along the trail and trail heads that afford public access.   Sarasota County estimates that between 125,000 and 140,000 people use the trail annually.  PX 20B (BB-PLTF-12332).

---

[1] The Court granted Plaintiffs' motion for class certification in Rogers v. United States, No. 07-273L, on November 21, 2007.  On December 14, 2007, this Court consolidated Rogers v. United States, No. 07-273L, and Bird Bay Executive Golf Course, Inc., No. 07-426L.   In December 2009, the Court consolidated Rogers, Bird Bay, and Bay Plaza v. United States, No. 08-198L, for proceedings on liability and decertified the class in Rogers at Plaintiffs' request. Subsequently, this Court severed the claims of the following Plaintiffs from the consolidated actions: Calusa Lakes Community Association, Inc., Patricia M. Davids, Ilene Mirman, Pine Ranch East Owners Association, Inc., Pulte Home Corporation, Stoneybrook Golf & Country Club of Sarasota, Inc., and TPC-Prestancia, Inc.  These landowners are seven of the Plaintiffs named in Bay Plaza.

[2] This Court also severed the claims of the following Plaintiffs in Bird Bay from the consolidated action: Nathan and Deborah Childers, A. Merle Clark Glueck Trust, JMC Real Estate Holdings, LLC, Dennis T. and Mary Ann Marlin Revocable Trusts, Mission Valley Golf & Country Club, Inc., and Palmer Ranch Holdings, Ltd.

[2] These findings of fact are derived from the record developed during a seven-day trial on damages.   The Court also conducted a site visit of the properties and the trail with counsel for both parties.   The Court uses "PX" and "DX" to designate trial exhibits and "Tr." to cite trial testimony.  Citations to exhibit page numbers are to the Bates numbers assigned to a given page.

[3] Findings of fact detailing the 13 individual properties are in the Discussion.

The 13 subject properties are located in Sarasota County in Florida, east of U.S. Route 41 and west of Interstate 75. PX 10. All of the properties are located within the urban services boundary, the area where utilities are available and development is encouraged. Tr. 769-72, 801; PX 11. On the date of the taking, three of the properties were golf courses, four contained a single-family residence, four were vacant lots, one was being developed as a residential subdivision, and one was an automobile salvage yard. Landowners whose residences abut the trail testified that noise, traffic, and instances of trespass and property damage increased because of the trail, and Plaintiffs submitted analyses indicating that the fair market value of properties adjacent to a corridor were 16-28% lower than properties off the corridor. Tr. 66-70, 93-97, 124-26; PX 13, PX 20B (BB-PLTF-12335 to 122336, BB-PLTF-12340); see also Tr. 254-56.

Several of the properties are within or adjacent to the area subject to the Palmer Ranch Development of Regional Impact ("DRI") Code, which imposes obligations concerning traffic, road use, environmental implications, and permissible uses. Specifically, Florida law requires a large development, which "because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county," to have guidelines and standards for development, referred to as a DRI. Fla. Stat. § 380.06(1) (2011). A DRI provides benefits to landowners because it allows more flexibility in how the site is configured and can allow for denser development than would otherwise be permissible. Tr. 806-07. The Palmer Ranch DRI requires residential developments to be developed as planned unit developments -- areas "zoned for a single-community subdivision with flexible restrictions on residential, commercial, and public uses." Black's Law Dictionary 1268 (9th ed. 2009); see also Tr. 805-06.[4]

Chad Durrance, Plaintiffs' expert real estate appraiser, described Palmer Ranch as follows:

> The community is a master planned community, and the type of development for the most part is single family detached, single story for the most part. The market, the people that are buying there, are retired or golf course communities, gated, secured, that type of community. Suburban residential is how I'd refer to it, and it's rapidly developing out.

Tr. 239-40.[5] Developments within the Palmer Ranch DRI must comply with the Palmer Ranch

---

[4] Maps of the Palmer Ranch DRI area depicting 12 of the 13 subject properties can be found in Appendices A, the Northern Segment of Palmer Ranch DRI, and B, the Southern Segment of Palmer Ranch DRI .

[5] In the related matter McCann Holdings, Ltd. v. United States, No. 07-4261L, the Court admitted Mr. Durrance as an expert in the field of real estate appraisal in Sarasota County. The parties stipulated to Mr. Durrance's expertise in this case. Tr. 185. Mr. Durrance has been a real estate appraiser for over 20 years and has appraised over 1,000 properties, including properties in Sarasota County. He has testified in eminent domain proceedings approximately 12 times. McCann Holdings, Ltd. v. United States, No. 07-4261L, 2013 WL 3326646, at *6 n.6 (Fed. Cl. June 27, 2013).

Code and are subject to approval from the Palmer Ranch Planning and Architectural Review Board.  Tr. 991-96; DX 21 (BB-PLF-18050).

In 2003, Sarasota County changed its zoning laws to facilitate smart growth.  Tr. 775. Crystal Allred, Plaintiffs' expert on long-range planning and zoning in Sarasota County, who worked for Sarasota County for 24 years as a Project Manager and Project Planner, testified that to encourage smart growth, Sarasota County revised its comprehensive plan and issued an updated future land use map in 2004, establishing limits on the allowable development density for areas of the County.  Tr. 766; PX 11, PX 33.[6]  For example, residential areas were designated low-density (less than two dwelling units per acre), moderate-density (between two and five dwelling units per acre), medium-density (between five and nine dwelling units per acre), or high-density residential (between 9 and 13 dwelling units per acre).  PX 11.  Land was also categorized by zoning district, such as residential single family-1, with a maximum of 2.5 dwelling units per acre, or open use estate-1, with a maximum of one dwelling unit per five acres.  PX 36.  In assessing a rezoning petition, the County considered the future land use designation to be more important than the current zoning designation or district.  Tr. 791.  As such, if the property's future land use designation permitted development at a density greater than permitted under its current zoning designation, the County would likely permit rezoning to allow denser development, consistent with the future use designation in the comprehensive plan. See Tr. 792-97.

## Discussion

### Jurisdiction

The Tucker Act confers jurisdiction on this Court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2006).  Here, Plaintiff alleges a taking under the Fifth Amendment of the United States Constitution, which is a money-mandating provision.  Schooner Harbor Ventures, Inc. v. United States, 569 F.3d 1359, 1362 (Fed. Cir. 2009).

### Legal Standards Governing Just Compensation

Plaintiffs' property was taken when the railroad easement on Plaintiffs' land was

---

[6]  The Court admitted Ms. Allred as an expert in long-range planning and zoning in Sarasota County.  Tr. 766.  Ms. Allred is currently a public sector project planner for WilsonMiller Stantec.  Tr. 752, 758.  She holds a bachelor's degree in sociology and a master's degree in urban and regional planning from Florida State University.  Tr. 753; PX 32.  The subject of her Master's thesis was DRIs on the Florida coast.  Tr. 753-54.  Ms. Allred worked for the Sarasota County Planning Department for 24 years, where she was a Project Manager and a Project Planner.  PX 32.  While employed by the County, she worked on updating the comprehensive plan, amending zoning regulations, critical area plans, corridor plans, revitalization plans, and rezoning petitions.  Tr. 755-56.  Ms. Allred managed the County's division responsible for processing rezoning and special exception petitions.  Tr. 756.

converted to a recreational trail easement under the Rails to Trails Act. Rogers, 90 Fed. Cl. at 433. The Act preserves shrinking rail trackage by converting unused railroad rights-of-way to recreational trails. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5-6 (1990); see also 16 U.S.C. § 1241 et seq. (2006). In a rails-to-trails case, the imposition of a recreational trail creates a new easement for a new purpose across the landowner's property, which constitutes a taking entitling the landowners to just compensation. Preseault v. United States, 100 F.3d 1525, 1542-43 (Fed. Cir. 1996) (en banc). Under the Trails Act, through a process known as "railbanking," the government retains jurisdiction for possible future railroad use. Caldwell v. United States, 391 F.3d 1226, 1229 (Fed. Cir. 2004).

Just compensation should be carefully tailored to the circumstances of the case, and this determination typically requires expert testimony. The Court has discretion in adopting a methodology that awards a takings plaintiff just compensation. Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1369 (Fed. Cir. 2012); Washington Metro. Area Transit Auth. v. United States, 54 Fed. Cl. 20, 36 (2002) ("[I]n dealing with a thorny issue of valuation, it is for this court to 'synthesize in its mind . . . the record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence . . . .'") (alteration in original) (quoting United States v. N. Paiute Nation, 183 Ct. Cl. 321, 346 (1968)). The landowner "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." Olson v. United States, 292 U.S. 246, 255 (1934); see also Kimball Laundry Co. v. United States, 338 U.S. 1, 20 (1949).

"Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'" Otay Mesa, 670 F.3d at 1364 (quoting United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961)). In addition to the value of the property actually taken, just compensation includes severance damages -- the diminution in value in the owner's remaining property resulting from the taking. United States v. Miller, 317 U.S. 369, 376 (1943) ("If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract."); see generally United States v. Grizzard, 219 U.S. 180, 185 (1911) ("When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account."). Plaintiff has the burden of proof with respect to severance damages and must offer evidence that the remainder lost market value. Miller v. United States, 223 Ct. Cl. 352, 383-84 (1980); see also Hendler v. United States, 175 F.3d 1374, 1383 (Fed. Cir. 1999); United States v. Honolulu Plantation Co., 182 F.2d 172, 179 (9th Cir. 1950).

The cost to cure -- or the cost of mitigating damages caused by the taking -- provides an alternative means of quantifying severance damages. It is well established that "[w]hen the cost of curing the injury to the remainder is less than the outright diminution in its value uncured, the government may pay the cost of cure." United States v. 2.33 Acres of Land, 704 F.2d 728, 730 (4th Cir. 1983) (citing United States v. Dickinson, 152 F.2d 865, 870 (4th Cir. 1946), aff'd, 331 U.S. 745 (1947)). As the author of one treatise explained:

It must be cautioned that the cost to cure, while admissible for the purpose of establishing just compensation, does not create individual rights to damages. Rather, it is merely evidence of the effect of the taking on market value, and

therefore on diminution in value of the remainder. The cost to cure approach is available only to the extent that the actual cost to cure is less than or equal to the diminution in value of the remainder, such that evidence of the cost to cure is admissible only when the cost to cure is no greater than the diminution in value of the remainder if the condition is left uncured.

4A Julius L. Sackman, Nichols on Eminent Domain § 14A.04[2][a] (rev. 3d ed. 2013) (footnotes omitted).

## Appraisals of the Subject Properties

The parties retained appraisers to value the subject properties before and after the taking. Both appraisers properly used April 2, 2004, the date of the Notice of Interim Trail Use, as the date of the taking. Rogers, 90 Fed. Cl. at 428. However, the appraisers disagreed on their appraisals of nine of Plaintiffs' properties and certain methodologies and appraisal principles.[7]

Chad Durrance appraised the subject properties for Plaintiffs using a qualitative comparable sales analysis and assuming that zoning changes were reasonably probable. In contrast, John Underwood, Defendant's expert, appraised the subject properties using a quantitative comparable sales analysis, and applying the zoning and use restrictions in effect on the date of the taking.[8] Mr. Underwood also applied a large-lot discount to the prices of large properties.

## The Experts' Methodologies

### Quantitative Versus Qualitative Comparable Sales Analysis

In a comparable sales analysis, the appraiser identifies sales of similar properties in a given market. There are two types of comparable sales analysis: quantitative and qualitative. In a quantitative analysis, the appraiser makes numerical adjustments based on the component parts of a property. In a qualitative analysis, the appraiser compares properties without making numerical adjustments. The appraiser evaluates the comparable properties, deems each property similar or dissimilar to the subject property with respect to specific factors, assigns each property an overall rating, and then ranks the properties based on the similarities. Tr. 1465-66, 668-69.

Defendant, citing the Uniform Standards for Federal Land Acquisition, also known as the

---

[7] The appraisers agreed on the valuation of the Glueck property at $200,000 per acre, and for three properties, Childers, Marlin, and JMC, Plaintiffs' appraiser valued the properties lower than Defendant's expert. Based on the record as a whole, the Court accepts Plaintiffs' valuations for the Childers, Marlin, and JMC properties.

[8] The Court admitted Mr. Underwood as an expert in real estate appraisal in Sarasota County in McCann Holdings, Ltd. v. United States. The parties stipulated to Mr. Underwood's expertise in this case. Tr. 1437. Mr. Underwood has been a real estate appraiser for over 30 years and has been qualified as an expert witness in federal court approximately 50 times. McCann Holdings, 2013 WL 3326646, at *8 n.13 (Fed. Cl. June 27, 2013).

"Yellow Book," argues that Mr. Durrance's appraisals are flawed because he performed qualitative analyses. The Yellow Book states: "[o]nly when adequate market data does not exist with which to support quantitative adjustments should the appraiser resort to qualitative adjustments (i.e., inferior, superior)." Uniform Standards for Federal Land Acquisition 21 (The Appraisal Institute, 5th ed. 2000).[9]   Mr. Durrance testified as to why he used the qualitative approach:

> If I have a reason for a percentage adjustment or some kind of basis for it, sure, you can do that.  But again, real quickly, what an appraiser -- what I'm trying to do is to mimic the market, how would the market react. And the market does not walk around with a clipboard and a summary chart like this and put minus 15 plus 20 is how this property stacks up to this property.  They look at all the available comparable properties, and what it is they want to buy or sell, and say, how does this property stack up to the others.

Tr. 455.

Dr. Kilpatrick, Plaintiffs' expert in appraisal practice standards and methodology, opined that the qualitative approach was superior here because Plaintiffs' properties were large tracts with "multiple interlocking complex attributes, and it would be overly judgmental of an appraiser to try to separate those attributes out and give a marginal value to each one of them."  Tr. 669-70.[10]  Dr. Kilpatrick further testified that quantitative comparable sales analyses are appropriate for appraising detached single-family properties.  Tr. 670.

The Court concludes that for the most part Mr. Durrance's qualitative analysis was more persuasive, because he provided a more compelling analysis regarding how the pertinent features

---

[9]  The Uniform Standards for Federal Land Acquisition is produced by the federal government and is intended to provide "general principles applicable to the appraisal of property for federal land acquisitions by both voluntary means and condemnation." Uniform Standards for Federal Land Acquisition 1.  The Uniform Standards of Federal Land Acquisition was originally published in 1971, the fifth edition was published in 2000, and portions of the book are in the record as Defendant's Exhibits 58, 59, and 60 and Plaintiffs' Exhibit 50.

[10]  The Court admitted Dr. Kilpatrick as an expert in appraisal practice, appraisal standards, and appraisal methodology.  Tr. 656.  He is the president and CEO of Greenfield Advisers, which provides expert testimony, high-amenity property appraisal, and wealth management services.  Tr. 647-48.  Dr. Kilpatrick holds an undergraduate degree in accounting, a master's degree in business administration with a concentration in real estate economics, and a doctorate in real estate finance from the University of South Carolina.  Tr. 643.  Dr. Kilpatrick is a licensed real estate appraiser in Florida and 25 other states.  Tr. 644.  He is a certified national appraisal standards instructor and teaches appraisal methods.  Tr. 645.  He has authored four books and over 100 articles and papers.  Tr. 646.

of a property would affect the price a buyer was willing to pay.[11]   Plaintiffs' expert better assessed features a knowledgeable buyer would consider, such as allowable density, the presence of environmental lands, and the impact of easements or encumbrances.  Mr. Durrance also better accounted for market conditions by using the contract date, rather than the closing date of a given property sale.  In contrast, Mr. Underwood's quantitative approach did not as thoroughly address important considerations such as development restrictions, particular land use restrictions, and features that impose additional costs, and he used only the closing date for most sales.  Additionally, the experts appraised Plaintiffs' properties as vacant, with residential and/or mixed-use development as the highest and best use.  As Dr. Kilpatrick testified, the qualitative approach is preferred for vacant properties while a quantitative approach is better for detached single-family properties.  Tr. 669-70.

## Appraisal Principles

### The Propriety of Applying a Large-Lot Discount

Defendant's appraiser, Mr. Underwood, adjusted the price per acre of the comparable properties for size.  Specifically, he decreased a property's per-acre price by 20% per 100 acres, and applied this adjustment to properties with sizes of up to 200 acres.  Mr. Underwood applied a large-lot adjustment to the comparable properties used in appraising six of Plaintiffs' properties, as follows:

| Property | Size of Property as Appraised | Adjustment Applied to Comparable Properties |
| --- | --- | --- |
| Calusa Lakes | 138.75 acres | -25 to 10% |
| Palmer Ranch | 123.442 acres | -20 to 15% |
| JMC | 229.427 acres | -35 to 0% |
| Mission Valley | 175.165 acres | -30 to 5% |
| TPC | 201.903 acres | -35 to 0% |
| Stoneybrook | 123.322 acres | -20 to 15% |

Mr. Underwood testified that the adjustments were necessary because as acreage increases, the price per acre decreases.  Tr. 1484.  To determine the appropriate adjustment, Mr. Underwood used paired sales analyses of four properties, ranging from 20.80 to 199.44 acres. Tr. 1485-86; DX 50 (US-BB001690).  Based on these properties, Mr. Underwood determined that a 100-acre difference in size resulted in a difference in price per acre ranging from 16.1 to 21.6%.  DX 50 (US-BB001692).  Mr. Underwood looked at sales of large properties in Manatee County and concluded that a 100-acre difference in size correlated with a difference in price of 24 to 32%.  He also considered sales of large and small properties in southern Sarasota County and found the difference in size correlated with a 19% difference in price per acre.  Tr. 1487-88.

Mr. Underwood acknowledged that southern Sarasota County and Manatee County were

---

[11]   The exception is the Davids property where the Court found Mr. Underwood's comparative analysis and valuation more persuasive because he focused on a comparable sale that was more similar to the subject property than any of Mr. Durrance's comparables.

different markets than the market in which the subject properties are located. Tr. 1487-88. Nonetheless, based on these analyses, Mr. Underwood concluded that for up to 200 acres, a 100-acre difference in size required a 20% adjustment. Tr. 1489-1490. He did not apply an adjustment for properties over 200 acres, finding that 200 acres was the "break point" because developers paid the same price per acre for a 210-acre property as they did for a 275-acre property. Tr. 1489-90. Mr. Underwood also made an adjustment for parcels ranging from 10 to 20 acres, which he derived using the same type of analysis, but the adjustment was smaller -- five percent. Tr. 1491; DX 50 (US BB001838).

Plaintiffs' experts disagreed with Mr. Underwood's size adjustment. Mr. Durrance agreed that a size adjustment is appropriate in some cases, such as where there is an abundance of large tracts. However, in the subject market there were few large tracts of land, and developers have purchased smaller parcels and put them together to create larger developments. Tr. 241. Mr. Durrance testified that a large lot offers flexibility:

> [I]f you have a tract of land and there's a significant difference and the market is paying significantly higher prices, well then you're going to cut off a chunk of your land and sell it in a smaller chunk. So the larger parcel gives you the ability to do that or keep it together and develop it as one overall planned development. I mean, it gives you flexibility.

Tr. 241. In a similar vein, Dr. Kilpatrick opined:

> I can tell you that in terms of large tracts of development land here in the suburbs of Sarasota, I don't see the rationale for a discount. And the simple fact is, there are enormous economies of scale associated with larger subdivisions.

> In other words, it's frankly easier on a per-house basis to develop a hundred acre tract than a 20 acre tract. And there are plenty of potential buyers out there for hundred acre tracts.

Tr. 672.

> Dr. Kilpatrick also disputed the numerical adjustment Mr. Underwood applied, testifying:

> I couldn't find what I thought was good support for it. It's sort of a step variable thing whereas he says if it's over, and I can't remember the exact arbitrary limits, but if it's over 20 acres, he's just going to discount it 10 percent.

> If it's over 50 acres, he's going to discount it 25 percent. If it's over 100 acres, he's going to discount it 30 percent or something like that, and that seems to be just sort of a personally developed model. As I testified a little earlier, I don't see, as an appraiser, the rationale for size discount model in suburban Sarasota County, and I know both of these appraisers are from Florida.

Tr. 694-95.

Mr. Underwood's broad application of rather substantial large-lot discounts does not take into account the factual circumstances under which Plaintiffs' properties could have been sold.

See e.g., N. Paiute Nation, 183 Ct. Cl. at 346 (recognizing that the trial court is charged with assessing whether a valuation amount is "supported by all the evidence."). Here, there is no evidence that Plaintiffs would have been restricted to selling their large lots in one transaction or as one parcel, as Mr. Underwood conceded. Tr. 1642; see also Tr. 241, 672, 694-98. Moreover, it is settled law that land should be appraised at its highest and best use. Olson, 292 U.S. at 255 ("The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable."); see also Snowbank Enters., Inc. v. United States, 6 Cl. Ct. 476, 484 (1984) ("Any and all factors, which would cause a reasonable seller to ask a higher sale price for the property and which would induce a reasonable buyer to pay a higher sale price for the property, should be considered."). As such, the Court finds that Mr. Underwood's large-lot discounts were unwarranted here.

### The Propriety of Considering Use Restrictions

The parties disagree about whether the appraisers should have considered use restrictions that applied to Plaintiffs' properties on the date of valuation, April 2, 2004, which affected their development potential or the highest and best use. Mr. Durrance did not consider any public or private deed restrictions when he appraised the subject properties. Neither did Mr. Underwood when he initially appraised the properties in mid-2010, and 2011. See DX 52A (US-BB002957) (appraisal report for TPC Prestancia dated July 1, 2010); DX 53A (US-BB002677) (appraisal report for Stoneybrook dated June 29, 2010), DX 54A (US-BB003358) (appraisal report for Arielle dated December 30, 2011), DX 55A (US-BB003274) (appraisal report for Pine Ranch East dated December 30, 2011), DX 56A (US-BB002586) (appraisal report for Calusa Lakes dated June 29, 2010). However, in February 2012, Defendant's trial attorney sent Mr. Underwood the following legal instruction:

> Consistent with the Uniform Appraisal Standards for Federal Land Acquisition, and in particular Section B-23, I instruct you to consider each of the subject properties in its condition and situation at the time of the alleged taking, including any zoning and use restrictions applicable to each specific property. Zoning ordinances and use restrictions are of critical importance because they may restrict the uses to which the property may be lawfully devoted.

DX 49 (US-BB001637).

After receiving the instruction and re-reviewing his original appraisal reports, Mr. Underwood issued another set of appraisal reports, concluding that the highest and best use for six of the properties changed because of counsel's instruction. Tr. 1461-62. Specifically, Mr. Underwood determined that five properties were subject to open space restrictions that precluded residential development and that a sixth property could not be developed because it was subject to a private deed restriction, as listed below:

1. The plat for Pine Ranch East designated certain land as open space. PX 41; DX 3;

2. For Arielle, environmentally sensitive lands were set aside for preservation in the ordinance approving the development. See DX 18 (US-RB007502), DX 19 (US-

RB006161);

3. For Calusa Lakes, the plats and the covenants, conditions, and restrictions for the development designated land as open space, a drainage area, and a wetland preserve and stated that the provisions would "bind the TOTAL LANDS of CALUSA LAKES . . . for a term of ninety-nine (99) years from the date this COMMUNITY DECLARATION is recorded." DX 36 (US-PR000151 to 000152, US-PR000173);

4. For Stoneybrook, the ordinance approving the development required that common areas be set aside as open space for 99 years, and the covenants, conditions, and restrictions for the development designated a portion of the common areas for a golf course. DX 29 (US-RB006630);

5. For TPC, the resolution approving the development required that land be set aside as parks and a golf course for 99 years, and the covenants, conditions, and restrictions for the development designated lands to be used accordingly. DX 30 (BB-PLTF-15879), DX 31 (BB-PLTF-15809 to 15810);

6. Mission Valley may have been subject to a private deed restriction, requiring that the property be used for a golf and country club complex. PX 6.

Mr. Underwood concluded that land without development potential sold for 15% of the price of similar developable land -- or 85% less -- and decreased his original valuation of five properties. Tr. 1498. The amount of the reduction ranged from $114,700 to $24,275,700 per property. PX 49. In all, the total decrease that resulted from applying the use restrictions was $92,676,400. PX 49.

Mr. Underwood acknowledged that originally he did not consider use restrictions because he followed the unit rule, stating:

And to begin with, I had valued all six of them just like the other seven under the unit rule, fee simple, assuming they could be put to the highest and best use based on the comprehensive plan. And my conclusion was residential development.

Tr. 1462. Under the "unit rule" referenced by Mr. Underwood, an appraiser does not consider partial or fractional ownership interests. Instead, the appraiser appraises the property as one undivided fee that is owned and controlled by a single interest. The Yellow Book explains the unit rule:

[T]he unit rule requires that property be valued as a whole rather than by the sum of the values of the various interests into which it may have been carved, such as lessor and lessee, life tenant and remainderman, and mortgagor and mortgagee, etc. This is an application of the principle that it is the property, not the various interests, that is being acquired. Many cases illustrate the unit rule, thus, if there are several interests or estates in the property, the property should be valued as a whole, embracing all of the rights, estates, and interests of all who may claim, and as if in one ownership. The market value of the whole property is later

15

apportioned among those who hold various interests in the property, but this apportionment generally falls outside the scope of the government appraiser's assignment.

DX 58 (Uniform Standards for Federal Land Acquisition 53-54 (footnote omitted).   As the author of one treatise explains:

> The unit rule requires that real estate be valued in respect to its gross value as a single entity as if there was only one owner.   There are two aspects to the unit rule: (1) there can be no separate valuation of improvements or natural attributes of the land; and (2) the manner in which the land is owned or the number of owners should not affect the value of the land. The unit rule is designed to protect the condemnor.

4 Nichols on Eminent Domain § 13.01[16] (footnotes omitted).   The unit rule was the primary reason Mr. Durrance did not consider use restrictions in appraising these six properties.   Tr. 383.

Mr. Underwood testified that the restrictions affecting Plaintiffs' properties were easements appurtenant and therefore an exception to the unit rule.   Tr. 1464.   An easement appurtenant is "[a]n easement created to benefit another tract of land, the use of easement being incident to the ownership of that other tract."   Black's Law Dictionary 586 (9th ed. 2009).   However, Mr. Underwood did not explain why the public and private use restrictions on Plaintiffs' properties constituted easements appurtenant or why they should be analyzed as exceptions to the unit rule.   Defendant did not present any testimony, documentary evidence, or legal authority supporting Mr. Underwood's conclusion that the use restrictions on Plaintiffs' properties were exceptions to the unit rule.

Mr. Underwood further testified he would not have rewritten the appraisal reports if he had not received the legal instruction from Defendant's counsel:

> Q      And then you testified that between December of 2011 and February at some point 2012 for six of the properties you rewrote the appraisal reports in response to Mr. Larson's letter of instruction, is that correct?
>
> A      It's a legal instruction, that's correct.
>
> Q      And apart from Mr. Larson's legal instruction would you have rewritten those appraisal reports?
>
> A      No, sir.

Tr. 1611.

In the view of Dr. Kilpatrick, Plaintiffs' expert in appraisal practice standards and methodology, Mr. Underwood's revision of his initial appraisal reports was flawed because there can only be one unique market value for a given property, and counsel's instruction did not alter the market value Mr. Underwood initially derived.   Tr. 1698-1701.   However, as Mr. Underwood acknowledged, he applied these use restrictions not because he believed them to be mandated as

a matter of appraisal methodology, but as a matter of law. Tr. 1616-18 ("[I]t takes me to is there a deed restriction in place which I guess might be a legal question." Tr. 1618). As such, the Court addresses Mr. Underwood's revised appraisals, turning first to the private deed restriction.

### <u>The Efficacy of a Private Deed Restriction</u>

Mission Valley Golf and Country Club is a private country club that owns a 174.716-acre property ("Mission Valley"), with an 18-hole golf course, clubhouse, and maintenance buildings in Sarasota County. Tr. 118, 1473; PX 24B (BB-PLTF-11835 to 11836); Joint Status Report, Oct. 19, 2012. In 2004, there was no residential development on the property. <u>See</u> PX 24B (BB-PLTF-11829). Mission Valley is west of Calusa Lakes and north of Mission Valley Estates, two residential developments. Tr. 119-20. In 2004, the property was zoned open use estate-1, and designated moderate-density residential under the comprehensive plan, allowing development at two to five units per acre. PX 24B (BB-PLTF-11833).

The parties dispute whether Mission Valley was subject to a private deed restriction that would have prohibited development of the golf course on the date of the taking. In 1969, Louise C. Ewing conveyed 143 acres of property to Mission Valley Golf and Country Club, and the deed provided:

> Grantee shall not use said property for any purpose other than recreational purposes, it being understood between the parties hereto that the use of the land shall be for a golf and country club complex and other similar recreational purposes.

> No housing or similar type of development shall be permitted by grantee on the property herein described.

PX 6. On January 6, 1992, the Circuit Court for Sarasota County issued an Amended Final Judgment in <u>Ewing v. Mission Valley Golf & Country Club, Inc.</u>, Case No. 90-1580-CA-01, which addressed the deed restriction. The judgment stated in relevant part:

> 2.   The parties entered into a binding contract through protracted negotiations whereby $100,000.00 was to be paid to Edward J. Ewing as personal representative of the Estate of Louis C. Ewing. Four honorary memberships were to be given to Ewing, and, in return, Ewing was to execute a deed releasing the estate interest in the property.

> * * *

> 5.   Upon defendant's full performance under this Amended Final Judgment, plaintiff shall execute and deliver a deed to defendant releasing the estate's interest in the property.

PX 7.

> On December 9, 1994, a quitclaim deed was executed, which provided:

> By this Deed, Grantor intends to release all rights with respect to the property described above, including without limitation any right Grantor may have had to

repurchase the property and all other rights of grantor, its successors and assigns, arising under that certain Deed dated May 9, 1969, from Louise C. Ewing to Grantee, recorded in O.R. Book 844, at page 709. . . .

PX 8.  However, this quitclaim deed was not recorded until February 24, 2012, over seven years after the taking.  Tr. 133; PX 8.

Plaintiffs contend that Sarasota County would not have considered any private deed restrictions in acting on a rezoning petition if a developer sought to rezone Mission Valley's golf course for residential development as of the date of the taking in April, 2004.  Pls.' Post-Trial Br. 103-04.  Pursuant to the unit rule, Mr. Durrance did not appraise Mission Valley as subject to this private deed restriction, explaining:

> Q    And in terms of this specific property, were you aware that it was encumbered by, at one point in time, a deed restriction?
>
> A    Yes, sir.
>
> Q    And so that would be something that you had in your work files and you considered when you derived your opinion as to the value of this property?
>
> A    That is correct.
>
> Q    Was it your understanding that this property was still encumbered by that deed restriction in April 2004?
>
> A    No.  My understanding is it was not.
>
> Q    And even if it had been encumbered by the deed restriction, how would a deed restriction that limited the development of the property to only a golf course, how would that have [a]ffected your appraisal?
>
> A    Well, as a private restriction in that manner, you'd go back to the unit rule or the undivided fee, and if you have two private parties with an interest in it, appraise the undivided fee, and if one interest hold[s] X percent of the value, and the other private interest holds the remaining percent of the value, well that's a matter that can be apportioned at a later date, but the undivided fee as a vacant and available to be put to its highest and best use is the methodology that I followed.

Tr. 382-83.

In valuing Mission Valley in April 2004, Mr. Durrance opined that residential development would have been the highest and best use.  Tr. 382-84.  Dr. Kilpatrick agreed with Mr. Durrance, testifying:

> Q    And you've heard the testimony in this case about the Mission Valley Country Club, is that correct?

18

> A        Yes.

> Q        And there was testimony about an original deed restriction in 1969. Do you recall that testimony?

> A        I do.

> Q        And then you recall the testimony with some exhibits where that was released in 1992 and 1994?

> A        I do, and it's a two-part problem.  I mean, (1) there's evidence that I've seen that the deed restriction was no longer valid, enforced or a matter to be of interest to us, which then raises the question why did he consider it in the first place.  I mean, it's just a total red herring; and (2) even if I had never seen the release, the unit rule tells me I'm supposed to ignore it because it's not part of the thing to be considered here.

> The original deed restriction simply constituted in effect, from an appraisal perspective, an easement on the property, which is to be ignored for purposes of determining the damage according to the take.

Tr. 710-11.

Mr. Underwood himself in his initial appraisal had considered the deed restriction, and that restriction did not affect his original valuation.  Tr. 1617.  With respect to Mission Valley, Mr. Underwood testified:

> Q        So apart from [counsel's] letter you would not have looked at a use restriction when you valued Mission Valley property, is that correct?

> A        That's correct.  In the original report I specifically stated that there was a deed restriction in place that restricted its use to a golf course, but that I was not looking at that private restriction in my valuation.

Tr. 1617-18.   Additionally, Ms. Allred credibly testified that the County does not consider private deed restrictions in considering a rezoning petition, and a private deed restriction would not have affected a landowner's ability to rezone a property.  Tr. 802-03.

Richard Bass, Defendant's expert in land use planning, testified that the County would have considered the deed restriction because the restriction affected whether the owner had unified control of the property.  Tr. 1224-26.[12]   Specifically, Mr. Bass opined that an heir to the

---

[12] The Court admitted Mr. Bass as an expert in land use planning.  Tr. 1069.  Mr. Bass is a consultant with Bass & Associates, Inc.  PX 45.  He is also a special hearing magistrate for the Value Adjustment Board of Sarasota County, where he hears appeals from property owners concerning property tax assessments.  Tr. 1035.  Mr. Bass holds a bachelor's degree in urban planning and environmental management from Florida International University.  Tr. 1028.  He previously worked at the Dade County Planning Department and as a consultant with a firm that provided land planning services for localities without internal planning departments.  Tr. 1031.

Ewing family estate or a landowner with property abutting the golf course could have sued to enforce the restriction in the 1969 deed.  Tr. 1229-30.[13]  However, Mr. Bass testified that when he initially gathered information about Mission Valley in 2010, at Mr. Underwood's request, he had obtained a report that stated Mission Valley could be developed with 344.6 units, and he believed the report contained true and accurate information.  Tr. 1272-74.  Jerry Gray, the planning director of Sarasota County from 1983-2003, provided Mr. Bass with the report.  Tr. 1270-71.

The Court concludes that Mission Valley should be appraised without the deed restriction.  Defendant has not established that the deed restriction encumbered the property in a way that would have affected the valuation of the property in 2004.  Defendant's reliance on the deed restriction ignores both the unit rule and the County's practice in rezoning.  Under the unit rule, as mandated by the Yellow Book and other appraisal authorities, the appraiser must assume unified control and ownership without competing partial interests, such as a third party who might seek to enforce the 1969 Ewing restriction.  See Tr. 382-83, 709-11.  Further, the Court credits Ms. Allred's testimony that the County would not have considered a private deed restriction if a landowner submitted an application to rezone the property.  Tr. 802-03; see also Tr. 1281-82.  Mr. Durrance and Dr. Kilpatrick articulated persuasive opinions that the unit rule required an appraiser to ignore the private deed restriction in valuing the property.  Both Mr. Bass and Mr. Underwood, Defendant's experts, fully aware of the deed restriction, initially appraised Mission Valley applying the unit rule and concluded that the deed restriction had no impact on the property's valuation.  Tr. 1617, 1272-74.  As such, the Court finds that Plaintiffs' expert appropriately valued Mission Valley ignoring the deed restriction.

### **Public Use Restrictions and the Ability to Rezone Property in Sarasota County in 2004**

Five of Plaintiffs' properties were subject to public use restrictions limiting development, and changing such a restriction would have required a rezoning of the property.  For three of the properties, the covenants, conditions, and restrictions governing the development would also have needed to be changed.  Whether these five properties should be appraised giving effect to the use restrictions depends on whether the properties could have been rezoned and whether the governing covenants, conditions, and restrictions could have been amended.  See Tr. 802-04, 1042-43, 1075-78.

---

Mr. Bass drafted comprehensive plans and zoning regulations for small governments in Florida.  Tr. 1031-33.  Mr. Bass has assisted landowners in preparing and filing rezoning petitions in Sarasota County.  Tr. 1038-40.  Mr. Bass is a member of the American Institute of Certified Planners.  PX 45.  He has testified in federal and state courts as an expert in land use planning and zoning.  PX 45.

[13] However, in his appraisal report, which was filed in conjunction with Plaintiffs' motion in limine, Mr. Bass referenced the restriction but did not mention the potential of anyone suing to enforce the restriction.  He concluded that rezoning was not reasonably probable but did not articulate the reasons for this opinion.

## Rezoning

Sarasota County's zoning regulations limited the density of development allowed on a property on a per-acre basis. For example, a parcel designated residential single-family-2 was permitted 3.5 dwelling units per acre. Tr. 781. All acreage over which the owner had control was considered for purposes of calculating permitted density, such as wetlands within the property, but land under a county road or a recreational trail was not considered. Tr. 781-82. Additionally, the County's comprehensive plan established future land use designations that set forth density classifications. Tr. 795; PX 36. Dr. Kilpatrick explained that a comprehensive plan "is a longer term view of where the jurisdiction wants land in this area to go," that typically takes into account demographic changes, and the anticipated need for schools, roads, shopping centers, offices, warehouses, and hospitals. Tr. 664. Density permitted under a property's zoning district could not exceed the density allowed by its future land use designation in the comprehensive plan. Tr. 796-97.

A landowner could petition to change his property's zoning designation or to replat the property. Ms. Allred testified that it was a routine process to rezone properties so that their zoning district better comported with the comprehensive plan -- for example, changing a property zoned open use estate-1 to residential single-family- 1, 2, 3, or 4. She testified:

> When Sarasota County [officials] adopted their future land use map, they didn't simultaneously rezone all those properties to be consistent. It was anticipated that property owners would come and rezone when they had, you know, everything, the infrastructure, and a willing seller, yes.

Tr. 799-800. If a zoning change petition was denied, the landowner could file another petition one year later, and the Board frequently waived this one-year requirement. Tr. 789. Ms. Allred credibly testified that Sarasota County processed approximately 80 rezoning petitions in 2004, and approved 80 to 90% of them. Tr. 791.

The County's zoning regulations required large developments to set aside some areas as open space. Tr. 773-76; DX 15. The regulations in effect in 2004, when the taking occurred provided that urban planned unit developments required a minimum of 30% open space. DX 15 (Sarasota County Code § 6.11.1). Habitat preservation areas, wetlands, buffering zones, and golf courses all qualified as open space. Tr. 778-80.

Defendant argues that Pine Ranch East, Arielle, Calusa Lakes, Stoneybrook, and TPC-Prestancia were subject to a 99-year open space restriction under the Sarasota County Zoning Code, DX 15 (Sarasota County Code § 6.11.1), and that Calusa Lakes, Stoneybrook, and TPC-Prestancia were subject to 99-year open space restrictions under the covenants, conditions, and restrictions governing the developments. For example, the covenants, conditions, and restrictions for Stoneybrook provided:

> 16.1 Duration of Covenants. The covenants, conditions, easements and restrictions in this declaration shall run with and bind the property within the community and shall inure to the benefit of and be enforceable by the county, the community association, the declarant and any owner, their representative, legal representative, heirs, successors and assigns for a period to expire on the 99th

anniversary of the date of recording of the master declaration in the public records of Sarasota County, Florida.

DX 29 (US-RB006643); see also DX 28 (US-RB006589), DX 31 (BB-PLTF-15830 to 15831), DX 37 (US-PR000174).   Ms. Allred testified that the 99-year open space requirement was intended to apply to habitat preservation areas -- not golf courses or parks -- and that is how it has been implemented.  Tr. 780.

As Dr. Kilpatrick testified, when a property is subject to a zoning or use restriction on the date of the taking, the appraiser must determine whether a change in that restriction would be reasonably probable.  Tr. 662-63.  In Dr. Kilpatrick's view, it would be appropriate for an appraiser to assume that a property could be rezoned consistent with Sarasota County's comprehensive plan.  Tr. 667.

Dr. Kilpatrick testified that in appraising the properties with the zoning or use restriction in place, Mr. Underwood did not appraise the properties at their highest and best use.  Tr. 709.  Additionally, Dr. Kilpatrick characterized the 99-year requirement as arbitrary and criticized Mr. Underwood for assuming that it limited development, testifying that "as an appraiser, to presume that 99 years is etched in stone tablets is simply fallacious.  There's absolutely no support for that in the empirical reality in which we live."  Tr. 716-17.

Defendant's expert in land use planning, Mr. Bass, testified that the County had a policy of preserving open space once it had been set aside and would not have ignored open space restrictions that had been recorded with the County via the filing of plats or covenants, conditions, and restrictions.  Tr. 1255, 1176-95 (discussing the ordinance that authorized development of Stoneybrook and the associated open space restrictions);[14] see also Tr. 1197-1223 (discussing the incremental development order and declaration of covenants, conditions, and restrictions that applied to TPC-Prestancia and designated areas as open space).

However, Mr. Bass also acknowledged that a property subject to a 99-year open use restriction in a zoning ordinance, such as Stoneybrook, could be rezoned if there was unified control over the property:

> Q    Now, the 99 year restriction you were referencing was found in documents related to a 1989 rezoning petition.  Is that correct?

> A    I'd have to review it, but I believe in Stoneybrook it was in the documents.

> * * *

> Q    So is it your view that this property would be restricted and could not be developed for anything or rezoned for another use until 2088?

---

[14] In this context, the ordinance is not a generally applicable ordinance.  Rather, the ordinance was specific to Stoneybrook, enacted in response to a rezoning petition for Stoneybrook.  See DX 27.

A      Again, I think my responses related to unified control and ownership in order to file a rezone, so whatever year that they could gain unified control and ownership to file a rezone.

Q      But that 99 year restriction is still in the record, isn't it?

A      It is.

Q      Well, how would I go about getting rid of it?

A      Gain unified control and ownership of the acreage that was rezoned under that rezone petition by legal description.  Once you've gained unified control and ownership you can then proceed to file a rezone.

Q      When you're saying unified control and ownership, what do I need to do to obtain unified control and ownership?

A      I need to own all of the property, have unified control of the property I wish to rezone.  If it's Stoneybrook then it's the entirety of Stoneybrook that was previously rezoned.

* * *

Q      So we assume all the lot owners would have a common interest in this property, correct?  That's your understanding?

A      Yes.

Q      So we assume all the lot owners basically were members of the corporation that owned the legal title of this property?  Is that correct?

A      Yes.

Q      Okay.  If we assume that they all agreed to let us try to rezone 4.5 acres of our property so we can sell it for residential use and use the money for our association, if you accept that assumption would that then allow this to be rezoned?

A      Allow what to be rezoned?

Q      The property so that we could take a portion of this land in Stoneybrook and rezone it for residential development.

A      Okay.  Under your hypothesis what we'd have to do is file a corrected deed in order to include the new acreage, file a rezone petition for the entirety of the new legal description to bring in this land to make it consistent with the zoning, the special exception or the conditions that are applicable in the current time, 2004, and proceed through the rezoning process.

Q      And assume we did proceed through that process.  Would that then allow this property to be rezoned for residential development or a portion of it?

> A      Under your hypothetical condition, yes.

Tr. 1288-91.

Plaintiffs argue the five properties should be appraised without use restrictions because there was a reasonable probability the County would rezone the properties to allow for denser development.  Defendant contends that the five properties should be appraised with use restrictions, claiming that Plaintiffs confuse rezoning a property with removing a use restriction, and arguing that Plaintiffs did not prove there was a reasonable probability that the restrictions would be changed.

Contrary to Defendant's assertions, the removal of a use restriction can be achieved by rezoning a property.  The use restrictions governing Plaintiffs' properties in 2004 were set forth in the instruments authorizing development on each property.  Rezoning a property would create a new ordinance, resolution, or incremental development order, which would replace the prior instrument authorizing the development that contained the use restriction, and the property would no longer be subject to the open space restriction.  Tr. 1288-91.[15]  As Mr. Bass, Defendant's expert, testified, the restriction could be removed by filing a corrected deed, filing a rezoning petition, and proceeding through the rezoning process.  Tr. 1288-91.  Thus, removing a use restriction could be accomplished through the rezoning process.

Defendant further argues that the unit rule, by ignoring use restrictions, would conflict with the appraiser's obligation to value the property as it existed on the date of taking.  Def.'s Post-Trial Reply Mem. 8-9.   However, it is well settled that valuation of a property on the date of the taking should take into account a reasonably probable future use.  A property owner is entitled to the fair market value of the property based on its highest and best use.  A property's highest and best use is not limited to its use on the date of the taking.  As the Supreme Court stated: "[t]he rule is well settled that, in condemnation cases, the most profitable use to which the land can probably be put in the reasonably near future may be shown and considered as bearing upon the market value. . . ."  McCandless v. United States, 298 U.S. 342, 345 (1936) (citing Olson, 292 U.S. at 255-56); see also Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 156 (1990), aff'd, 28 F.3d 1171 (Fed. Cir. 1994) (The highest and best use "is defined by the industry as, '[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.'") (quoting The Appraisal of Real Estate 269 (9th ed. 1987))).  Further, a property can be appraised using a proposed use when there is "a showing of reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future." Bd. of Cnty. Supervisors v. United States, 276 F. 3d 1359, 1365 (Fed. Cir. 2002).  Consideration of a future use is particularly appropriate here as Ms. Allred testified that rezoning consistent with Sarasota's comprehensive plan was

---

[15]   The Sarasota County Code's 99-year provision depended upon the instrument governing the development.  Section 6.11(a)(3) provided: "[l]ands designated as open space shall be restricted by appropriate legal instrument satisfactory to an attorney designated by the Board of County Commissioners, as open space in perpetuity, or for a period of not less than 99 years." DX 15.  As such, the 99-year requirement would not be in effect if the instrument containing that requirement were superseded by rezoning.

probable and occurred routinely.

In sum, Plaintiffs have established there was a reasonable probability that the properties subject to use restrictions could be rezoned for residential development if the use restrictions were not intended to preserve habitats. Ms. Allred credibly testified that when Sarasota County reviews a rezoning application, it considers the property's future land use designation and current zoning district and gives more weight to the future land use designation. Tr. 791. Defendant's expert, Mr. Underwood, concurred that the County's primary concern is the property's future land use designation in the County's comprehensive plan, stating that "[a] zoning change conforming to the [future land use designations] is automatic." DX 54 (US-BB003629) (appraisal of Pulte); see also DX 50 (US-BB001680 to 001681) (appraisal of Mission Valley); DX 55 (US-BB001828) (appraisal of Pine Ranch East), DX 56 (US-BB001531) (appraisal of Calusa Lakes). The five properties that Defendant claims must be appraised subject to open space restrictions are all designated moderate-density residential -- a designation both parties' experts agreed would be taken into account in a rezoning application. Mr. Bass, Defendant's expert on land use planning, acknowledged Plaintiffs' properties could be rezoned if there was unified control and ownership. Tr. 1288-91. Importantly, Ms. Allred testified that for purposes of deciding whether to rezone a property, Sarasota County did not consider an open space restriction unless the restriction was implemented to preserve habitats. Tr. 780, 802-03. As explained more fully below, the Court finds Plaintiffs' properties should be appraised without use restrictions, with the exception of Arielle and Calusa Lakes where the restrictions were directed at habitat preservation.

## The Taking's Effect on the Fair Market Value of Properties Adjacent to the Trail

### Plaintiffs' Paired Sales Analysis

Plaintiffs contend that the imposition of the Legacy Trail negatively affected the value of properties adjacent to the trail. In conducting his "after taking" valuation, Plaintiffs' appraiser, Mr. Durrance, conducted two paired sales analyses to quantify the effect of the trail on the value of properties adjacent to it. In a paired sales analysis, an appraiser compares two properties that are alike except for one characteristic. Any difference in the price is attributed to the characteristic that differs, which allows the appraiser to isolate the effect of that variable. Mr. Durrance compared sales of vacant lots on and off the railroad corridor to isolate the effect of the corridor. Tr. 250; PX 13.[16] The railroad was sparsely used during the time period these two subdivisions were developed, in the 1990's, but nonetheless was operating. PX 16B (BB-PLTF-12089).

In the first paired sales analysis, Mr. Durrance used 15 sales of vacant lots that occurred in 1998 and 1999, within Mission Estates, a residential community near the subject properties, which was built before the railroad corridor was abandoned. Tr. 251-52. The lots within the development were almost exactly the same size. Tr. 251. Eight of the lots were located on the corridor, while seven were off the corridor. Mr. Durrance found that lots on the corridor sold for an average of $35,288, and lots off the corridor sold for an average price of $48,914. Tr. 254; PX 13. Mr. Durrance concluded that the $13,625 difference -- 28% -- or $170 per lineal foot,

---

[16] Although some properties had homes (Marlin, Childers, Mirman, Davids), both parties' experts appraised them as vacant.

was due to the railroad corridor.  PX 13, PX 15B (BB-PLTF-12924 to 12929).

Mr. Durrance conducted a similar paired sales analysis of properties within Bay Oaks Estates, a residential community near Plaintiffs' properties.  Tr. 255.  He analyzed 16 sales of vacant lots in 1994 and 1995.  PX 13, PX 15B (BB-PLTF-12924 to 12929).  Nine of the properties were located on the corridor, and seven were off the corridor.  He found that lots on the corridor sold for an average of $42,100, while properties off the corridor sold for an average of $50,000, a  difference of approximately $8,050 -- 16% -- or $130 per lineal foot.  Tr. 256; PX 13, PX 15B (BB-PLTF-12924 to 12929).  Based on the Mission Estates and Bay Oaks Estates paired sales analyses, Mr. Durrance determined that the railroad corridor had a negative effect on property values ranging from 16% to 28%.  PX 15B (BB-PLTF-12924 to 12929).

### Plaintiffs' Anecdotal Evidence

Plaintiffs also offered lay opinion testimony from area residents to support their position that the trail had a negative effect on property values.  Anthony Rolfes, a resident of Pine Ranch East and president of the Pine Ranch East Homeowners' Association, testified that he observed people camping and lighting bonfires on the association's land near the trail.  Tr. 67.  He also testified that someone cut a hole in the barbed wire fence that runs along Pine Ranch East between the property and the trail.  Tr. 67.  Mr. Rolfes testified that the main impact of the trail has been increased traffic, requiring the association to install speed bumps on Pine Ranch East Road.  Tr. 69-70.

Patricia Davids, a plaintiff in Bay Plaza v. United States, No. 08-198L, also testified about the Legacy Trail's impact.  The Legacy Trail abuts the eastern edge of her property, extending 641 lineal feet and encumbering 0.737 acres.  PX 15B (BB-PLTF-12896).  When asked how the trail has affected her enjoyment of the property, she testified:

> It's totally eroded my serenity or my security in living there.  It has just absolutely devastated my way of life.  I live alone, and it's always a matter of is someone in your backyard.  Is someone coming onto your property?  The noise is constant. It's like living more on a major highway.

Tr. 94.  Ms. Davids further testified that she used to walk on her property on a daily basis, but now she would like to "run away from home."  Tr. 94.  Ms. Davids testified that the trail has caused a "drug area" to the south, with motorized scooters, firecrackers, and boom boxes.  Tr. 96.  She also said that it has become difficult to exit the neighborhood because of the increased pedestrian and bicycle traffic.  Tr. 95.  She now keeps her house closed up because of the noise from the trail.  Tr. 96.

George Dellos, the president of the Mission Valley Board, testified that the Legacy Trail is visible from Mission Valley's golf course.  Tr. 121.  Mr. Dellos testified about the invasive Brazilian pepper trees that border the trail: "[a]esthetically it looks terrible.  It's a lot of bramble and tangled trees, and it cuts out all other vegetation that might flourish that might be under those trees.  So aesthetically it's very unattractive."  Tr. 121.  Mr. Dellos explained that people using the trail are loud, which disrupts golfers playing at Mission Valley.  Tr. 124.  Mr. Dellos also testified the trail has led to occasional trespassers who walk across the golf course and use the club's facilities.  Tr. 125-26.

**Plaintiffs' Evidence on Potential Future Uses of the Legacy Trail**

Plaintiffs contend that the Legacy Trail negatively impacted property values because of the possibility that the railroad corridor could be reactivated.  Mr. Rolfes testified that at county commission meetings, people discussed the possibility of developing light rail or a busway on the corridor.  Tr. 68.  Mr. Rolfes testified he would "probably get out of there before that happened."  Tr. 68.  In his appraisals of Plaintiffs' properties, Mr. Durrance considered that the corridor could be converted to other transportation uses.  Tr. 317; see PX 20B (BB-PLTF-12332).

Because a prudent buyer would consider possible future uses, Mr. Durrance opined that any appraisal of the Plaintiffs' properties should as well.  Tr. 319.  Mr. Durrance listed the following contemplated future uses in his appraisal reports: transit use, transportation, an extension of the Bus Rapid Transit, commuter rail passenger rail service within existing CSX tracks linking Venice with Sarasota and Bradenton, and joint use of the corridor for transit and bicycling.  See PX 20B (BB-PLTF-12332 to 12333); see also PX 21B (BB-PLTF-13041 to 13042), PX 22B (BB-PLTF-12570 to 12571).  Dr. Kilpatrick agreed that it was appropriate to consider potential future uses of the corridor.  Tr. 681-82.

**Defendant's Paired Sales Analysis**

Mr. Underwood conducted his own paired analysis to refute Plaintiffs' claim that the Legacy Trail negatively affected the value of properties adjacent to the trail.  Mr. Underwood located trails throughout Florida and compared properties on a trail with nearby properties not on a trail.  Tr. 1502-03; see generally DX 51.  Mr. Underwood considered 38 properties -- 21 that sold in 2002-2005, on or near the Pinellas Trail, which is located near St. Petersburg, Florida; 17 located near Orlando, Florida -- 11 on or near the Cady Way Trail that sold in 2007-2009; and 6 on or near the West Orange Trail that sold in 2006-2007.  DX 51.  For each pairing, Mr. Underwood identified a property sale on a trail and compared it with the sale of a similar property in the same neighborhood and within the same time frame but not on a trail.  Mr. Underwood testified: "my conclusion was that there's no definitive answer and that the data is not telling me positively one way or the other that there is a negative impact or a positive impact. And that it's looking like it's more neutral than anything else."  Tr. 1505.  Specifically, he found that 9 pairings showed that properties off the trail were worth more than those on a trail, 14 pairings indicated that properties off the trail had a lower value, and 7 pairings had a price differential of less than 3%, which Mr. Underwood deemed statistically insignificant.  Tr. 1504-05.  Mr. Underwood acknowledged that there was a difference between being adjacent to a trail and near it, but he maintained that his analysis showed that adjacency to the recreational trail did not have a negative impact.

**Defendant's Trail Impact Studies**

In addition, Mr. Underwood considered trail studies that he found on the internet.  Tr. 1506.  In two of the studies, the researchers surveyed landowners with property immediately adjacent to the trail and landowners who owned property off the trail.  Tr. 1507.  According to Mr. Underwood, the internet studies showed that some people did not like being adjacent to the trail while others valued the adjacency.  Mr. Underwood did not testify about details of the internet studies, such as location or time period.

27

Defendant also offered expert testimony from Charles Blanton, a transportation and urban planner.[17]  Mr. Blanton has worked on recreational trail projects since 1993.  He has developed concept plans for recreational trails in several Florida jurisdictions.  Tr. 1390-91.  He conducted the Pinellas Trail Community Impact Study for the Pinellas County Metropolitan Planning Organization, which was published in 2000.  Tr. 1390; DX 46.  Pinellas County is approximately 50 miles north of Sarasota County, across Tampa Bay.  In the study, Mr. Blanton analyzed home sales and appraised property values of single-family homes over a multi-year period to see if the Pinellas Trail impacted property values.  Tr. 1403.  He also sent surveys to people who resided in single-family homes within a quarter-mile of the trail.  Tr. 1403-04.  Mr. Blanton defined adjacency to the trail as being within a five-minute walk from the trail.  Tr. 1407.  As a third component of the study, Mr. Blanton interviewed 20 realtors in Pinellas County about whether the trail made properties more marketable.  Tr. 1410.  Of the 14 realtors who offered opinions, 13 believed that properties located closer to the trail were more marketable.  Tr. 1410-11.

Based on his study and survey, Mr. Blanton determined that recreational trails have a positive impact on the value of properties adjacent to the trail.  Specifically, he found that the median sales price of homes within a five-minute walk of the trail increased by 7.83%, while prices for homes in the county increased by 4.67%, over a 3% difference.  Tr. 1407; DX 46 (US-RBL000041).

Mr. Blanton also reviewed studies from southwestern Ohio conducted in 2003-2005, Delaware, Marion County, Indiana in 1999, and Austin, Texas in 1999-2001, and determined that the majority of studies found that trails had a positive effect on property values and, at worst, a neutral effect.  DX 44 (US-RBL000001, US-RBL000006 to 000007).  The studies Mr. Blanton reviewed are not in the record.

### Defendant's Anecdotal Evidence

Defendant presented evidence regarding public perceptions of trails.  Mr. Underwood interviewed Bart Bartholomey, the lead sales agent for a residential community that abuts the Cady Way Trail in Orlando, Florida.  Mr. Bartholomey told Mr. Underwood "there was no distinction in price for those properties that abutted the Trail, as opposed to those that did not."  DX 51 (US Ex. 000004 to 000006).  Further, Mr. Bartholomey reported that while some potential purchasers did not want to buy properties abutting the trail, an equal number of people preferred trail-adjacent properties because they thought the trail would increase property values.  DX 51 (US Ex. 000004 to 000006).

---

[17] The Court admitted Mr. Blanton as an expert in the field of transportation planning.  Tr. 1393.  He holds a bachelor's degree in journalism from the University of Florida and completed the course work for a master's degree in urban and regional planning at Florida State University.  Tr. 1385-86; DX 43.  He is the founding principal and owner of Renaissance Planning Group, a transportation and urban planning firm that primarily provides services to public agencies at the local, state, regional, and federal levels.  Tr. 1382.  He has worked in transportation and urban planning for 22 years.  Mr. Blanton teaches courses and seminars on urban and transportation planning.  Tr. 1384.  He is a member of the American Institute of Certified Planners ("AICP") and has been inducted into the College of Fellows of the AICP.  Tr. 1382-83.

**Defendant's Evidence on Future Uses of the Legacy Trail**

In 2001, Mr. Blanton's firm conducted a study regarding potential long-term uses of the Legacy Trail corridor through 2035, known as the 2035 Plan, for the Sarasota/Manatee Metropolitan Planning Organization. The 2035 Plan is not in the record. The 2035 Plan investigated whether the rail line could be converted to passenger use and concluded that conversion to passenger use would not be cost-effective because it would not generate sufficient usage. Tr. 1417. The elected officials of the Manatee/Sarasota Metropolitan Planning Organization adopted the 2035 Plan in December 2010, and "[i]t is effectively the law of the land for how state and federal transportation dollars will get spent. Until this plan is updated or amended, it is the guiding document." Tr. 1419-20. Mr. Blanton is confident the Legacy Trail will not be converted to a busway until at least 2035. Tr. 1421.

Mr. Underwood looked at reports discussing railroads across the country and found that railroad corridors had been reactivated nine times, at the most, a very low number considering all of the railroads that had been deactivated. Tr. 1512. Mr. Underwood also spoke to the vice president of Seminole Gulf Railroad, the railroad that had previously operated along the corridor, who told Mr. Underwood he did not anticipate a need to restore rail service. Tr. 1512. Based on his review, Mr. Underwood determined that the potential for rail reactivation did not impact the sale price of properties adjacent to the corridor. Tr. 1514.

**The Court's Assessment of the Experts' Opinions on Whether the Legacy Trail Negatively Impacted Property Values**

The record as a whole establishes that the Legacy Trail had a negative impact on the value of land adjacent to the Legacy Trail. Although Plaintiffs' expert used properties bordering an existing railroad easement -- not a recreational trail -- in his paired sales analysis, these properties were the best data available in the subject locale. Mr. Durrance cannot be faulted for not using data for sales on and off the Legacy Trail itself when such information was apparently nonexistent. Nor did Defendant's expert attempt to do a paired sales analysis of properties on and off the Legacy Trail itself. Mr. Underwood resorted to paired sales analyses in areas farther away from the Legacy Trail -- St. Petersburg and Orlando -- and looked at studies published by an organization that advocates for trails that focused on select trails across the country. Mr. Blanton examined Pinellas County, 50 miles away from Sarasota County, and trails across the country.

Dr. Kilpatrick identified problems with Mr. Blanton's September 2001 study of the Pinellas Trail and his literature review, pointing out that Mr. Blanton's literature dealt with community benefits, as opposed to the impact of a trail on immediately adjacent properties, that the literature and Pinellas Study had significant methodological flaws, that many of the projections in the Pinellas Study failed to come true, and that other literature, which Mr. Blanton failed to cite, countered his projections and claims about a trail's effect. PX 31 (BB-PLTF-26987). Dr. Kilpatrick concluded that "*a more objective review of these underlying sources would come to exactly the opposite conclusions from the Blanton Report*." PX 31 (BB-PLTF-26987) (emphasis in original).

The Court does not deem Defendant's paired sales and broad based studies by an advocate of trails, the American Trail Conservancy, to be as pertinent and objective as the paired

sales analyses performed by Mr. Durrance on the corridor at issue.  In the view of Dr. Kilpatrick, Plaintiffs' expert in appraisal practice standards and methodology, whom the Court found to be knowledgeable and credible, Mr. Durrance's paired sales analysis exceeded the standards of good appraisal practice.  Tr. 683.  Mr. Durrance's paired sales analysis used over 30 properties and properties in two different subdivisions that were adjacent, not merely proximate, to the corridor.  Dr. Kilpatrick tested Mr. Durrance's data using statistical analysis and determined it was robust.  Tr. 686-87.  Mr. Durrance's paired sales analysis better accomplished the goal of a paired sales analysis -- isolating and quantifying the effect of a single variable, the trail -- than did Mr. Underwood's analysis.

 Both Mr. Underwood and Mr. Blanton used studies that did not distinguish between properties directly adjacent to a trail and properties located half a mile away.  Tr. 693-94, 720-21.  As Dr. Kilpatrick testified, one could not reliably infer that properties near a trail are affected in the same manner as properties adjacent to it.  Tr. 693-94, 720-21.  Further, Mr. Underwood's paired sales analysis used some properties adjacent to a trail that had buffering.  Tr. 1504, 1687.  Additionally, there were significant differences in the properties that Mr. Underwood used in his paired sales analysis beyond their location; Mr. Underwood compared improved properties, as opposed to vacant lots, and the homes differed with respect to age, number of bathrooms, and yard size.  These differences make it difficult to isolate the effect of the trail.

In sum, the Court finds that the imposition of the Legacy Trail negatively affected the fair market value of properties adjacent to the trail.  Before the taking, Plaintiffs' properties were adjacent to a rarely used rail corridor.  After the taking, Plaintiffs' properties were encumbered with an oft-used recreational trail, which caused residents to experience trespassing, noise, property damage, litter, and increased traffic.  Tr. 67, 69, 94, 95, 124, 126.  Mr. Rolfes has experienced increased traffic, the fence next to the trail has been cut, and people have built bonfires on the association's land.  Ms. Davids feels insecure in her home and no longer enjoys being outside.  Mr. Dellos explained that golfers at Mission Valley are distracted by noise from the trail and that people trespass onto the club's property.  As Plaintiffs' experts testified, the presence of such problems would undoubtedly affect the amount a knowledgeable buyer seeking property in this area would be willing to pay.  The landowners' testimony was credible, and Defendant failed to rebut it with any testimony from landowners or other percipient witnesses.

Furthermore, because of the rail-banking that occurs under the Rails to Trails Act, there is a possibility that rail or other transit could return to the corridor.  The Court recognizes that elected officials of the Manatee/Sarasota Metropolitan Planning Organization adopted the 2035 Plan, which makes reactivation unlikely in the near future, but they had not adopted the 2035 Plan at the time of the taking -- the Plan was adopted in 2010, six years after the date of valuation.  In 2004, a knowledgeable buyer would likely have considered the potential reactivation of transit on the corridor and factored that into the price he was willing to pay for the subject properties.

**The Diminution in Value to the Remainder Due to the Trail**

Plaintiffs seek severance damages for 10 of the 13 properties.[18]  Plaintiffs do not ask the Court to award them the 16 to 28% diminution in value Mr. Durrance attributed to the trail based on his paired sales analyses of Bay Oaks and Mission Estates.  Rather, Plaintiffs seek severance damages measured by the cost of buffering.  Defendant argues that Plaintiffs are not entitled to buffering costs because buffering is not required by law, and the cost to cure via buffering is greater than the alleged decrease in property value.

**The Width of the Buffer**

Mr. Durrance contacted two developers, J&J Homes and Neal Communities, regarding the impact of a recreational trail easement on a residential development.  Tr. 263.  The developers told Mr. Durrance that when a residential property abuts an undesirable element, such as the corridor, they install a buffer to separate the property from that element.  Tr. 263.  However, Mr. Durrance did not testify as to the width of buffering these developers would use in given circumstances.

The Sarasota County Zoning Code contains buffering requirements that depend on the type of property being buffered and the adjoining land use.  For example, under this Code, property within a residential single-family district that is adjacent to another residential single-family district does not require any buffering, while a property within a residential single-family district next to a residential multifamily district requires a buffer with 30% opacity.  DX 22 (BB-PLTF-49785).  Sarasota County also requires buffering when properties are adjacent to roads or parking.  Tr. 1097.  Properties adjacent to Interstate 75 require 20-foot buffers, while nonresidential properties adjacent to a local street require a six-foot buffer.  Tr. 1099-1102; DX 22 (BB-PLTF-49782).  The maximum buffer under the County Code for residential property is 25 feet, where residential property is adjacent to commercial property.  Tr. 1097.  The County Code does not require buffering between residential properties and a railroad right-of-way. Tr. 1102.

In addition to the County zoning regulations, developments within the Palmer Ranch DRI are subject to the Palmer Ranch Development Code.  Of the properties where damages for buffering are at issue, Stoneybrook is the only one within the Palmer Ranch DRI.  The Palmer Ranch Development Code provides:

> 5.07  LANDSCAPE BUFFER.  Applicant shall create, design, construct, irrigate, and provide for continued maintenance of a minimum 50-foot landscape buffer wherever his parcel boundary has frontage to a planned or existing external public road right-of-way. . . .
>
> The landscape design of the buffer areas shall include berming, canopy tree plantings and ornamental tree and shrub masses. . . . .

DX 21 (BB-PLTF-18064).  Under the Palmer Ranch Development Code, a public road right-of-

---

[18]  Plaintiffs do not seek severance damages for TPC-Prestancia, Arielle, or Palmer Ranch.

31

way is characterized as a road-right-of way with "vehicular circulation."  DX 21 (BB-PLTF-18063).  James Paulmann, who coordinated the Palmer Ranch DRI review process for Sarasota County in the 1980's and later worked for the owner of the Palmer Ranch DRI, testified that under the Palmer Ranch Development Code, the Legacy Trail is considered an external public road right-of-way for which a 50-foot wide buffer is required.  Tr. 1013-14.  Mr. Paulmann testified that developments along the railroad right-of-way in the Palmer Ranch DRI, such as Silver Oak and Deer Creek, were developed with 50-foot buffers, and buffers were used for aesthetics, public safety, and protection from light and noise.  Tr. 1014-1015.  In his valuation, Mr. Durrance used a 50-foot buffer for all properties -- even those not within the Palmer Ranch DRI -- because the Palmer Ranch Development Code required 50-foot buffers for land adjacent to the rail-trail corridor.  Tr. 279, 524; PX 24B (BB-PLTF-11848 to 11849).

Mr. Durrance investigated the cost of a 50-foot buffer, and based on information provided by WilsonMiller, a planning and landscape architecture consulting firm, estimated the cost at $150 per lineal foot.  Tr. 273.[19]  Mr. Durrance used a 50-foot buffer based on the Palmer Ranch DRI, but he acknowledged that a 50-foot buffer was wider than the typical buffer, stating: "[a]s shown, the 50-foot wide landscape buffer within Palmer Ranch is an increased buffer than what is typically required when adjacent to similar residential or interim agricultural acreage. Differently zoned residential properties with differing densities are typically buffered 10 to 20 feet in width . . . ."  PX 15B (BB-PLTF-12928).  Mr. Durrance acknowledged that some of the subject properties contained environmental lands, which provided natural buffering when adjacent to the trail.  Under the Sarasota County Zoning Code, water retention ponds and wetlands can also be used to buffer properties.  PX 34.  Mr. Durrance did not attribute damages to the land adjacent to the corridor that did not require additional man-made buffering.

Defendant contends Plaintiffs are not entitled to the cost of buffering because the Sarasota County Zoning Code requires buffering a property at the perimeter -- not adjacent to a recreational trail.  Further, Defendant contends the largest buffer required under the zoning regulations is a 25-foot buffer with 70% opacity.  From this, Defendant argues there is no basis for Plaintiffs' claim that a 50-foot buffer is required for properties adjacent to the trail.

Plaintiffs counter that the County zoning code is not determinative on what buffering is required.  Mr. Durrance cited the Isles of Sarasota development where there is extensive buffering near a power line corridor, which the zoning code does not require, but which was necessary to distance homes from a perceived nuisance.  Tr. 277.

The Court recognizes that the Sarasota County Zoning Code did not require buffering on properties adjacent to the Legacy Trail.  However, the Palmer Ranch Development Code required a 50-foot buffer wherever a "parcel boundary has frontage to a platted or existing external public road right of way," and the Legacy Trail was considered such an external public road.  DX 21 (BB-PLTF-18063); Tr. 1013-14.  Thus, Plaintiffs have proved they are entitled to severance damages measured by installing a 50-foot buffer on Stoneybrook because Stoneybrook was within the Palmer Ranch DRI.

---

[19] WilsonMiller's estimate was based on the Palmer Ranch Development Code and the cost of buffering in the Isles of Sarasota, a residential development within the Palmer Ranch DRI.

However, Plaintiffs have not proved that properties outside the Palmer Ranch DRI required 50-foot buffers. The widest buffer required by the County was 25 feet where residential properties were adjacent to commercial properties. Even properties adjacent to Interstate 75 only required 20-foot buffers under the County Code. Mr. Durrance, Plaintiffs' expert, acknowledged that a 50-foot wide buffer is an increased buffer beyond what is typically required. PX 15B (BB-PLTF-12928).

Although Plaintiffs have not made a case for a 50-foot buffer for properties outside the Palmer Ranch DRI, the Court is persuaded that some buffering would be required. The record demonstrates that residential developments in the subject area have buffering, particularly when adjacent to perceived nuisances. Tr. 277. Based on the record as a whole, the Court concludes that a 25-foot buffer would be sufficient to mitigate the harm from the corridor to properties outside the DRI. This measurement splits the difference between the competing experts where Mr. Underwood deemed zero buffering necessary and Mr. Durrance, 50 feet. See Navajo Tribe of Indians v. United States, 9 Cl. Ct. 336, 409 (1986) ("Splitting the difference is a familiar and permissible technique, especially where the determinations of qualified opposing experts must be resolved.") (citing Ass'n of Am. Publishers, Inc. v. Governors of U.S. Postal Service, 485 F.2d 768, 773 (D.C. Cir. 1973)).

### The Cost of Buffering

Joseph Samnik, Jr., Defendant's expert on landscaping, testified about the costs of installing 25- and 50-foot buffers with 50% opacity.[20] Tr. 1323. He used the Sarasota Zoning Regulations to determine the number and type of plants required. Tr. 1325-27; DX 41. Mr. Samnik chose plants that were commonly used and readily available and consulted tree vendors in the local market to determine the prices. Tr. 1331-33. Mr. Samnik concluded a 25-foot buffer would cost $58.50 per lineal foot, and a 50-foot buffer, $80.80 per lineal foot. Tr. 1337-38; DX 40.

Defendant alleges Plaintiffs overestimated the cost of buffering. Both parties elicited testimony of higher or lower costs for buffering, depending on the size and the plants and materials used. Tr. 272, 1365. The evidence indicates that the cost of a 25-foot buffer in Sarasota County ranged from $58.80 to $75 per lineal foot, for an average of approximately $67 per lineal foot. See Navajo Tribe of Indians, 9 Cl. Ct. at 409. Because Plaintiffs established that land adjacent to the corridor was harmed by the taking, buffering the land at $67 per lineal foot

---

[20] The Court admitted Mr. Samnik as an expert on the cost of installing landscaping, buffers, and berms. Tr. 1322. Mr. Samnik is an arboreal consultant with Samnik & Associates, where he designs, installs, and maintains berms for developers. Tr. 1306. He has worked in landscaping for 43 years. Mr. Samnick is a graduate of the Arboriculture Consulting Academy and has received training from the American Society of Consulting Arborists, the Institute of Food and Agricultural Sciences at the University of Florida, and the International Society of Arboriculture. DX 39. Mr. Samnik teaches courses to landscape architects and lectures at colleges and landscaping conferences. Tr. 1313-15. He is a certified arborist. DX 39. Mr. Samnick has served as the president of the Association of Eminent Domain Professionals and is a member of The American Society of Consulting Arborists and the International Society of Arboriculture. DX 39. Mr. Samnik also appraises plants and has testified as an expert approximately 20 times. Tr. 1320.

for a 25-foot buffer provides a reasonable means to quantify severance damages to the remainders.  Likewise, for Stoneybrook, the evidence indicates that the cost of a 50-foot buffer in Sarasota County ranged from $80.80 to $150 per lineal foot, for an average of approximately $115 per lineal foot.

Defendant contends that Plaintiffs cannot recover the cost of buffering as "cost-to-cure" severance damages because Plaintiffs did not specify the diminution in the value of the remainder of their properties in dollars because of the trail.   In order to obtain cost-to-cure damages, Plaintiffs must establish that the cost to cure does not exceed the diminution in fair market value of the remainder of their properties.  United States v. 2.33 Acres of Land, 704 F.2d 728, 730 (4th Cir. 1982); United States v. Dickinson, 152 F.2d 865, 870 (4th Cir. 1946), aff'd, 331 U.S. 745 (1947).   Based on his paired sales analyses in Bay Oaks Estates and Mission Estates, Plaintiffs' expert found that properties adjacent to the trail were worth 16 to 28% less than properties off the trail, but he did not take the next step and quantify this diminution in value of each remainder in dollar terms.  PX 13.  Nonetheless, the record contains a sufficient basis to conclude that Plaintiffs' requested cost to cure does not exceed the diminution in value to the remainders.

Mr. Durrance determined that the Legacy Trail caused a 16 to 28% diminution in the value of the remainder, or an average diminution of 22%.  The cost to buffer the land adjacent to the trail on Plaintiffs' properties is less than a 22% diminution in the remainder of all 10 properties at issue as evidenced by the following chart:

### The Claimed Cost-to-Cure Compared with the Remainders' Diminution in Value

| Property | Original Acreage | Remainder | Plaintiffs' Claimed Value per Acre | Diminution In Value of Remainder by 22% | Severance Damages Plaintiffs Seek |
|---|---|---|---|---|---|
| Mission Valley | 174.716 | 172.33 | $175,000.00 | $6,634,705.00 | $311,800.00 |
| Stoneybrook | 196.076 | 191.754 | $200,000.00 | $8,437,176.00 | $302,600.00 |
| JMC | 229.4185 | 221.779 | $100,000.00 | $4,879,138.00 | $1,109,300.00 |
| Pine Ranch East | 16.378 | 13.63 | $190,000.00 | $569,734.00 | $341,400.00 |
| Caulsa Lakes | 60.673 | 59.4 | $175,000.00 | $2,286,900.00 | $45,300.00 |
| Childers | 10.363 | 9.52 | $200,000.00 | $418,880.00 | $110,100.00 |
| Marlin | 11.18 | 10.443 | $200,000.00 | $459,492.00 | $96,300.00 |
| Davids | 13.6095 | 12.82 | $150,000.00 | $423,060.00 | $103,100.00 |
| Mirman | 14.478 | 13.7 | $175,000.00 | $527,450.00 | $101,700.00 |
| Glueck | 23.527 | 22 | $200,000.00 | $968,000.00 | $199,500.00 |

See Pls.' Post-Trial Br. 72.  As reflected above, the smallest of Plaintiffs' properties -- the Childers property -- had a 9.517-acre remainder worth $200,000 per acre, meaning a 22% diminution would be $418,748.  Plaintiffs seek $110,100 in severance damages for the Childers property -- far less than the diminution in value.  Similarly, for JMC, the largest of Plaintiffs'

properties, the 221.7705-acre remainder is valued at $100,000 per acre, meaning a 22% diminution would equate to $4,878,951. Plaintiffs seek $1,109,300 in severance damages for JMC -- less than one-quarter of the diminution in value of the remainder.

The Court is persuaded that the adjacency of the Legacy Trail resulted in at least a 22% decrease in the fair market value of the remainder of the 10 properties at issue. Moreover, the Court finds that, based on the evidence as informed by the site visit, the trail impacts the entire remainder of properties of less than 25 acres, and the trail substantially impacts the remainder of larger properties. The cost of buffering land adjacent to the trail on Plaintiffs' individual properties is an appropriate measure of severance damages given that this cost is less than the diminution in the value of the remainder. Sys. Components Corp. v. Fla. Dep't of Transp., 14 So. 3d 967, 978 (Fla. 2009) ("Severance damages are part of the constitutional guarantee of 'full compensation' and reimburse the owner for the reduction in value the taking causes to any remaining land . . . ."). "The cost to cure is a flexible tool. It can be used alone or in conjunction with the payment of just compensation for any uncured severance damages." 4A Nichols on Eminent Domain § 14.02[2][c]. As described below for each individual property outside of the Palmer Ranch DRI, the Court awards cost-to-cure severance damages measured by 25-foot buffering at a cost of $67 per lineal foot. For Stoneybrook, which is within the Palmer Ranch DRI, the Court awards cost-to-cure severance damages measured by a 50-foot buffering at a cost of $115 per lineal foot.

## Just Compensation for Plaintiffs' Individual Properties

### Mission Valley

#### Plaintiffs' Expert's Valuation of Mission Valley

Mr. Durrance appraised Mission Valley and determined the highest and best use was residential development. Tr. 384; PX 24B (BB-PLTF-11836). While the property was zoned open use estate-1 on the date of the taking, Mr. Durrance determined that it was reasonably probable that it could be rezoned for denser development because of its location, size, and the designation for moderate-density residential development in Sarasota County's comprehensive plan. PX 24B (BB-PLTF-11835).

In appraising Mission Valley, Mr. Durrance conducted a comparable sales analysis using six properties in the same market, which had prices ranging from $140,000 to $260,000 per acre. The following table summarizes his findings:[21]

---

[21] This chart reflects the data provided in the table in PX 24B (BB-PLTF-11836-37), Mr. Durrance's appraisal report of Mission Valley, except as modified to correct an inconsistency with respect to Sale 2. Specifically, the entry for the overall comparability of Sale 2 is corrected to state "similar" rather than "inferior." The table entitled Land Value Summary and Conclusion in Mr. Durrance's appraisal report lists Sale 2 as "inferior." PX 24B (BB-PLTF-11840). However, the table entitled Summary Table in the same report, and the placement of Sale 2 above Mission Valley on the qualitative ranking on the Land Value Summary and Conclusion table indicate that Mr. Durrance found Sale 2 to be similar. PX 24B (BB-PLTF-11836 to 11837).

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 11/1/04 | 7/28/04 | 8/30/04 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $5.3 mil | $5.9 mil | $28 mil |
| **Size (Ac)** | 174.716 | 40 | 15.381 | 20.77 | 25.746 | 27.732 | 199.44 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $206,000 | $213,000 | $140,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to seller | Cash to seller | Cash to seller | Cash to seller | Cash to seller | Cash to seller |
| **Zoning/Future Land Use Entitlements[22]** | OUE-1/MDR | RE-1/MDR Approved units available within DRI | RSF-4/MDR Approved for 57-unit SFR sub-division | RSF-4, RMF-2, PUD & MDR/MEDR | OUE-2/RSF-3 & MDR/OF FMF Approved for 75 SFR and 16,200 SF Office | RMF-3/HDR Approved for 160-unit attached town-homes | OUE-1/MDR Approved units available within DRI |
| **Utilities Available** | Water/ sewer | Water/ sewer | Water/ sewer | Water/ Sewer | Water/ sewer | Water/ sewer | Water/ sewer |
| **Environmental Lands** | <5% | 25-30% | <5% | <5% | <5% | 20-25% | 0% |

[22] The Zoning/ Future Land Use Entitlement designations are:

OUE: Open Use Estate

RE: Residential Estate

RSF: Residential Single-Family

SFR: Single-Family Residential

RMF: Residential Multifamily

PUD: Planned Unit Development

MDR: Moderate Density Residential

MEDR:  Medium Density Residential

HDR: High Density Residential

OFFMF: Office/Multifamily

OPI: Office, Professional, and Institutional

RMH: Residential Manufactured Home

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Easements/ Encumbrances** | Typical | Typical | Typical | Perpetual Miti-gation Easement | Typical | Typical | South Creek/Tra nsmission Power Lines |
|  |  |  |  |  |  |  |  |
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Similar | Similar | Inferior |
| **Location** | Laurel/ Nokomis | Superior | Inferior | Slightly Superior | Slightly Superior | Slightly Inferior | Superior |
| **Size (Ac)** | 174.716 | Slightly Inferior | Slightly Inferior | Slightly Inferior | Slightly Inferior | Slightly Inferior | Similar |
| **Zoning/Future Land Use Entitlements** | OUE-1/MDR | Similar | Superior | Superior | Superior | Superior | Similar |
| **Utilities Available** | Water/ Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | <5% | Inferior | Similar | Similar | Similar | Inferior | Slightly Inferior |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Slightly Inferior | Similar | Similar | Inferior |
| **Comparability** | -- | Slightly Superior | Similar | Superior | Slightly Superior | Slightly Superior | Inferior |

In his appraisal, Mr. Durrance used seven salient characteristics to compare each property to Mission Valley: market conditions, location, size, zoning/future land use designation, utilities available, environmental lands, and easements/encumbrances. He then gave each property an overall rating for comparability. He gave the properties most similar to Mission Valley the most weight in his appraisal.

Mr. Durrance evaluated Contract 1 as slightly superior to Mission Valley. PX 24B (BB-PLTF-11836 to 11837). Contract 1 sold in July 2004, three months after the date of the taking. PX 24B (BB-PLTF-11836). Because Contract 1 was within the Palmer Ranch DRI, Mr. Durrance judged it as superior with respect to location. PX 24B (BB-PLTF-11837). Contract 1, at 40 acres, was substantially smaller than Mission Valley, so Mr. Durrance rated it as slightly

superior.[23]  When sold, Contract 1 needed to be rezoned to allow for denser development, so Mr. Durrance appraised it as similar to Mission Valley.  Id.  He found Contract 1 to be slightly inferior to Mission Valley with respect to environmental lands because 25 to 30% of Contract 1's land was designated as environmental lands, while Mission Valley had less than five percent. PX 24B (BB-PLTF-11836).   Lastly, because neither property had any easements or encumbrances that impacted potential development, Mr. Durrance rated Contract 1 as similar to Mission Valley.

Mr. Durrance found that Mission Valley was most similar to Sale 2.  While Sale 2 was under contract in late 2002, the sale involved a substantial assignment fee, so Mr. Durrance rated the market conditions of Sale 2 as slightly inferior because the fee mitigated the effect of the weaker market conditions in 2002.  PX 24B (BB-PLTF-11839).  Mr. Durrance found Sale 2's location inferior because it was off an unimproved road and was north of Clark Road, a less desirable area.  Id.  He rated Sale 2's size as slightly superior because it was more than 150 acres smaller than Mission Valley.  PX 24B (BB-PLTF-11838 to 11839).  Mr. Durrance determined that Sale 2 had superior zoning/future land use designations because it allowed for denser development.  PX 24B (BB-PLTF-11836 to 11837).  Finally, Sale 2 was similar to Mission Valley with respect to both environmental lands and easements/encumbrances because Sale 2 had a similar percentage of environmental lands and no significant easements or encumbrances. Id.

Sale 3 was the one property Mr. Durrance found to be superior to Mission Valley.  Sale 3 had better zoning/future land use designations because it allowed for denser development -- 146 multifamily residential units.  PX 24B (BB-PLTF-11836 to 11837).  Sale 3 also had a slightly superior location and size because it was east of the Palmer Ranch DRI and more than 150 acres smaller than Mission Valley.  PX 24B (BB-PLTF-11840).  Mr. Durrance found Sale 3 and Mission Valley to be similar regarding environmental lands because they both contained less than five percent.  PX 24B (BB-PLTF-11837).  Lastly, Sale 3 was slightly inferior with respect to easements/encumbrances because approximately 2.3 acres of the property were encumbered with a perpetual mitigation easement that prohibited development. PX 24B (BB-PLTF-11836 to 11838).

Mr. Durrance found Sale 4 to be similar to Mission Valley with respect to three factors: market conditions, environmental lands, and easements/encumbrances, because Sale 4 was contracted in mid-2004, the properties had approximately the same amount of environmental lands, and neither property had any easements or encumbrances that impacted potential development.  PX 24B (BB-PLTF-11836).  Sale 4's location was slightly superior because it facilitated infill development -- development of an undeveloped parcel that is surrounded by existing development.  Tr. 772 ("Infill is where you encourage those vacant tracts within the

---

[23] There is an inconsistency within Mr. Durrance's appraisal report of Mission Valley concerning the sizes of Contract 1 and Sales 2, 3, 4, and 5. The table entitled Summary Table characterizes the sizes of these five comparable properties as "slightly inferior."  PX 24B (BB-PLTF-11837).  However, the narrative portion of the appraisal report states "[t]he remaining sales range between about 15 to 40 acres in size and are considered to be slightly superior to the subject relative to size . . . ." (emphasis added).  The narrative portion is consistent with Mr. Durrance's other appraisal reports, indicating that the designation should be "slightly superior."

urban area where you want to see urban-related densities of residential development. . . ."); PX 24B (BB-PLTF-11837). Sale 4's size also provided a slight advantage because it was almost 150 acres smaller than Mission Valley. PX 24B (BB-PLTF-11836 to 11837). Overall, Mr. Durrance concluded that Sale 4 was slightly superior to Mission Valley. PX 24B (BB-PLTF-11840).

Mr. Durrance appraised Sale 5 as slightly superior to Mission Valley, finding it similar to Mission Valley with respect to market conditions and easements/encumbrances because its sale was contracted near the date of the taking and there were no easements or encumbrances that impacted development. PX 24B (BB-PLTF-11836 to 11837, BB-PLTF-11840). Mr. Durrance found Sale 5 had superior zoning/future land use entitlements because it sold with multifamily zoning in place. PX 24B (BB-PLTF-11836 to 11837). Mr. Durrance opined Sale 5 was slightly superior with respect to size because it was almost 150 acres smaller than Mission Valley, but slightly inferior as to location because Sale 5 was located near Interstate 75. PX 24B (BB-PLTF-11837 to 11838). Finally, he found Sale 5 inferior because 20 to 25% of the property had environmental lands, 15 to 20% more than Mission Valley. PX 24B (BB-PLTF-11836).

Mr. Durrance appraised Sale 6 as inferior to Mission Valley. PX 24B (BB-PLTF-11840). Location was the only attribute where Sale 6 had an advantage over Mission Valley because Sale 6 was within the Palmer Ranch DRI. PX 24B (BB-PLTF-11836 to 11838). Sale 6 was similar to Mission Valley with respect to size and zoning/future land use because it was almost 200 acres and required rezoning to achieve denser development. PX 24B (BB-PLTF-11836 to 11837). However, Sale 6 was inferior to Mission Valley in terms of market conditions and easements/encumbrances because the sale was contracted in mid-2003, when prices were lower, and the property was encumbered with a power line easement and featured a creek and a mesic hammock. PX 24B (BB-PLTF-11839).

Mr. Durrance ranked the properties and concluded that four of the comparable properties were superior or slightly superior to Mission Valley, one property was inferior, and Sale 2, which sold for $176,000 per acre, was similar. Based on this comparable sales analysis, Mr. Durrance appraised Mission Valley at $175,000 per acre before the taking. Tr. 384-85.

### Defendant's Expert's Valuation of Mission Valley

Defendant's expert, Mr. Underwood first appraised Mission Valley without any use restrictions and with residential development as the highest and best use. After receiving counsel's instruction to consider zoning and use restrictions, Mr. Underwood re-appraised Mission Valley under the assumption that the entire property would remain a golf course because of the deed restriction. In the second appraisal, Mr. Underwood appraised Mission Valley with a golf course as the property's highest and best use.

Mr. Underwood used quantitative adjustments. Mr. Underwood applied a negative adjustment to the property's sale price if a comparison property was superior to Mission Valley. If the comparison property was inferior to Mission Valley, he applied a positive adjustment to the comparison's sale price. Mr. Underwood then used the adjusted prices of the comparison properties to determine the value of the subject property. The following table summarizes the

properties used and the adjustments that Mr. Underwood made:[24]

|  | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | 1851 Mission Valley Blvd. | W side of Cattlemens Rd. N of Richardson Rd. | E side of Honore Ave. S of Central Sarasota Pkwy | E side of Honore Ave. S of Clark Rd. | NWC of Cattlemens Rd. & Colonial Oaks Blvd. | S side of SR 681 E of US 41 |
| **Sale Price** | N/A | $5.9 mil | $28 mil | $5.402 mil Adjusted | $5.3 mil | $19,959,100 |
| **Sale Date** |  | 7/04 | 8/04 | 10/04 | 11/04 | 8/05 |
| **Cond of Sale** |  | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | OUE-1/MDR | RMF-3/HDR | OUE-1/MDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RMH/MDR |
| **Size (Ac)** | 175.165 | 27.732 | 199.44 | 20.80 | 25.746 | 221.77 |
| **Price/Acre** |  | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| **Adjustments** | | | | | | |
| **Financing** |  | 0% | 0% | 0% | 0% | 0% |
| **Time** |  | 0% | 0% | -9% | -11% | -15% |
| **Time-Adjusted Sales Price** |  | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |
| **Location** |  | 0% | -10% | -10% | 0% | 10% |
| **Property Size** |  | -30% | 5% | -30% | -30% | 5% |
| **Land Use Regulation** |  | -5% | 0% | -5% | 0% | -10% |

---

[24] This chart reflects the data provided in the table in DX 50 (US-BB001690).

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Total Adjustment** | | -35% | -5% | -45% | -30% | 5% |
| **Adjusted Price/Acre** | | $138,288 | $133,373 | $129,986 | $128,249 | $80,325 |

The first step in Mr. Underwood's analysis was adjusting the comparable properties' sale prices for the time of sale, finding that if the comparison property sold after the date of the taking, it sold under superior market conditions. To reflect this advantage, Mr. Underwood adjusted the price of sales that occurred after April 2004 downward by 1.5% per month so that the sale price better reflected the market conditions when the taking occurred -- in April 2004. Similarly, Mr. Underwood adjusted the prices of comparable sales that occurred before April 2004 upward by 1.5% per month to reflect the fact that real estate prices were increasing in 2004. Tr. 1482-83; DX 50 (US-BB001691).

Mr. Underwood next analyzed each property and made adjustments for the factors other than time. He determined that Sale A-1 was located in an area with older and smaller homes, similar to Mission Valley, and he did not make any adjustment for location. DX 50 (US-BB001692). Because Sale A-1 was just under 28 acres, and Mission Valley was approximately 175 acres, he applied a 30% downward adjustment for size. Id. Mr. Underwood found that Sale A-1 had a similar zoning designation as Mission Valley and did not require any adjustment. DX 50 (US-BB001693). In all, he adjusted the price of Sale A-1 by -35%.

Mr. Underwood next compared Mission Valley to Sale A-2. He determined that Sale A-2 had a superior location because it was within the Palmer Ranch DRI. DX 50 (US-BB001692). Because Sale A-2 was approximately 200 acres, 25 acres larger than Mission Valley, he applied a five percent adjustment for size. Id. Mr. Underwood did not make any adjustments with respect to land use regulations because Sale A-2 and Mission Valley were zoned similarly. DX 50 (US-BB001693). Mr. Underwood adjusted Sale A-2 by five percent, for an adjusted price of $133,373 per acre.

Mr. Underwood next considered Sale A-3. He appraised its location as superior to Mission Valley's because it was located in the Palmer Ranch DRI and applied a -10% adjustment. DX 50 (US-BB001692). For size, because Mission Valley was approximately 175 acres and A-3 was approximately 20 acres, Mr. Underwood applied a -30% adjustment. DX 50 (US-BB001690 to 001692). With respect to zoning, Mr. Underwood applied a negative five percent adjustment to Sale A-3 because the sale was contingent on rezoning the property to a higher density of seven dwelling units per acre. DX 50 (US-BB001693). In all, he adjusted Sale A-3 by -45%, for an adjusted price of $129,986 per acre.

The fourth property in Mr. Underwood's analysis of Mission Valley was Sale A-4. He did not make any location-based adjustment because Sale A-4 was located in areas with older and smaller homes, similar to that of Mission Valley. DX 50 (US-BB001692). Because Sale A-4 was approximately 25 acres, or 150 acres smaller than Mission Valley, Mr. Underwood

adjusted the price of Sale A-4 by -30%. DX 50 (US-BB001690, US-BB001692). Finally, Mr. Underwood found that Sale A-4 had a similar land use designation as the subject property, requiring no adjustment. DX 50 (US-BB001693). Mr. Underwood adjusted the price of Sale A-4 by -30%, for an adjusted price of $128,249 per acre.

Lastly, Mr. Underwood analyzed Sale A-13. For location, he increased the price of Sale A-13 by 10% because it was adjacent to a mobile home park and had limited means of access.[25] DX 50 (US-BB001690). Because Sale A-13 was 221.77 acres, larger than Mission Valley, Mr. Underwood adjusted the price of Sale A-13 upward by five percent to reflect his position that larger properties sell for less per acre. Tr. 1491-92; DX 50 (US-BB001690, US-BB001692). For land use regulations, he adjusted the price of A-13 downward by 10% because the sale was contingent on rezoning the property to a mixed-use planned unit development with multifamily residential housing -- a better zoning designation than its pre-sale designation for residential manufactured homes. DX 50 (US-BB001693). Mr. Underwood adjusted Sale A-13 by five percent, yielding an adjusted price of $89,325 per acre.

Before the adjustments, the sale prices of the comparable properties ranged from $90,000 to $259,712 per acre. After adjustments, the prices ranged from $80,325 to $138,288 per acre. Tr. 1494. Based on his analysis, Mr. Underwood appraised Mission Valley at $135,000 per acre, with development potential. Tr. 1495.

Following the instruction of Defendant's counsel, Mr. Underwood then appraised Mission Valley with the Ewing deed restriction in place -- limiting the use of the property to a golf course -- by comparing Mission Valley to sales of noneconomic remainders. Tr. 1497. Mr. Underwood defined a noneconomic remainder as a property without development potential. Tr. 1497-98. Mr. Underwood compared four parcels with development potential to four similar parcels in similar locations that did not have development potential. Tr. 1498; DX 50 (US-BB001695). Parcels without development potential sold for 9.8 to 22.6% of the value of the comparable properties with development potential. DX 50 (US-BB001695). Mr. Underwood concluded: "[t]hat tells me if I look at it with the deed restriction in place that it can't be used for residential development, and that the development potential is gone, that the site has a value roughly 15 percent of what our unrestricted value is." Tr. 1498. Mr. Underwood appraised Mission Valley at $135,000 per acre with development potential, and at $20,300 per acre, or 15% of $135,000 without development potential. Tr. 1499. Thus, he determined that the total "before value" of Mission Valley without development potential was $3,555,900. Tr. 1499; DX 50 (US-BB001696).

### What Is the Proper "Before Value" of Mission Valley?

Plaintiffs' expert appraised Mission Valley in the "before" condition, at $175,000 per acre, and Defendant's expert appraised it at $20,300 per acre with a use restriction and $135,000 per acre without the restriction. As discussed above, the Court finds Mission Valley should be appraised without the deed restriction affecting valuation.

---

[25] The chart in Mr. Underwood's report lists a 10% adjustment for A-13 with respect to location, while the narrative description states that he made a 30% adjustment. Compare DX 50 (US-BB001690), with DX 50 (US-BB001692).

In their appraisals of Mission Valley at $175,000 per acre, and $135,000 per acre, Plaintiffs' and Defendant's experts used four of the same properties in their comparable sales analyses: Sale 5/A-1, Sale 6/A-2, Sale 3/A-3, and Sale 4/A-4.   Mr. Durrance found that the market conditions for Sale 6/A-2 were inferior to those affecting Mission Valley, while Mr. Underwood did not make any time-based adjustment, indicating the properties had similar market conditions.   Compare PX 24B (BB-PLTF-11836 to 11837), and DX 50 (US-BB001690). Mr. Durrance rated Sale 6/A-2 as inferior to Mission Valley because Sale 6/A-2 was contracted in mid-2003, when market conditions were less favorable, while Mr. Underwood did not make any adjustments for time because he used the closing date of August 2004, not the contract date. DX 50 (US-BB001691).   In not making an adjustment to Sale 6/A-2 when it should have received a 1.5% adjustment for each month between the contract date and April 2004, Mr. Underwood undervalued Mission Valley.   Mr. Durrance's approach is more accurate because the price of Sale 6/A-2 was set when the sale was contracted -- in 2003 -- and the price reflects the market conditions at that time -- not the April 2004 date of valuation.

Similarly, Mr. Underwood adjusted the prices of Sale 3/A-3 and Sale 4/A-4 by -9% and -11%, respectively, because the sales closed after the date of valuation.  DX 50 (US-BB001690). However, these sales were contracted just before or around the date of the taking, and Mr. Durrance found similar conditions as the subject property.   PX 24B (BB-PLTF-11838).   In adjusting the prices of Sale 3/A-3 and Sale 4/A-4 when no adjustment was warranted, Mr. Underwood improperly inflated the values of the comparison properties.   Mr. Durrance's approach, using the contract date, better reflects the realities of the market and more accurately valued Mission Valley.

The appraisers also disagreed about how some of the properties compared in terms of land use regulations.   Mr. Durrance's analysis addressed three factors related to land use regulations: zoning/future land use, easements/encumbrances, and environmental lands.   Mr. Underwood assessed the properties in terms of "land use regulations," which did not provide the same degree of precision.   For instance, Mr. Underwood did not make any adjustments to Sale 6/A-2 to reflect advantages or disadvantages with respect to land use regulations because Mission Valley and Sale 6/A-2 had "similar zoning and land use designations."  DX 50 (US-BB001693).   Mr. Durrance agreed that the properties were zoned similarly, but rated Sale 6/A-2 as slightly inferior in terms of environmental lands because the property contained 10% more environmental lands than the subject property.   Mr. Durrance rated Sale 6/A-2 as inferior for easements/encumbrances because Sale 6/A-2 was encumbered by an overhead power transmission line, had a mesic hammock, and featured a creek -- all of which limited potential development.  PX 24B (BB-PLTF-11838).   Similarly, Mr. Durrance determined that Sale 5/A-1 was inferior with respect to environmental lands because 20 to 25% of the property consisted of environmentally sensitive lands, limiting potential development.   PX 24B (BB-PLTF-11836 to 11837).   There is no indication in the record that Mr. Underwood considered these factors, and his failure to consider these factors led him to inflate the values of the comparison properties and undervalue Mission Valley.

Mr. Durrance more accurately accounted for market conditions and provided more detail and analysis concerning land use regulations.   As such, the Court adopts $175,000 per acre as the "before value" of Mission Valley.

### Just Compensation for Mission Valley

Plaintiffs seek $725,200 in damages for the taking as it relates to Mission Valley, representing $413,400 for the 2.386-acre area encumbered by the corridor and $311,800 for the cost of buffering land adjacent to the trail.

To arrive at $413,400 for the land encumbered by the easement, Mr. Durrance first determined that the taking resulted in a loss of 99% of Plaintiffs' rights in the fee interest, and Mr. Underwood agreed. Tr. 1500. Because Mr. Durrance appraised Mission Valley at $175,000 per acre before the taking, the loss of 99% of value of the 2.386 acres was $413,400 (2.386 acres x $175,000 x 0.99).

A 25-foot wide buffer measuring 2,078.36 lineal feet, the length of the corridor on Mission Valley, would cost $139,250.12. PX 24B (BB-PLTF-11851); Tr. 384-85. Mr. Durrance assumed that buffering would be needed along the entire length of the corridor because he did not identify any areas with natural buffering.

Defendant argues just compensation should be limited to the land encumbered by the easement because the trail did not affect the property's fair market value. As discussed above, the Legacy Trail negatively affected the property values of adjacent land. Plaintiffs established that installing a 25-foot buffer at $67 per lineal foot would mitigate the damage from the trail, and is a reasonable method of quantifying Plaintiffs' severance damages. Accordingly, Plaintiffs are awarded $413,374.50 for the land taken and $139,250.12 in severance damages for a total of $552,624.62, as just compensation relating to Mission Valley.

## Stoneybrook

Plaintiff Stoneybrook Golf & Country Club of Sarasota, Inc. ("Stoneybrook"), owns a parcel of land which was occupied by a golf course, country club, and homes on the date of the taking. The property was zoned residential single-family-2 in 2004, and was within the Palmer Ranch DRI. Tr. 805. The land underlying the trail corridor is 4.322 acres.

Stoneybrook was built pursuant to a rezoning petition, with an ordinance, Ordinance 89-27, and a resolution, Resolution No. R89-131, approving the development as a special exception in 1989. Tr. 1176; DX 27, DX 28. Sarasota County approved plans to build a golf course and up to 1,870 residential units. The declaration of covenants, conditions, and restrictions ("Covenants") for Stoneybrook designated open space land for a golf course and stated that the land would remain a golf course for at least 99 years. DX 29 (US-RB006630). Additionally, Section 4 of Resolution No. R89-131 provided that land utilized for open space would be restricted by appropriate legal instruments as open space perpetually or for a period of not less than 99 years. DX 28 (US-RB006589). The Covenants also stated that all of the provisions in the Covenants would be in effect for 99 years, but were subject to amendment by at least two-thirds of the voting interests, or members of the homeowners' association, present at a vote. DX 29 (US-RB006643 to 006644).

### Plaintiffs' Expert's Valuation of Stoneybrook

Mr. Durrance determined that the highest and best use of Stoneybrook was residential development based on the property's future land use designation, its zoning district, and its

location.   Tr. 390.   To appraise Stoneybrook, Mr. Durrance conducted a comparable sales analysis using five of the same properties that he used in appraising Mission Valley.   The following table summarizes his findings:[26]

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 8/30/04 | 7/28/04 | 12/27/05 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $28 mil | $5.9 mil | $9.11mil |
| **Size (Ac)** | 196.76 | 40.00 | 15.381 | 20.77 | 199.44 | 27.732 | 38.40 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $140,000 | $213,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RSF-2/PUD & MDR | RE-1/MDR Approved units available within Palmer Ranch DRI | RSF-4/MDR Approved for 57-unit SFR sub-division | RSF-4, RMF-2, PUD & MDR / MEDR | OUE-1/MDR Approved units available within Palmer Ranch DRI | RMF-3/HDR Approved for 160-unit attached town-homes | RSF-4/MEDR Approved for 211-unit attached town-homes |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | 30-35% | 25-30% | <5% | <5% | <10% | 20-25% | 20% |
| **Easements/ Encumbrances** | Typical | Typical | Typical | Perpetual Mitigation Easement | South Creek/ Transmission Power Lines | Typical | Typical |

---

[26] This chart reflects the data provided in the table in PX 25B (BB-PLTF-13165 to 13166).

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Inferior | Similar | Superior |
| **Location** | Palmer Ranch DRI | Similar | Inferior | Slightly Inferior | Similar | Inferior | Inferior |
| **Size (Ac)** | 196.076 | Slightly Superior | Slightly Superior | Slightly Superior | Similar | Slightly Superior | Slightly Superior |
| **Zoning/Future Land Use Entitlements** | RSF-2/PUD & MDR | Slightly Inferior | Similar | Slightly Superior | Slightly Inferior | Similar | Similar |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | 30-35% | Similar | Superior | Superior | Superior | Similar | Similar |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Slightly Inferior | Inferior | Similar | Similar |
| **Comparability** | -- | Slightly Superior | Inferior | Superior | Inferior | Superior | Superior |

Mr. Durrance first compared Stoneybrook with Contract 1. He found Contract 1 was similar to Stoneybrook with respect to market conditions because it was contracted near the April 2004 taking. PX 25B (BB-PLTF-13166). Likewise, Mr. Durrance rated Contract 1's location as similar to Stoneybrook's because both properties were within the Palmer Ranch DRI. Id. However, Mr. Durrance characterized Contract 1 as slightly superior to Stoneybrook with respect to size because it was approximately 150 acres smaller. PX 25B (BB-PLTF-13165 to 13166). Mr. Durrance judged Contract 1 as slightly inferior in terms of zoning because it would need to be rezoned to achieve the same density as Stoneybrook. PX 25B (BB-PLTF-13166). Lastly, he found Contract 1 was similar to Stoneybrook with respect to environmental lands and easements because the properties contained the same amount of environmental lands and neither property was encumbered by any significant easements. Id. Mr. Durrance determined Contract 1 was slightly superior to Stoneybrook.

Mr. Durrance appraised Sale 2 as inferior to Stoneybrook. First, he found that the market conditions for Sale 2 were slightly inferior because Sale 2 was contracted in late 2002. PX 25B (BB-PLTF-13166, BB-PLTF-13193). However, the contract for Sale 2 had a $400,000 contract assignment fee, which Mr. Durrance determined mitigated the difference. Mr. Durrance also found Sale 2's location to be inferior because it was on an unimproved road. PX 25B (BB-PLTF-13166). He ranked Sale 2 as slightly superior for size because it was more than 175 acres

smaller than Stoneybrook.  Id.  Sale 2 was similar to Stoneybrook for zoning because like Stoneybrook, moderate-density residential development was permitted.  Id.  Sale 2 had less environmental lands than Stoneybrook and was therefore superior.  Id.  Lastly, Sale 2 was similar to Stoneybook with respect to easements and encumbrances because neither property had any significant easements or encumbrances.  Id.

Mr. Durrance found that Sale 3 was superior to Stoneybrook for one factor, slightly superior for two factors, and slightly inferior for three factors.  He rated Sale 3 superior because it had a smaller percentage of environmental lands.  PX 25B (BB-PLTF-13166).  Mr. Durrance deemed Sale 3 slightly superior for size and zoning because it was substantially smaller than Stoneybrook and because medium-density residential development was allowed on Sale 3.  PX 25B (BB-PLTF-13165 to 13166).  Mr. Durrance determined Sale 3 was slightly inferior for three characteristics: market conditions, location, and easements/encumbrances.  PX 25B (BB-PLTF-13166).  Mr. Durrance found Sale 3 sold under slightly inferior market conditions because its sale was contracted in September 2003 -- a time when demand and prices were lower.  PX 25B (BB-PLTF-131968, BB-PLTF-13195).  However, a $1,891,500 contract assignment fee lessened the extent of the delay's impact.  Mr. Durrance found Sale 3 was slightly inferior for location because it was adjacent to the Palmer Ranch DRI, not within the DRI as Stoneybrook was.  PX 25B (BB-PLTF-13166, BB-PLTF-13168).  Finally, he assessed Sale 3 as slightly inferior for easements/encumbrances because it was encumbered with a perpetual mitigation easement.  PX 25B (BB-PLTF-13169).

Mr. Durrance found Sale 4 was superior to Stoneybrook with respect to environmental lands because Stoneybrook had 20 to 25% more environmental lands.  PX 25B (BB-PLTF-13165).  Mr. Durrance rated Sale 4 as inferior for market conditions because its sale was contracted approximately one year before the taking occurred, when market conditions were less favorable.  PX 25B (BB-PLTF-13166, BB-PLTF-13168).  He found Sale 4 to be similar for location and size because it was located within the Palmer Ranch DRI and was only four acres larger than Stoneybrook.  PX 25B (BB-PLTF-13166, BB-PLTF-13168).  Mr. Durrance rated Sale 4 slightly inferior in terms of zoning/future land use designation because Sale 4 needed to be rezoned to reach the densities allowed on Stoneybrook.  Mr. Durrance found that Sale 4 was inferior with respect to easements/encumbrances because transmission power lines, a mesic hammock, and a creek encumbered the property, which constrained potential development. PX 25B (BB-PLTF-13169).  Overall, Mr. Durrance rated Sale 4 as inferior to Stoneybrook.

In Mr. Durrance's view, Sale 5 was slightly superior to Stoneybrook with respect to one factor, similar for five factors, and inferior for one factor.  PX 25B (BB-PLTF-13166).  He rated Sale 5 slightly superior for size because it was more than 150 acres smaller than Stoneybrook and similar with respect to market conditions because it sold within three months of the taking.  PX 25B (BB-PLTF-13165 to 13166).  Sale 5 was similar to Stoneybrook in terms of zoning because both properties were designated for moderate-density residential development.  PX 25B (BB-PLTF-13166).  Stoneybrook and Sale 5 were similar for environmental lands and easements/encumbrances because they contained approximately the same amount of environmental lands and neither had any easements or encumbrances that affected potential development.  PX 25B (BB-PLTF-13169).  Ultimately, Mr. Durrance appraised Sale 5 as superior to Stoneybrook.

47

Finally, Mr. Durrance compared Stoneybrook to Sale 6.  Mr. Durrance determined Sale 6 sold under superior market conditions because its sale was contracted in mid-2005, a year after the date of the taking when real estate prices were reaching their peak.  PX 25B (BB-PLTF-13168).  Mr. Durrance deemed Sale 6 inferior in terms of location because it was located outside of the Palmer Ranch DRI and bordered an interstate and an overhead power line.  PX 25B (BB-PLTF-13168).  He found Sale 6 similar for zoning because it also allowed for moderate-density residential development.  PX 25B (BB-PLTF-13168).  Lastly, Mr. Durrance concluded Sale 6 was similar for containing the same amount of environmental lands and not being encumbered by any significant easements.  PX 25B (BB-PLTF-13169).  Mr. Durrance rated Sale 6 superior to Stoneybrook.

Mr. Durrance concluded that Contract 1, which sold for $206,000 per acre, was most similar to Stoneybrook.  Accordingly, he appraised Stoneybrook at $200,000 per acre.

### Defendant's Expert's Valuation of Stoneybrook

Mr. Underwood appraised Stoneybrook using the same approach that he used to appraise Mission Valley -- first using a comparable sales analysis to find the unrestricted value of Stoneybrook, and then appraising the property without development potential because of the open space use restriction.  Tr. 1526.  Before making any adjustments, the per acre prices of the comparable properties ranged from $90,000 to $259,712.  The following table summarizes Mr. Underwood's adjustments:[27]

|  | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | SEC Corner of Central Sarasota Pkwy & McIntosh Rd. | W side of Cattlemens Rd. N of Richardson Rd. | E side of Honore Ave. S of Central Sarasota Pkwy | E side of Honore Ave. S of Clark Rd. | NWC of Cattlemens Rd. & Colonial Oaks Blvd. | S side of SR 681 E of US 41 |
| **Sale Price** | N/A | $5.9 mil | $28 mil | $5.402 mil | $5.3 mil | $19,959,100 |
| **Sale Date** |  | 7/04 | 8/04 | 10/04 | 11/04 | 8/05 |
| **Cond of Sale** |  | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RSF-2/MDR | RMF-3/HDR | OUE-1/MDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RMH/MDR |

----

[27] This chart reflects the data provided in the table in DX 53 (US-BB003782 to 003783).

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| Size (Ac) | 123.322[28] | 27.732 | 199.44 | 20.80 | 25.746 | 221.77 |
| Price/Acre | | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| Adjustments | | | | | | |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Time | | 0% | 0% | -9% | -11% | -15% |
| Time-Adjusted Sales Price | | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |
| Location | | 10% | 0% | 0% | 10% | 20% |
| Property Size | | -20% | 15% | -20% | -20% | 15% |
| Land Use Regulation | | -5% | 0% | -5% | 0% | -10% |
| Total Adjustment | | -15% | 15% | -25% | -10% | 25% |
| Adjusted Price/Acre | | $180,838 | $161,452 | $177,254 | $164,892 | $95,625 |

Mr. Underwood used the same properties in this comparable sales analysis as he used in the analysis for Mission Valley. Thus, when he adjusted the sales prices for time, he made the same adjustments as described above, adjusting Sale A-3 by -9%, Sale A-4 by -11%, and Sale A-13 by -15%. DX 53 (US-BB003782 to 003783). Mr. Underwood then compared Stoneybrook with the five comparable sales based on the three other factors -- location, size, and land use regulations.

Mr. Underwood determined Sale A-1 was in a less desirable location than Stoneybrook because A-1 was next to rental apartments and in an area with smaller and older homes. DX 53 (US-BB003784). He applied a 20% downward adjustment to reflect the fact that Sale A-1 was substantially smaller than Stoneybrook. DX 53 (US-BB003784 to 003785). Lastly, he adjusted Sale A-1's sale price by negative five percent because it was zoned for a density of 5.77 dwelling units per acre, a greater density than that allowed for Stoneybrook. DX 53 (US-BB003786). In

---

[28] The experts appraised Stoneybrook using different sizes. Mr. Durrance appraised the property at 196.076 acres, the combination of Units 1 and 8 from the recorded plat book. Joint Status Report, Oct. 19, 2012. Mr. Underwood determined that the property measured 123.322 acres based on the County tax roll. This difference does not affect the damages at issue.

all, he adjusted the price of Sale A-1 by -15%, for an adjusted price of $180,838 per acre. DX 53 (US-BB003782).

Mr. Underwood then compared Sale A-2 with Stoneybrook. He did not make any adjustments for location because both properties were within the Palmer Ranch DRI. DX 53 (US-BB003784). He increased the price of Sale A-2 by 15% pursuant to the large-lot adjustment because it was almost 200 acres. DX 53 (US-BB003784 to 003785). Mr. Underwood did not make any adjustments for land use regulations because the properties were zoned similarly and had similar future land use designations. DX 53 (US-BB003786). After considering all of the factors, Mr. Underwood adjusted Sale A-2 by 15%, for an adjusted price of $161,452 per acre. DX 53 (US-BB003783).

For Sale A-3, Mr. Underwood began with the time-adjusted price of $236,338 per acre, and did not make any adjustments for location, as Sale A-3 and Stoneybrook were both in the Palmer Ranch DRI. DX 53 (US-BB003782 to 003784). Mr. Underwood applied a -20% adjustment because Sale A-3 was 100 acres smaller than Stoneybrook. Lastly, he applied a negative five percent adjustment for land use regulations because the sale of Sale A-3 was contingent on rezoning for denser development. DX 53 (US-BB003786). After adjusting for time by negative nine percent, Mr. Underwood adjusted the sales price of Sale A-3 by an additional -25% to reflect these differences, resulting in an adjusted price of $177,254 per acre. DX 53 (US-BB003783).

For Sale A-4, Mr. Underwood began with the time-adjusted price of $183,213 per acre, and because Sale A-4 was located near Sale A-1, a less desirable area, he applied a 10% adjustment. DX 53 (US-BB003784 to 003785). Because Sale A-4 was almost 100 acres smaller than Stoneybrook, following his large-lot adjustment theory, Mr. Underwood applied a -20% adjustment. DX 53 (US-BB003783 to 003784). He did not make any adjustments for land use regulations because the zoning and land use designations for Sale A-4 were similar to those of Stoneybrook. DX 53 (US-BB003786). After adjusting by -11% for time, Mr. Underwood adjusted Sale A-4 by -10%, resulting in a final adjusted price of $164,892 per acre. DX 53 (US-BB003782 to 003783).

Finally, Mr. Underwood compared Stoneybrook to Sale A-13, beginning with its time-adjusted price. He applied a 20% adjustment for location because it was next to a mobile home development and southeast of major roads, a less desirable location than Stoneybrook. DX 53 (US-BB003784). He made a 15% adjustment for size because Sale A-13 was 221.77 acres, almost 100 acres larger than Stoneybrook. Mr. Underwood also made a -10% adjustment for land use regulations because the contract for Sale A-13 was contingent upon rezoning to a mixed-use planned development with multifamily housing. DX 53 (US-BB003786). The non-time related adjustments for Sale A-13 totaled 25%, resulting in a final adjusted price of $95,625. DX 53 (US-BB003782 to 003783).

Mr. Underwood concluded Sale A-2, which sold for an adjusted price of $161,452 per acre, was the most comparable to Stoneybrook, while Sales A-1 and A-13 were the least similar. DX 53 (US-BB003786). Based on this analysis, Mr. Underwood appraised Stoneybrook at $165,000 per acre before the taking without development restrictions. Tr. 1529; DX 53 (US-BB003786).

Mr. Underwood then appraised Stoneybrook with the assumption that it had no other potential uses than as a golf course.  He imposed this restriction because the zoning ordinance that approved the development did not allocate any residential density to the golf course.  Tr. 1526-27.  To value Stoneybrook as a golf course, Mr. Underwood utilized the same paired analysis featuring noneconomic remainders that he created as part of the Mission Valley appraisal, which provided that a property without development potential was worth 15% of the value of the same property with developmental potential.  DX 53 (US-BB003787 to 003788).  Accordingly, he appraised Stoneybrook at $24,800 per acre.  Tr. 1530; DX 53 (US-BB003788 to 003789).

### What Is the Proper "Before Value" of Stoneybrook?

The parties dispute whether Stoneybrook was subject to a 99-year open space requirement.  The 99-year open space restriction is set forth in the resolution granting the petition for a special exception and documented in the Covenants recorded with the County in 1994.  DX 28 (US-RB006589), DX 29 (US-RB006630).  Mr. Durrance acknowledged the use restriction in his appraisal report but determined that it had no effect, stating:

> The property is subject to the covenants, conditions, and restrictions for the Stoneybrook Golf and Country Club of Sarasota and identified as Community Common Areas and Club Common Areas.  The private restrictions, imposed on the property when it was developed, can be removed by a majority vote of the members.

PX 25B (BB-PLTF-13165).  The removal mechanism Mr. Durrance referenced is contained in the amendments provision of the Covenants.  DX 29 (US-RB006643 to 006644).

Mr. Bass, Defendant's expert in land use planning, opined that Stoneybrook could not be used for residential development, testifying:

> [T]he density's already been transferred off the golf course, off the common area.  When in rezoning process, you're coming with a special exception to put a golf course in, open space preservation.  You're clustering your density over to development pots, so there is no density on the golf course at present, as of the date the ordinance was adopted.  That's why you do a clustering or [planned unit development].  You move the density around on site.  Take smaller lots.

Tr. 1175.  Mr. Bass disagreed with Ms. Allred's conclusion that the County would ignore the Covenants, stating: "I believe they would not ignore it because they're the ones who required it."  Tr. 1194.  He opined that if a rezoning petition made it through the review process, the Board of County Commissioners would deny it.  Tr. 1194-95.  However, Mr. Bass acknowledged that Stoneybrook could be rezoned if there were unified control and ownership over the property.  Tr. 1289-92.  Specifically, if the residents who owned land within the Stoneybrook development agreed to develop the golf course, they could file a corrected deed and rezoning petition, and proceed through the rezoning process.

Stoneybrook should be appraised without the use restriction.  The fact that Stoneybrook was subject to use restrictions in April 2004, does not limit its highest and best use if Plaintiffs can show that a more valuable use was physically possible, appropriately supported, and

financially feasible. McCandless v. United States, 298 U.S. 340, 345 (1936); Lovelandies Harbor Inc. v. United States, 21 Cl. Ct. 153, 156 (1990). Plaintiffs satisfied this burden here. First, Mr. Bass testified that Stoneybrook could be rezoned assuming there was unified control and ownership of the property, as the unit rule requires. Tr. 1288-91. Similarly, under the unit rule, the 99-year use restriction in the Covenants could be removed because the Covenants were subject to amendment, and the unit rule requires an appraiser to assume unified control and ownership. See DX 29 (US-RB006643 to 006644). Second, according to Ms. Allred's credible testimony, Sarasota County would not consider open space restrictions in the context of rezoning unless they were related to habitat preservation. Tr. 780. The restriction here preserves open space for a golf course -- not habitat preservation. Plaintiffs have put forth sufficient evidence to show that rezoning for residential development was reasonably probable, because such a proposed change comports with this property's future land use designation under Sarasota County's comprehensive plan. PX 11, PX 25B (BB-PLTF 13164).

Even without the use restriction, the parties do not agree on the value of Stoneybrook before the taking. Mr. Durrance appraised the property at $200,000 per acre, while Mr. Underwood appraised it at $165,000 per acre. Messrs. Durrance and Underwood used two of the same properties in their analyses: Sale 4/A-2 and Sale 3/A-3. While the appraisers agreed about how the properties compared to Stoneybrook overall -- that Sale A-3 was superior and Sale 4/A-2 was inferior -- they disagreed about how the properties compared with respect to market conditions and land use regulations. Specifically, for market conditions, Mr. Underwood did not make any time-based adjustments to Sale 4/A-2 because the sale closed in August 2004. In contrast, Mr. Durrance rated Sale 4/A-2 as inferior to Stoneybrook because its sale was contracted a year before the date of valuation. Compare DX 53 (US-BB003782), with PX 25B (BB-PLTF-13165 to 13166). Similarly, Mr. Underwood applied a negative nine percent adjustment to Sale 3/A-3 because the sale closed in October 2004, indicating it sold during superior market conditions, while Mr. Durrance rated the same property slightly inferior because its sale was contracted in September 2003. Compare DX 53 (US-BB003782), with PX 25B (BB-PLTF-13165 to 13166). Again, Mr. Durrance based his analysis on the dates when Sales 3/A-3 and 4/A-2 were contracted, while Mr. Underwood used the closing dates, and inflated the value of Sale 3/A-3. Mr. Durrance's approach better reflects the market conditions when the prices for the properties were determined, and is therefore more accurate and persuasive.

The experts also approached land use differently. Mr. Durrance addressed three types of restrictions: zoning/future land use designation, environmental lands, and easements/encumbrances. Mr. Underwood utilized one category, zoning/future land use, and did not mention a 2.3-acre perpetual mitigation easement that limited development on Sale 3/A-3, while Mr. Durrance rated Sale 3 as slightly inferior for easements/encumbrances because of the mitigation easement. Mr. Underwood made a negative five percent adjustment for land use regulations, indicating Sale 3/A-3 was superior to Stoneybrook for that factor. Moreover, Mr. Underwood did not acknowledge the fact that Sale 4/A-2 featured a creek, mesic hammock, and overhead transmission power lines, while Mr. Durrance rated the property as inferior because of those development constraints. Mr. Durrance's more thorough consideration of land use better reflected the "before value" of Stoneybrook, while Mr. Underwood inflated the value of Sales 3/A-3 and 4/A-2. Mr. Durrance appraised Stoneybrook at $200,000 per acre, and the Court adopts this as the "before value" of the property.

## Just Compensation for Stoneybrook

After the taking, 4.322 acres of Stoneybrook are occupied by the trail corridor. The corridor runs along the eastern side of the property for 2,017.62 lineal feet. Plaintiffs seek $1,483,900 in compensation in relation to Stoneybrook -- $860,500 for the land encumbered by the easement, $302,600 in severance damages, and $320,800 for "conversion land damages." Defendant argues just compensation should be limited to the land encumbered by the easement and would limit just compensation to $106,100 per acre, based on the assumption that Stoneybrook did not have development potential.

As discussed above, Stoneybrook should be appraised with development potential, at $200,000 per acre. As such, because 4.322 acres of Stoneybrook are encumbered by the rail-trail corridor, Plaintiffs are awarded $855,756 for the land encumbered.

Plaintiffs are also entitled to compensation for the cost of installing a 50-foot buffer for the 2,017.62 lineal feet of land adjacent to the corridor. As discussed above, because Stoneybrook is in the Palmer Ranch DRI, which required a 50-foot buffer, adding such a buffer on the land adjacent to the corridor at $115 per lineal foot is a reasonable means of mitigating the negative effect of the trail on the value of the Stoneybrook remainder. Accordingly, Plaintiffs are entitled to $232,026.30 in severance damages representing the cost of buffering.

Plaintiffs seek "conversion land damages" for Stoneybrook but do not seek this category of damages for the other 12 properties. These damages represent the value of an additional 35 feet of land adjacent to the trail necessary to create a 50-foot wide buffer. Mr. Durrance included conversion damages for Stoneybrook because after the taking, a developer would need to set aside an additional 35 feet of land for a setback and buffering along the trail to comply with the Palmer Ranch Development Code, which required a 50-foot buffer, and that land would have been rendered unusable for other purposes. Tr. 391-93. He provided the following explanation:

> [P]er the Palmer Ranch Development Code, the minimum required buffer width along the new rail/trail corridor is 50 feet, which is an increase of 35 feet from the Before condition and results in 1.62 acres of developable residential lands being converted to buffer area. The use of this area has essentially been acquired as a result of the rail-trail easement. In other words, it is a linear strip of land along the perimeter of the property that is essentially "set aside" for other uses and effectively becomes the new boundary of the property.

PX 25B (BB-PLTF-13183). Mr. Durrance continued:

> The manner in which that was calculated is in the before condition, the market says 10 to 20 feet. I used 15 feet, a 15-foot setback from the perimeter as the typical market before situation, and I used 50 feet in the after, so you have an increased setback or distance, if you will, and that 35 feet of additional land area as a result of the new easement times the length comes out to 1.62 acres that I've put there in the chart, and you can see the calculations there, $320,800. It essentially eliminates some land area is what it does.

Tr. 391-93. In sum, Mr. Durrance determined that a 35-foot wide strip of land adjacent to the trail would need to be converted to a buffer to comply with the Palmer Ranch Development Code, and Plaintiffs seek damages of $320,800 representing the value of the land underlying the 35-foot wide strip, because the buffered land could not be used for other purposes. Defendant contends Plaintiffs are not entitled to recover conversion damages because the Palmer Ranch Development Code does not have the force of law.

Plaintiffs' claim for conversion damages presents an issue of first impression. Plaintiffs include their claim for conversion land damages under the rubric of severance damages. When a partial taking occurs, a plaintiff may recover severance damages to compensate for the diminution in the value of the remainder caused by the taking. See United States v. Grizzard, 219 U.S. 180, 184 (1911) (awarding severance damages because plaintiff proved that the partial taking caused plaintiff to lose access to a village market, church, and school, which lessened the remainder's value); United States v. Welch, 217 U.S. 333, 338-39 (1910) (awarding severance damages because plaintiff proved that the partial taking caused plaintiff to lose access to a right-of-way, which decreased the value of the remainder); Georgia-Pac. Corp. v. United States, 226 Ct. Cl. 95, 123-24 (1980) (per curiam) (awarding severance damages because plaintiff proved that a partial taking of forest land negatively impacted the manner in which the remainder could be logged, decreasing the value of the remainder).

In order to recover severance damages, Plaintiffs must demonstrate that the taking caused a diminution in the value of the remainder. See Grizzard, 219 U.S. at 184; Welch, 217 U.S. at 338-39; Georgia-Pac. Corp., 226 Ct. Cl. at 123-24. Plaintiffs have not met that burden here. While the Legacy Trail itself caused a diminution in value to the remainder by exposing landowners to noise, trespass, and nuisance, Plaintiffs have not established that mitigation of this harm in the form of an additional 35-foot buffer would equate to a diminution in the value of the remainder. In essence, Plaintiffs are asking the Court to find that the 35-foot buffered strip is valueless. But that is not the case. Plaintiffs still own the land under the 35-foot buffer, and they have not demonstrated how the buffer adversely affected the value of either the land underneath it or the valuation of the remainder. In contrast, there is evidence that in Sarasota County buffering has a recognized value. Under the County Code, buffered areas qualify as open space, and Sarasota County has an open space requirement of 30% for urban planned unit developments, such as Stoneybrook. Tr. 778-80.

This is not a situation like Gizzard where the taking eliminated access to the remainder, causing a depreciation in the value of the remainder. Nor is this akin to Welch where the taking caused plaintiff to lose the only practical outlet from plaintiff's farm to the county road, causing a diminution in the value of the remainder. Finally, Plaintiffs' generalized assertion that the 35-foot buffer prevented them from otherwise using their land, does not come close to the detailed proof of economic loss to the remainder shown by the plaintiff in Georgia-Pacific. There, plaintiff proved that defendant's taking of forest land adversely affected the manner in which the remainder could be logged, which lowered the value of the remainder, by demonstrating the manner the timber could have been logged before the partial taking, the manner the timber had to be logged after the taking, the total quantity of timber that could be logged on the remainder, and the economic consequences of this change in logging manner. 226 Ct. Cl. at 123-25.

The Court awards Plaintiffs $1,087,782.30 in damages with respect to Stoneybrook, representing $855,756 for the land encumbered by the easement and $232,026.30 in severance damages for the cost of installing a 50-foot wide buffer.

## TPC-Prestancia

Plaintiff Tournament Players Club at Prestancia, Inc. owns TPC-Prestancia ("TPC"), a tract of land with an 18-hole golf course, a clubhouse, and related facilities.[29] McIntosh Road runs north-south along the eastern border, separates TPC from the rail-trail corridor, and runs along the McIntosh Road right-of-way. PX 26C. The parties agreed that land underlying the rail-trail corridor measured 3.903 acres.

TPC-Prestancia's golf course was built in the mid-1980s, after Sarasota County approved a 986-unit residential development adjacent to the course. DX 30. TPC was developed pursuant to an incremental development order, allowing a development to be added to an existing DRI. Tr. 1200-01. Exhibit B to the incremental development order, Resolution 84-419, stated:

> The Bay Venture Corporation, as committed in the [Application for Incremental Development Approval], shall provide 146.5 acres of parks and green space, a 106.3 acre golf course and club, and 65 acres of lakes/ponds. All recreational facilities shall be maintained via membership fees, mandatory master home-owners association, sub-home owner/condo associations, and other similar maintenance and management operations.

DX 30 (BB-PLTF-15879).[30] Section 4.1 of the resolution stated that all conditions, restrictions, requirements, commitments, and impact mitigating provisions in the resolution were enforceable by Sarasota County by an action at law or equity. DX 30 (BB-PLTF-15863).

The Covenants for TPC, which were recorded in 1986, provided that land designated on the property plan as a golf club would only be used for "Golf Course Purposes." DX 31 (BB-PLTF-15805, BB-PLTF-15809 to 15810). The Covenants further provided that the provisions would remain in effect for 99 years. DX 31 (BB-PLTF-15830 to 15831). However, the Covenants were subject to amendment by a vote of two-thirds of all members of the homeowners' association. DX 31 (BB-PLTF-15831).

### Plaintiffs' Expert's Valuation of TPC-Prestancia

Plaintiffs' expert appraised TPC by comparing it to six other nearby properties, with residential development as the highest and best use. The six properties that Mr. Durrance used to appraise TPC were the same properties he used to appraise Stoneybrook. The following table

---

[29] An aerial image of TPC is in Appendix C.

[30] Bay Venture Corporation, Inc., the company that developed the TPC golf course and adjacent residential development, submitted the application for incremental development approval for TPC. DX 30.

summarizes his findings:[31]

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 8/30/04 | 7/28/04 | 12/27/05 |
| **Sale Price** | -- | $8.250 mil | $2.7 mil | $5.402 mil | $28 mil | $5.9 mil | $9.11 mil |
| **Size (Ac)** | 226.241 | 40.00 | 15.381 | 20.77 | 199.44 | 27.732 | 38.40 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $140,000 | $213,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RSF-2/PUD RMF-1/PUD & MDR | RE-1/MDR Approved units available within Palmer Ranch DRI | RSF-4/MDR Approved for 57-unit SFR subdivision | RSF-4, RMF-2, PUD & MDR / MEDR | OUE-1/MDR Approved units available within Palmer Ranch DRI | RMF-3/HDR Approved for 160-unit attached town-homes | RSF-4/MEDR Approved for 211-unit attached town-homes |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | <5% | 25-30% | <5% | <5% | <10% | 20-25% | 20% |
| **Easements/ Encumbrances** | Typical | Typical | Typical | Perpetual Mitiga-tion Easement | South Creek/ Trans-mission Power Lines | Typical | Typical |
| **Shape/Configuration** | Irregular | Slightly Irregular | Generally Rectang-ular | Generally Rectang-ular | Slightly Irregular | Generally Rectang-ular | Triangular |
|  |  |  |  |  |  |  |  |

---

[31] This chart reflects the data provided in the table in PX 26B (BB-PLTF-13293 to 13294).

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Inferior | Similar | Superior |
| **Location** | Palmer Ranch DRI | Similar | Inferior | Slightly Inferior | Similar | Inferior | Inferior |
| **Size (Ac)** | 226.241 | Slightly Superior | Slightly Superior | Slightly Superior | Similar | Slightly Superior | Slightly Superior |
| **Zoning/Future Land Use Entitlements** | RSF-2/PUD RMF-1/PUD & MDR | Slightly Inferior | Similar | Slightly Superior | Slightly Inferior | Similar | Similar |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | <5% | Inferior | Similar | Similar | Similar | Inferior | Inferior |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Slightly Inferior | Inferior | Similar | Similar |
| **Shape/Configuration[32]** | Irregular | Slightly Superior | Superior | Superior | Slightly Superior | Superior | Slightly Superior |
| **Comparability** | -- | Superior | Similar | Superior | Inferior | Superior | Superior |

Mr. Durrance first compared TPC to Contract 1, a 40-acre property that was under contract with a developer in mid-2004 for a proposed residential subdivision. PX 26B (BB-PLTF-13293). Mr. Durrance determined that Contract 1 was similar to TPC with respect to

---

[32] The table in Mr. Durrance's appraisal report for TPC states that all of the comparable properties are "superior" with respect to shape/configuration. PX 26B (BB-PLTF-13294). However, the narrative explanation of this factor in the report states: "The subject is irregular in shape and configuration. Sales 2, 3, and 5 are generally rectangular in shape and are considered to be superior to the subject. Contract 1 and Sales 4 and 6 have slightly irregular shape/configurations and are estimated to be slightly superior to the subject." PX 26B (BB-PLTF-13297). Because the narrative description reflects the descriptions of the properties' shape/configurations that Mr. Durrance provided in the summary of each property preceding the discussion of adjustments, the Court assumes that Mr. Durrance appraised Sales 2, 3, and 5 as "superior" and Contract 1 and Sales 4 and 6 as "slightly superior" with respect to shape/configuration.

market conditions because its contract was signed in July 2004, three months after the date of the taking.  PX 26B (BB-PLTF-13296).  The properties were also similar in terms of location because both were located within the Palmer Ranch DRI.  Id.  Mr. Durrance determined that Contract 1 was slightly superior in terms of size because it was 40 acres, and "in some instances smaller sized properties may sell for higher unit prices."  Id.  Mr. Durrance found Contract 1 was slightly inferior for zoning because it was zoned residential estate-1, a lower density designation than TPC, and required rezoning to achieve moderate-density development.  Id.  He rated Contract 1 inferior with respect to environmental lands because 25% to 30% were occupied by environmentally sensitive lands, while less than five percent of TPC was.  PX 26B (BB-PLTF-13293 to 13294).  Mr. Durrance found that TPC did not have any easements or encumbrances that negatively affected TPC's development potential.  He opined that the McIntosh Road right-of-way, while an easement, was typical of the DRI.  PX 26B (BB-PLTF-13296).  Mr. Durrance determined the McIntosh Road right-of-way was not a negative because it ran throughout the Palmer Ranch DRI.  Id.  Finally, Mr. Durrance rated Contract 1 slightly superior with respect to shape/configuration because TPC was more irregularly shaped.  PX 26B (BB-PLTF-13297).  After considering these five factors, Mr. Durrance concluded that Contract 1 was superior to TPC.  Id.

Mr. Durrance compared TPC to Sale 2, a 15.381-acre property located on an unimproved road.  PX 26B (BB-PLTF-13293 to 13294).  He rated Sale 2 slightly inferior to TPC with regard to market conditions because the sale was contracted in 2002, when demand was not as strong.  PX 26B (BB-PLTF-13296).  However, the contract included a $400,000 contract assignment fee, which reflected changing market conditions and mitigated the impact of the gap in time.  Mr. Durrance found Sale 2 to be inferior in terms of location because it was on an unimproved road.  Id.  He assessed Sale 2 as slightly superior for size because it was more than 200 acres smaller than TPC.  PX 26B (BB-PLTF-13293).  Mr. Durrance determined Sale 2 was similar for environmental lands and easements/encumbrances because the properties had less than five percent environmentally sensitive lands and neither was negatively impacted by an easement or encumbrance.  PX 26B (BB-PLTF-13296 to 13297).  Lastly, he appraised Sale 2 as superior to TPC with respect to shape/configuration because Sale 2 was generally rectangular, while TPC was irregular.  PX 26B (BB-PLTF-13297).  Mr. Durrance's final assessment of Sale 2 was that it was similar to TPC.  Id.

Mr. Durrance next compared TPC to Sale 3, a property to the east of the Palmer Ranch DRI.  He rated the market conditions for Sale 3 as slightly inferior because the sale was contracted in September 2003, when market conditions were less favorable because of weaker demand.  PX 26B (BB-PLTF-13294 to 13296).  However, the sales contract included a $1,891,500 assignment fee, which lessened the negative impact of the time of sale.  Because Sale 3 was approximately 200 acres smaller than TPC, Mr. Durrance rated it as slightly superior for size.  PX 26B (BB-PLTF-13296).  Mr. Durrance appraised Sale 3 as slightly superior for zoning because it had entitlements in place to allow for medium-density residential development.  Id.  He determined Sale 3 was similar to TPC because both properties had less than five percent environmental lands.  PX 26B (BB-PLTF-13293 to 13294).  Mr. Durrance rated Sale 3 slightly inferior regarding easements/encumbrances because it had a perpetual mitigation easement that limited development on the property.  PX 26B (BB-PLTF-13296).  Finally, Mr. Durrance assessed Sale 3 as superior for shape/configuration because it was more regularly shaped.  In all, Mr. Durrance appraised Sale 3 as superior to TPC.  PX 26B (BB-PLTF-13297).

Mr. Durrance rated Sale 4, an almost 200-acre property located within the Palmer Ranch DRI, as inferior to TPC with respect to market conditions because its sale was contracted one year before the date of the taking. PX 26B (BB-PLTF-13296). He rated Sale 4 as similar in terms of size and location because it was approximately 25 acres smaller than TPC and both properties were in the Palmer Ranch DRI. PX 26B (BB-PLTF-13293, BB-PLTF-13296). Mr. Durrance found Sale 4 to be slightly inferior in terms of zoning because it needed to be rezoned from open use estate-1 to residential multifamily to reach the same level of density allowed on TPC. PX 26B (BB-PLTF-13296). Mr. Durrance determined that the properties were similar for environmental lands because each contained less than five percent environmental lands. Id. He concluded that Sale 4 was inferior to TPC in terms of easements/encumbrances because it was encumbered by a transmission power line, a mesic hammock, and a creek, which limited development. Id. Mr. Durrance determined that Sale 4 was slightly superior for shape/configuration because it was less irregularly shaped than TPC. PX 26B (BB-PLTF-13297). Mr. Durrance concluded that in all, Sale 4 was inferior to TPC.

Mr. Durrance determined Sale 5 was similar to TPC in regard to market conditions because the sale closed in July 2004, three months after the date of the taking. PX 26B (BB-PLTF-13295). For location, Mr. Durrance found that Sale 5 was inferior to TPC because Sale 5 was near an interstate. Id. He rated Sale 5 slightly superior with respect to size because it was almost 200 acres smaller than TPC. Id. He found Sale 5 and TPC to be similar in terms of zoning because both properties had zoning in place to allow moderate-density residential development. Id. Mr. Durrance deemed Sale 5 inferior for environmental lands because 20 to 25% of Sale 5 was occupied with such lands. PX 26B (BB-PLTF-13293, BB-PLTF-13296). He rated Sale 5 similar for easements/encumbrances because neither property had any easements that significantly impacted development potential. PX 26B (BB-PLTF-13296). Lastly, Mr. Durrance deemed Sale 5 superior for shape/configuration because Sale 5 was more regularly shaped. PX 26B (BB-PLTF-13297). Overall, Mr. Durrance rated Sale 5 superior to TPC.

Finally, Mr. Durrance compared TPC to Sale 6. Sale 6 sold in December 2005, when demand for real estate was higher, leading Mr. Durrance to rate it superior. PX 26B (BB-PLTF-13296, BB-PLTF-13338). Because Sale 6 was outside of the Palmer Ranch DRI, Mr. Durrance rated it inferior to TPC for location. PX 26B (BB-PLTF-13296). He deemed Sale 6 slightly superior to Sale 6 with respect to size because it was almost 200 acres smaller than TPC. Id. He found Sale 6 to be similar to TPC with respect to zoning because the properties had zoning and land use restrictions in place to allow moderate-density residential development. Id. Mr. Durrance determined Sale 6 was inferior because 20% of Sale 6 had environmentally sensitive lands, while TPC had less than 5%. PX 26B (BB-PLTF-13293 to 13294). He assessed Sale 6 as similar to TPC for easements/encumbrances because neither property had any easements or encumbrances that affected the property's development potential. PX 26B (BB-PLTF-13296 to 13297). Finally, Mr. Durrance found Sale 6 to be slightly superior for shape/configuration because Sale 6 was less irregularly shaped. PX 26B (BB-PLTF-13297). Ultimately, Mr. Durrance evaluated Sale 6 as superior to TPC.

Mr. Durrance ranked the properties from superior to inferior and concluded that TPC was most similar to Contract 1, which sold for $206,000 per acre, and Sale 2, which sold for $176,000 per acre. Mr. Durrance appraised TPC at $200,000 per acre before the taking. PX 26B (BB-PLTF-13297).

**Defendant's Expert's Valuation of TPC-Prestancia**

Defendant's expert also appraised TPC using a comparable sales analysis. As he did for Mission Valley and Stoneybrook, Mr. Underwood initially appraised TPC without any development restrictions and with residential development as the highest and best use, but then changed his assumption based on counsel's instruction. Like Mr. Durrance, Mr. Underwood used the same properties to appraise TPC as he did to appraise Stoneybrook. Before making any adjustments, the prices of the comparable properties ranged from $90,000 to $259,712 per acre. The following table summarizes the properties used and the adjustments that Mr. Underwood made:[33]

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | SWC of Palmer Ranch Pkwy & McIntosh Rd. | W side of Cattlemens Rd. N of Richardson Rd. | E side of Honore Ave. S of Central Sarasota Pkwy | E side of Honore Ave. S of Clark Rd. | NWC of Cattlemens Rd. & Colonial Oaks Blvd. | S side of SR 681 E of US 41 |
| **Sale Price** | | $5.9 mil | $28 mil | $5.402 mil | $5.3 mil | $19,959,100 |
| **Sale Date** | | 7/04 | 8/04 | 10/04 | 11/04 | 8/05 |
| **Cond of Sale** | | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RE-2/MDR | RMF-3/HDR | OUE-1/MDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RMH/MDR |
| **Size (Ac)** | 201.903[34] | 27.732 | 199.44 | 20.80 | 25.746 | 221.77 |
| **Price/Acre** | | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| **Adjustments** | | | | | | |
| **Financing** | | 0% | 0% | 0% | 0% | 0% |

[33] This chart reflects the data provided in the table in DX 52 (US-BB002267 to 002268).

[34] Mr. Durrance appraised TPC as a 226.24-acre property, consisting of the platted acreage, the portion of land encumbered by the easement, the golf course, and the land encumbered by the McIntosh Road right-of-way. Joint Status Report, Oct. 19, 2012. Mr. Underwood appraised TPC without the land encumbered by the McIntosh Road right-of-way and determined it was 201.903 acres. Id. This difference does not affect the damages at issue.

|  | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Time** |  | 0% | 0% | -9% | -11% | -15% |
| **Time-Adjusted Sales Price** |  | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |
| **Location** |  | 10% | 0% | 0% | 10% | 20% |
| **Property Size** |  | -35% | 0% | -35% | -35% | 0% |
| **Land Use Regulation** |  | -5% | 0% | -5% | 0% | -10% |
| **Other** |  | -30% | 0% | -40% | -25% | 10% |
| **Total Adjustment** |  | -30% | 0% | -40% | -25% | 10% |
| **Adjusted Price/Acre** |  | $148,926 | $140,393 | $141,803 | $137,410 | $84,150 |

Mr. Underwood first adjusted the sales prices for time, making the same adjustments in his appraisals of Mission Valley and Stoneybrook, resulting in a -9% adjustment to Sale A-3, a -11% adjustment to Sale A-4, and a -15% adjustment to Sale A-13. Mr. Underwood then compared TPC with the five comparable sales based on the three other factors -- location, size, and land use regulations.

Mr. Underwood first analyzed Sale A-1, a 27.732-acre property. He adjusted the price of Sale A-1 by 10% because it was located in a less desirable area of Sarasota County where homes were typically older and smaller. DX 52 (US-BB002269). Because Sale A-1 was approximately 170 acres smaller than TPC, Mr. Underwood applied the 35% large-lot adjustment. DX 52 (US-BB002267). Lastly, he applied a negative five percent adjustment for land use regulations because Sale A-1 was zoned to allow development at 5.77 dwelling units per acre, while TPC was zoned to allow 1.95 dwelling units per acre. DX 52 (US-BB002259, US-BB002271). In all, Mr. Underwood adjusted Sale A-1 by a total of -30%, for an adjusted price of $148,926 per acre. DX 52 (US-BB002267).

Mr. Underwood next compared TPC to Sale A-2. He did not make any adjustments to Sale A-2 because like TPC, it was within the Palmer Ranch DRI, it was almost the same size as TPC, and the properties were subject to similar land use regulations. DX 52 (US-BB002267 to 002271). Because Mr. Underwood did not make any adjustments to Sale A-2, its final price per acre was $140,393. DX 52 (US-BB002267).

Mr. Underwood next considered Sale A-3, a property within the Palmer Ranch DRI that was purchased for residential development. He began with the time-adjusted price of $236,338

per acre. Mr. Underwood did not make any adjustments for location because both Sale A-3 and TPC were within the DRI. DX 52 (US-BB002269). He applied the 35% large-lot adjustment because Sale A-3 was 20.8 acres, approximately 180 acres smaller than TPC. DX 52 (US-BB002267). Lastly, he adjusted the price of Sale A-3 by negative five percent to reflect the fact that it was zoned to allow development up to 7.02 dwelling units per acre. DX 52 (US-BB002265, US-BB002267). In sum, Mr. Underwood adjusted the price per acre of Sale A-3 by -40%, for a final price of $141,803 per acre. DX 52 (US-BB002267).

Mr. Underwood compared TPC to Sale A-4, a 25.746-acre property that was subsequently developed with smaller homes. He began with the time-adjusted price of $183,213 per acre. He made a 10% adjustment for location because Sale A-4 was located in the same area as Sale A-1, a less desirable area with older homes. DX 52 (US-BB002269). He applied the 35% large-lot discount because Sale A-4 was approximately 175 acres smaller than TPC. DX 52 (US-BB002267). Mr. Underwood did not make any adjustments for land use regulations because the property had similar zoning restrictions to TPC. DX 52 (US-BB002271). In addition to the -11% time-based adjustment, Mr. Underwood adjusted the price per acre of Sale A-4 by -25%, for a final adjusted price of $137,410. DX 52 (US-BB002267).

The final property in Mr. Underwood's comparable analysis was Sale A-13, and he began with the time-adjusted price of $76,500. He determined Sale A-13's location was substantially inferior to TPC's because it was adjacent to an existing mobile home park and had only one access point, resulting in a 20% adjustment. DX 52 (US-BB002269). Mr. Underwood did not make any adjustment for size because A-13 was 20 acres larger than TPC, which he deemed insignificant. DX 52 (US-BB002267). Lastly, with respect to land use regulations, Mr. Underwood adjusted the price per acre by -10% because A-13 was zoned to allow multifamily and commercial development, a designation preferable to the residential development allowed on TPC. DX 52 (US-BB002271). After adjusting for time, Mr. Underwood adjusted the price of Sale A-13 by 10%, for a final adjusted price of $84,150 per acre. DX 52 (US-BB002267).

After the adjustments, the prices of the comparison properties ranged from $84,150 to $148,926 per acre. Based on his analysis, Mr. Underwood concluded that TPC was most similar to Sale A-2, and Sales A-1 and A-3 were the next most similar. DX 52 (US-BB002271). He appraised TPC at $145,000 per acre, with residential development as the highest and best use. DX 52 (US-BB002271).

Mr. Underwood then appraised TPC with the assumption that all development rights had been removed. He applied the same analysis of noneconomic remainders that he used in appraising Mission Valley and Stoneybrook, finding that a property without development potential was worth 15% of the value of the same property with development potential. DX 52 (US-BB002273). Thus, Mr. Underwood valued 198 acres of TPC at $21,800 per acre. Further, he determined that the 3.903 acres of TPC east of McIntosh Road could not be used as a golf course. Rather, "[i]ts only use as a 50-foot strip would be passive recreation," and was accordingly worth less than the remaining land. DX 52 (US-BB002273). Based on this premise, he valued those 3.903 acres at 15% of $21,800, or $3,300 per acre. Id.[35] The combined value of the 198-acre tract and 3.90-acre tract without development potential was $4,329,279.90.

---

[35] 15% of $21,800 is $3,270, which Mr. Underwood rounded to $3,300.

**What Is the Proper "Before Value" of TPC-Prestancia?**

Mr. Durrance valued TPC at $200,000 per acre with residential development as its highest and best use.  Mr. Underwood concluded residential development was prohibited under the 99-year open use restriction and appraised it as a golf course with 198 acres worth $21,800 per acre, plus 3.903 acres that could not be used as a golf course worth $3,300 per acre.  As discussed above, the Court concludes that a property should be appraised subject to a use restriction only if the use restriction preserved land for habitats and the unit rule's assumption of unified control and ownership did not apply.  Here, the unit rule requires assuming unified control and ownership, and the restriction did not affect habitat but designated land as a golf course, which the County would not consider when reviewing a rezoning petition.  Furthermore, rezoning residential development would be consistent with TPC's future land use designation under the County's comprehensive plan.

Additionally, the fact that the restriction was set forth in the Covenants does not prohibit development because all of the provisions in the Covenants were subject to amendment by a two-thirds vote of the members of the homeowners' association.  The unit rule requires an appraiser to assume unified interests -- a unanimous vote -- that would seek the highest and best use of the property.  Accordingly, Plaintiffs have demonstrated that it was reasonably probable that the restriction could have been removed in 2004, allowing residential development.

Even aside from the development restriction, the parties do not agree as to the value of TPC before the taking.  Plaintiffs contend that it was worth $200,000 per acre, while Defendant asserts it was worth $145,000 per acre.  There were three properties that both experts used in their appraisals: Sale 5/A-1, Sale 4/A-2, and Sale 3/A-3.  Messrs. Underwood and Durrance disagreed about how these three properties compared to TPC in terms of market conditions and land use regulations.

With respect to market conditions, Messrs. Durrance and Underwood disagreed about how TPC compared to Sale 4/A-2 and Sale 3/A-3.  Mr. Durrance rated Sale 4/A-2 as inferior and Sale 3/A-3 as slightly inferior, while Mr. Underwood did not make any adjustment to Sale 4/A-2 and made a negative nine percent adjustment to Sale 3/A-3, indicating its market conditions were better than TPC's.  PX 26B (BB-PLTF-13293); DX 52 (US-BB002267).  Mr. Durrance used the dates that Sale 4/A-2 and Sale 3/A-3 were contracted -- May and September 2003.  PX 26B (BB-PLTF-13329, BB-PLTF-13332).  Mr. Underwood used the sale dates, August 2004 for Sale 4/A-2, and October 2004 for Sale 3/A-3, which resulted in his overvaluing the comparison properties and undervaluing TPC.  DX 52 (US-BB002267).

Messrs. Durrance and Underwood also disagreed about how TPC compared to Sale 4/A-2 and Sale 3/A-3 with respect to easements and encumbrances.  Mr. Durrance rated Sale 4/A-2 inferior and Sale 3/A-3 slightly inferior.  PX 26B (BB-PLTF-12293 to 12294).  Mr. Underwood only addressed the properties' zoning designations and apparently did not take into account easements or encumbrances.  DX 52 (US-BB002271).  Sale 4/A-2 was encumbered by a power line easement, a mesic hammock, and a creek, which imposed development constraints, and Sale 3/A-3 had a 2.3-acre perpetual mitigation easement, which also limited development.  The Court deems Mr. Durrance's approach more persuasive because Mr. Underwood inflated the prices of the comparison properties by ignoring these development constraints.

Additionally, Mr. Durrance considered the presence of environmentally sensitive lands. He rated Sale 5/A-1 inferior for that factor because 20 to 25% of Sale 5/A-1 contained such lands, while less than five percent of TPC had such lands. PX 26B (BB-PLTF-13293 to 13294). Mr. Underwood did not address the presence of environmentally sensitive lands, a characteristic that affects a property's development potential.

For these reasons, the Court finds Mr. Durrance's approach more persuasive and determines the "before value" of TPC to be $200,000 per acre.

### Just Compensation for TPC-Prestancia

Plaintiffs seek $772,794 in compensation with respect to TPC, representing the value of the 3.903 acres encumbered by the easement.[36] Plaintiffs do not seek any severance damages related to TPC because the rail-trail corridor is separated from the property by McIntosh Road. Defendant argues compensation should be limited to $12,800, representing the land encumbered by the easement when appraised at $3,300 per acre. Because the Court determined that TPC should be valued at $200,000 per acre before the taking, Plaintiffs are entitled to $772,794 in compensation, representing 99% of the fee interest in the 3.903 acres encumbered by the easement.

## Arielle

Plaintiff Pulte Home Corporation owns 39.907 acres of land adjacent to the corridor ("Arielle").[37] In 2004, the land was vacant, zoned residential multifamily-1, and designated for moderate-density residential development under the comprehensive plan. Tr. 833; PX 22B (BB-PLTF-12559 to 12561). The property's zoning designation allowed for a maximum of six dwelling units per acre. DX 54 (US-BB003629). The land, located within the Palmer Ranch DRI, was vacant on the date of valuation, but it had been platted as a condominium development. DX 54 (US-BB003607); Tr. 833.

Development on Arielle is governed by a 2003 Incremental Development Order as an increment of the Palmer Ranch DRI. DX 18, DX 19. On the application for the incremental development order, the developer listed the following native habitats as being present on portions of the parcel: marshes and sloughs, wet prairies, mesic hammocks, agricultural land, and a borrow pit. DX 18 (US-RB007472). The developer also indicated that the parcel contained a "plant or animal species with special status, or rare, threatened, or endangered species of special concern (e.g. mangrove, Florida coontie, golden polypody, gopher tortoise, scrub jay, indigo snake, bald eagle)," which would be managed or protected in accordance with Exhibit D to the application for Incremental Development Order, a Resource Management Plan. DX 18 (US-RB007472). The Resource Management Plan provided:

---

[36] In their post-trial brief and in Mr. Durrance's appraisal report, Plaintiffs sought $680,900 for the land encumbered by the easement. Pls.' Post-Trial Br. 70; PX 26B (BB-PLTF-13308). This calculation was based on 3.539 acres of TPC that were encumbered by the easement. In the October 19, 2012 Joint Status Report, the parties agreed that the size of the easement on TPC was 3.903 acres. 3.903 acres x $200,000 x 0.99 = $772,794.

[37] An aerial image of Arielle is in Appendix D.

2.1     Preserved Wetlands

Approximately 4.37 acres of Wetland WP #135 will be preserved within
Increment XVII.  The final configuration and acreage of preserved Wetland
WP#135 may be modified as a result of re-evaluation of the jurisdictional limits
of the system by the regulatory agencies with jurisdiction during permitting.
Mitigation for any unavoidable impact to Wetland WP #135 and to Wetlands WP
#16A, WP #16B, and WP #136A will be provided in accordance with the
permitting criteria of Sarasota County, the Southwest Florida Water Management
District, the Florida Department of Environmental Regulation, and [Master
Development Order] Native Habitat Condition B.2.  The mitigation will be
accomplished within the Increment south of Wetland WP#135.

To ensure preservation of the wetland and mitigation area, these features and their
respective 30-foot upland buffers will be set aside as perpetual preserve areas on
all plats of record, Site and Development or Construction Plans, and in
conformance with agency permits. . . .  Post-development monitoring of the
wetland and mitigation area will be conducted in accordance of the requirements
of the [Master Development Order], Sarasota County Land Development
regulations, and permits issued for the project.

. . .

2.3     Mesic Hammock

Consistent with Native Habitat Condition A.9, the 5.06-acre mesic hammock
within the Increment will be preserved.  Measures to ensure the preservation of
the mesic hammock will include designating this area as a perpetual preserve in
all plats, site and development or construction plans, and in conformance with
agency permits. . . .

DX 18 (US-RB007502 to 007504) (emphasis added).  The Resource Management Plan further
provided:

3.0     Implementation

The strategies outlined above will commence with the initiation of site
development.  The habitats designated for preservation will be managed in
perpetuity as described herein.  The Applicant will be responsible for the
implementation and financial requirements of the Resource Management Plan.
Palmer Ranch Holdings, Ltd., through a binding legal mechanism, will ultimately
transfer the management and maintenance of the preservation areas to one or
more property owners associations, special taxing units or other legally
responsible management entities.

DX 18 (US-RB007505).

The Resource Management Plan specified that the "preserved habitats within [Arielle]
are intended to be managed with the objective of maintaining native habitat characteristics."  DX

18 (US-RB007505).   The wetland preservation areas listed in the Plan were depicted in the Conceptual Development Plan as an exhibit to an ordinance approving the development and recorded with the County.   DX 19 (US-RB006164).[38]   As shown on the Conceptual Development Plan there are wetland preservation and mitigation areas on the southern portion of Arielle, adjacent to the corridor.  Appendix E (DX 19 (US-RB006164).  The plat for Arielle and an aerial image of the property indicate that development was limited to the northern half of the property, and there is no development adjacent to the corridor on the southern half of the property.  Appendix D (PX 22C (BB-PLTF-51851)), Appendix F (DX 38 (US-RB006138)).

### Plaintiffs' Expert's Valuation of Arielle

On the date of valuation, April 2, 2004, Arielle was in the midst of being developed as a 192-unit residential condominium development with site work and infrastructure on the property. PX 22B (BB-PLTF-12564).  Mr. Durrance appraised Arielle as vacant land with the highest and best use as residential development, using a comparable sales analysis based on six nearby properties.   Mr. Durrance determined that approximately one-quarter of Arielle contained environmental lands.  The following table summarizes Mr. Durrance's findings:[39]

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 8/30/04 | 7/28/04 | 12/27/05 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $28 mil | $5.9 mil | $9.11 mil |
| **Size (Ac)** | 39.907 | 40.00 | 15.381 | 20.77 | 199.44 | 27.732 | 38.40 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $140,000 | $213,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |

---

[38] The Conceptual Development Plan is in Appendix E.   The plat for Arielle is in Appendix F.

[39] This chart reflects the data provided in the table in PX 22B (BB-PLTF-12564 to 12565).

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Zoning/Future Land Use Entitlements** | RMF-1/PUD & MODR | RE-1/MDR Approved units available within Palmer Ranch DRI | RSF-4/MDR Approved for 57-unit SFR sub-division | RSF-4, RMF-2, PUD & MDR/MEDR | OUE-1/MDR Approved units available within Palmer Ranch DRI | RMF-3/HDR Approved for 160-unit attached town-homes | RSF-4/MEDR Approved for 211-unit attached town-homes |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | 20-25% | 25-30% | <5% | <5% | <10% | 20-25% | 20% |
| **Easements/ Encumbrances** | Typical | Typical | Typical | Perpetual Mitiga-tion Easement | South Creek/ Trans-mission Power Lines | Typical | Typical |
| | | | | | | | |
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Inferior | Similar | Superior |
| **Location** | Palmer Ranch | Similar | Inferior | Slightly Inferior | Similar | Inferior | Inferior |
| **Size (Ac)** | 39.907 | Similar | Similar | Similar | Slightly Inferior | Similar | Similar |
| **Zoning/Future Land Use Entitlements** | RMF-1/PUD & MODR | Slightly Inferior | Similar | Slightly Superior | Slightly Inferior | Similar | Similar |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | 20-25% | Similar | Superior | Superior | Superior | Similar | Similar |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Slightly Inferior | Inferior | Similar | Similar |

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Comparability** | -- | Slightly Inferior | Inferior | Superior | Inferior | Slightly Inferior | Slightly Superior |

Mr. Durrance first compared Arielle to Contract 1, a property that was under contract with Pulte Home Corporation in 2004. He rated Contract 1 as similar to Arielle with respect to market conditions because the sale was contracted within three months of the date of the taking. PX 22B (BB-PLTF-12564). He also assessed Contract 1 as similar in size and location because it was within the Palmer Ranch DRI and was approximately one-tenth of an acre larger than Arielle. PX 22B (BB-PLTF-12564, BB-PLTF-12567). Mr. Durrance found Contract 1 to be slightly inferior to Arielle for zoning because it was zoned to allow 4.6 dwelling units per acre and would need to be rezoned to achieve the density allowed on Arielle. PX 22B (BB-PLTF-12567, BB-PLTF-12589). He rated Contract 1 as similar with respect to environmental lands because Contract 1 contained 25 to 30% environmental lands, while Arielle had 20 to 25%. PX 22B (BB-PLTF-12564 to 12565). Lastly, Mr. Durrance found the properties to be similar in terms of easements/encumbrances because neither property contained any significant easements or encumbrances. PX 22B (BB-PLTF-12567). Mr. Durrance gave Contract 1 an overall rating of slightly inferior.

Mr. Durrance next compared Arielle to Sale 2. He rated Sale 2 slightly inferior for market conditions because its sale was contracted in late 2002, when demand and prices were lower. PX 22B (BB-PLTF-12564). However, the contract for Sale 2 included a $400,000 assignment fee, which partially compensated for the lower initial price. Mr. Durrance determined the location of Sale 2 was inferior because it was on an unimproved road in a less desirable area. PX 22B (BB-PLTF-12567). He rated Sale 2 as similar in size because it was approximately 15 acres, while Arielle was just under 40 acres. PX 22B (BB-PLTF-12564). Mr. Durrance found the properties to be similar for zoning because both properties were zoned for moderate-density development. PX 22B (BB-PLTF-12567). He deemed Sale 2 superior for environmental lands because less than 5% of the property contained environmentally sensitive lands, while Arielle contained 20 to 25%. PX 22B (BB-PLTF-12564 to 12565). Lastly, he found Sale 2 and Arielle to be similar in terms of easements/encumbrances because neither property contained significant easements/encumbrances. PX 22B (BB-PLTF-12567). Overall, Mr. Durrance found Sale 2 to be inferior to Arielle.

Mr. Durrance considered Sale 3, contracted in September 2003, when demand was weaker. PX 22B (BB-PLTF-12565 to 12567). As such, Mr. Durrance rated Sale 3 slightly inferior in terms of market conditions. However, the contract included an assignment fee, worth $1,891,500, that partially offset the contract's initial price. Mr. Durrance also rated Sale 3 as slightly inferior for location because it was adjacent to the Palmer Ranch DRI rather than within it. PX 22B (BB-PLTF-12567). Mr. Durrance deemed the properties similar with respect to size because both fell within the 15 to 40 acre range. Id. Mr. Durrance found the land use regulations for Sale 3 to be slightly superior to Arielle's because development at a slightly higher density -- seven dwelling units per acre -- was permitted on Sale 3. PX 22B (BB-PLTF-12567, BB-PLTF-12592). He determined Sale 3 was superior for environmental lands because less than

68

5% of the property contained such lands, in contrast to Arielle's 20 to 25%.  PX 22B (BB-PLTF-12567).  Finally, Mr. Durrance rated Sale 3 slightly inferior in terms of easements/encumbrances because 2.3 acres of the property was encumbered with a perpetual mitigation easement, which prohibited development.  PX 22B (BB-PLTF-12564, BB-PLTF-12565).  Based on his analysis, Mr. Durrance appraised Sale 3 as superior to Arielle.

Mr. Durrance rated Sale 4 inferior for market conditions because it was contracted in April 2003, when demand was weaker.  PX 22B (BB-PLTF-12567).  Mr. Durrance found the location of Sale 4 to be similar to that of Arielle because both properties were within the Palmer Ranch DRI.  Id.  He assessed the size of Sale 4 as slightly inferior to Arielle because it was 160 acres larger than Arielle.  PX 22B (BB-PLTF-12564, BB-PLTF-12567).  Mr. Durrance also determined that Sale 4 was slightly inferior with respect to zoning because development was permitted at 3.38 dwelling units per acre, while Arielle was zoned for denser, moderate-density development.  PX 22B (BB-PLTF-12567, BB-PLTF-12595).  Less than 10% of Sale 4 contained environmental lands, which led Mr. Durrance to rate it superior to Arielle.  PX 22B (BB-PLTF-12564, BB-PLTF-12567).  However, he deemed Sale 4 inferior with respect to easements/encumbrances because the property was encumbered with transmission power lines, a mesic hammock, and a creek, which constrained development.  PX 22B (BB-PLTF-12567).  Based on these six factors, Mr. Durrance concluded that Sale 4 was inferior to Arielle.

Mr. Durrance compared Arielle to Sale 5, a property that was subsequently developed as a 160-unit townhome community.  Mr. Durrance rated Sale 5 as similar to Arielle for all but one factor.  He deemed Sale 5 similar for market conditions because its sale was contracted in 2004, near the date of the taking.  PX 22B (BB-PLTF-12566).  Mr. Durrance found the properties to be similar in size because Sale 5 was only 12 acres smaller than Arielle.  PX 22B (BB-PLTF-12564).  Mr. Durrance determined development at a density of 5.77 dwelling units per acre was permitted on Sale 5, which was similar to the density allowed on Arielle.  PX 22B (BB-PLTF-12599).  Additionally, both properties contained 20 to 25% environmentally sensitive lands.  PX 22B (BB-PLTF-12564 to 12565).  Mr. Durrance found the properties were similar with respect to easements/encumbrances because neither property was substantially impacted by any.  PX 22B (BB-PLTF-12567).  Mr. Durrance deemed Sale 5 inferior for location because it was near the interstate.  Id.  Overall, Mr. Durrance appraised Sale 5 as slightly inferior to Arielle.

Lastly, Mr. Durrance compared Arielle to Sale 6, a property that sold in late 2005.  Because it sold more than a year after Arielle, when demand for real estate was stronger, Mr. Durrance rated it superior with respect to market conditions.  PX 22B (BB-PLTF-12567).  He found Sale 6's location to be inferior to Arielle's because it was outside of the Palmer Ranch DRI and was adjacent to an interstate.  PX 22B (BB-PLTF-12566).  Mr. Durrance found Sale 6 to be similar to Arielle for every other factor.  Specifically, he found the properties to be similar in size because Arielle was only one-and-a-half acres larger than Sale 6.  PX 22B (BB-PLTF-12564).  He rated the properties similar in terms of zoning because Sale 6 was zoned at 5.5 dwelling units per acre, similar to the moderate density permitted on Arielle.  PX 22B (BB-PLTF-12601).  Mr. Durrance deemed the properties similar with respect to environmental lands because they contained approximately the same percentage of such lands.  He rated them similar for easements/encumbrances because neither property was significantly impacted by any easements or encumbrances.  Mr. Durrance rated Sale 6 as slightly superior to Arielle overall.

Based on his comparable sales analysis, Mr. Durrance ranked the properties and determined that Arielle was most similar to Sales 5 and 6, which sold at $213,000 and $237,000 per acre, respectively. PX 22B (BB-PLTF-12568). Mr. Durrance appraised Arielle at $225,000 per acre, for a total value of $8,979,000. PX 22B (BB-PLTF-12568).

**Defendant's Expert's Valuation of Arielle**

Defendant's expert also appraised Arielle using a comparative sales analysis. Mr. Underwood compared Arielle to five area properties, four of which he used in the analyses for Stoneybrook, Mission Valley, and TPC. While Mr. Durrance determined that 20 to 25% of Arielle was environmentally sensitive land, Mr. Underwood determined 48% of Arielle was undevelopable environmental land, including all of the land underlying the corridor. PX 22B (BB-PLTF-12564-65); DX 54 (US-BB003622). Mr. Underwood's appraisal report states:

> According to site plans, filed with Sarasota County, approximately 20.18 acres (52%) of the site is developable land, after approvals were in place. There are 5.08 acres in hammocks, 5.7 acres in lakes and 4.9 acres in wetlands. The total non-usable area is about 48% . . . . The southern portion of the site, where the abandoned right-of-way abuts, is identified as wetlands preservation on the development's concept plan.

DX 54 (US-BB003622).

Before making any adjustments, the price per acre of the comparable properties ranged from $87,250 to $259,712. DX 54 (US-BB003638). After adjustments, the prices ranged from $129,566 to $202,113 per acre. DX 54 (US-BB003638). The following table summarizes the properties used and the adjustments that Mr. Underwood made:[40]

| | Subject | A-1 | A-3 | A-4 | A-10 | A-14 |
|---|---|---|---|---|---|---|
| **Location** | McIntosh Road at Palmer Ranch Parkway<br><br>Sarasota County | W side of Cattlemen Rd N of Richardson Rd<br><br>Sarasota County | E side of Honore Ave S of Clark Rd<br><br>Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd<br><br>Sarasota County | S. End of Fielding Lane, 1 block north of Clark Rd.<br><br>Sarasota County | McIntosh Road at Palmer Ranch Parkway<br><br>Sarasota County |
| **Sale Price** | N/A | $5.9 mil | Adjusted $5.402 mil | $5.3 mil | $2.7 mil | $3.36 mil |
| **Sale Date** | | 7/04 | 10/04 | 11/04 | 3/04 | 10/03 |
| **Cond of Sale** | | Arm's Length | Arms Length | Arms Length | Arms Length | Arms Length |

[40] This chart reflects the data provided in the table entitled "Vacant Land Sales Chart" in DX 54 at US-BB003638.

|  | Subject | A-1 | A-3 | A-4 | A-10 | A-14 |
|---|---|---|---|---|---|---|
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RMF-1/MDR | RMF-3/HDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RSF-4/MODR | RMF-1/MDR |
| **Size (Ac)** | 39.45 | 27.732 | 20.80 | 25.746 | 15.39 | 38.51 |
| **Price/Acre** |  | $212,751 | $259,712 | $205,857 | $175,439 | $87,250 |
| **Adjustments** |  |  |  |  |  |  |
| **Financing** |  | 0% | 0% | 0% | 0% | 0% |
| **Time** |  | 0% | -9% | -11% | 0% | 35% |
| **Time-Adjusted Sales Price** |  | $212,751 | $236,338 | $183,213 | $149,448 | $117,788 |
| **Location** |  | 10% | 0% | 10% | 25% | 0% |
| **Property Size** |  | 0% | -5% | 0% | -5% | 0% |
| **Land Use Regulation** |  | 0% | 0% | 5% | 5% | 10% |
| **Other** |  | -15% | -15% | -15% | -15% | 0% |
| **Total Adjustment** |  | -5% | -20% | 0% | 10% | 10% |
| **Adjusted Price/Acre** |  | $202,113 | $189,070 | $183,213 | $164,392 | $129,566 |

Mr. Underwood first decided whether any adjustments to reflect time of sale were necessary. He adjusted the prices of three properties for time -- Sales A-3, A-4, and A-14. Mr. Underwood determined that from 2004 to 2005, prices of vacant land were increasing at 1.5% per month. Tr. 1646-47. Accordingly, he adjusted Sale A-3 by negative nine percent, resulting in a time-adjusted price per acre of $236,338, because it sold six months after the date of the taking. Similarly, he adjusted the price per acre of Sale A-4 by -11%, resulting in an adjusted price per acre of $183,213, because it sold seven months after the April 2004 taking. Lastly, he applied a 35% adjustment to Sale A-14 because it sold in October 2003, and there was an 18-month delay between contract signing and closing. This resulted in a time-adjusted price of $117,788 per

acre.  Mr. Underwood did not adjust the prices of Sales A-1 or A-10 for time of sale because he found the sales occurred sufficiently close in time to the taking.

Mr. Underwood then considered the location, size, land use regulations, and site characteristics of each property and made adjustments to reflect any differences from Arielle.[41] Mr. Underwood first analyzed Sale A-1, a property he deemed inferior to Arielle because of its location and the existence of a 6.34-acre preservation area.  DX 54 (US-BB003635).  For location, Mr. Underwood adjusted the price of Sale A-1 by 10% because it was near an interstate.  DX 54 (US-BB003640).  He did not make any adjustments for size because there was less than a 20-acre difference between A-1 and Arielle.  DX 54 (US-BB003640).  He also did not make any adjustments for land regulations because similar levels of density were allowed on the properties, as both were zoned residential multifamily.  DX 54 (US-BB003638).  Lastly, Mr. Underwood applied a -15% adjustment for site characteristics because less than 25% of Sale A-1 was occupied with wetlands, while almost half of Arielle contained wetlands, preserves, or lakes.  DX 54 (US-BB003640).  In all, Mr. Underwood adjusted the price per acre of Sale A-1 by negative five percent.

Mr. Underwood next compared Arielle to Sale A-3, beginning with the time-adjusted price of $236,338.  Mr. Underwood made no adjustments for location because both were within the Palmer Ranch DRI, but he adjusted Sale A-3 by negative five percent because it was almost 20 acres smaller than Arielle.  DX 54 (US-BB003638, US-BB003640).  Mr. Underwood did not make any adjustments for zoning regulations because the sale of Sale A-3 was dependent on rezoning the property, which resulted in an allowance of 7.02 dwelling units per acre, a similar density to Arielle.  DX 54 (US-BB003635, US-BB003640).  Finally, he adjusted the price per acre by -15% because less than 25% of Sale A-3 was wetlands, while 48% of Arielle contained wetlands and/or preservation areas.  DX 54 (US-BB003640).  After adjusting for time, Mr. Underwood adjusted the price per acre of Sale A-3 by an additional -20% for a final adjusted price of $189,070 per acre.

Mr. Underwood next considered Sale A-4, a property he deemed inferior to Arielle with respect to its location, land use, and achievable density.  DX 54 (US-BB003635).  He began with the time-adjusted price of $183,213.  He increased the price per acre by 10% for location because Sale A-4 was near an interstate.  DX 54 (US-BB003640).  He did not make any adjustments for size because there was a less than a 20-acre difference, but he applied a five percent adjustment for land use regulations because Sale A-4 could not be developed to the same density.  Id. Lastly, he applied a -15% adjustment because less than 25% of Sale A-4 contained wetlands, while almost half of Arielle featured wetlands and preservation areas.  Id.  Ultimately, aside from the time-based adjustment, these adjustments canceled each other out, yielding a final adjusted price of $183,213 per acre.

The fourth property in Mr. Underwood's analysis was Sale A-10, a property that he considered inferior in most respects.  In particular, he adjusted the price by 25% for location because A-10 was surrounded by older properties and in an area that was not easily accessible. DX 54 (US-BB003640).  He adjusted the price by negative five percent for size because Sale A-10 was more than 20 acres smaller than Arielle.  Id.  Mr. Underwood found that A-10 was less

---

[41] Mr. Underwood testified that "site characteristics" encompassed "the amount of wetlands or developable area on each particular property." Tr. 1541.

desirable with respect to zoning regulations because it could not be developed at as high of a density as Arielle.  Id.  And, like the other comparable properties, he made a -15% adjustment because less than 25% of Sale A-10 contained wetlands, while almost half of Arielle featured wetlands and preservation areas.  Id.  In sum, Mr. Underwood adjusted the price of Sale A-10 by 10%, for a final adjusted price of $164,392 per acre.

The last property in Mr. Underwood's analysis was Sale A-14 -- the sale of Arielle itself. DX 54 (US-BB003637).  Sale A-14 sold in October 2003, for $3,360,000 pursuant to a May 2002 contract.  Id.  The buyer rezoned the property at a cost of between $300,000 and $400,000. Id.  The only adjustments Mr. Underwood made were for market conditions and land use regulations.  Specifically, he adjusted the price per acre by 35% to reflect the 18 months between the date of the contract and closing.  DX 54 (US-BB003638).  He also adjusted the price per acre by 10% to reflect the increase in allowable density.  Id.  He did not adjust for location, property size, or site characteristics.  The final adjusted price of Sale A-14 was $129,566 per acre.

After adjusting for market conditions, location, property size, land use regulations, and site characteristics, the price per acre of the comparison properties ranged from $129,566 to $202,113.  Mr. Underwood did not determine which comparable property was most similar to Arielle.  Based on his analysis, he appraised Arielle at $185,000 per acre.  Tr. 1554.

Mr. Underwood determined that the 0.94-acre strip of land underlying the trail easement lacked development potential because it was within an area of the property designated as wetlands, lakes, littoral areas, and open space.  Tr. 1555 ("[L]ooking at everything in a situation and condition that particular piece didn't add a whole lot of value to the site, which was traditional open space."); DX 54 (US-BB003634).  Based on the same analysis he undertook for Stoneybrook, TPC, and Mission Valley, Mr. Underwood valued the 0.94-acre portion of Arielle underlying the trail easement at 15% of the value of the property with development potential.  Tr. 1555-56.  Accordingly, he appraised the 0.94-acre portion at $27,800.  Combining the 0.94-acre segment with the remaining 38.51 acres, valued at $185,000 per acre, resulted in a "before" value of $7,150,482, which Mr. Underwood rounded to $7,150,500.  DX 54 (US-BB003643).

**What Is the Proper "Before Value" of Arielle?**

**The Price Per Acre**

Plaintiffs' expert appraised Arielle at $225,000 per acre, and Defendant's expert valued it at $185,000 per acre, with the 0.94-acre easement on the property valued at $27,800.  The appraisers used three of the same properties in their comparable sales analyses -- Sales 2/A-10, 5/A-1, and 3/A-3 -- but disagreed with respect to how these properties compared with Arielle in several ways.  First, Messrs. Durrance and Underwood disagreed as to how the market conditions of Sale 3/A-3 and Sale 2/A-10 compared to Arielle's.  Mr. Durrance rated Sale 3/A-3 as slightly inferior, while Mr. Underwood made a negative nine percent adjustment to Sale 3/A-3, indicating this comparison property sold at a better time than the date of valuation.  Compare PX 22B (BB-PLTF-12564), with DX 54 (US-BB003638).  Mr. Underwood based his opinion on the October 2004 closing date of Sale 3/A-3, while Mr. Durrance based his determination on Sale 3/A-3's contract date, September 2003.  Mr. Underwood's approach caused him to inflate the value of Sale 3/A-3 and undervalue Arielle.

Mr. Durrance rated the market conditions for Sale 2/A-10 as slightly inferior, while Mr. Underwood concluded the market conditions for the same property were similar. Mr. Durrance relied on the late 2002 contract date, and Mr. Underwood used the March 2004 closing date. Because the prices of the properties were set on their respective contract dates, Mr. Durrance's analysis of market conditions is more persuasive and better reflects the market conditions at the time the prices of the comparable properties were established. As such, the Court finds Mr. Underwood's decrease in the value of Arielle based on market conditions unpersuasive.

The experts also disagreed about how Sale 3/A-3 compared to Arielle with respect to location. Mr. Durrance rated it as slightly inferior because it was adjacent to the Palmer Ranch DRI, while Arielle was within the DRI. PX 22B (BB-PLTF-12567). Mr. Underwood did not make any adjustment to Sale 3/A-3 for location. Mr. Durrance's finding with respect to the location of Arielle vis-à-vis Sale 3/A-3 is more persuasive. The record reflects that there are benefits to being located within the DRI, such as higher density development, flexibility in site configuration, and access to preexisting environmental plans. See Tr. 806-07. Mr. Durrance's analysis of the properties' locations was more complete than Mr. Underwood's because he took the DRI into account, and Mr. Underwood's failure to address this consideration led him to undervalue Arielle.

Accordingly, the Court adopts Mr. Durrance's valuation of $225,000 per acre with development potential, and $33,750 per acre without development potential, 15% of the value with development potential.[42]

## The Land Underlying the Trail Easement

Mr. Underwood valued 0.94 acres of the land underlying the trail easement at 15% of the value of the rest of the property because the land underlying the easement had been designated for habitat preservation in the Resource Management Plan that was an exhibit to the application for an Incremental Development Order. See DX 18 (US-RB007502 to 007505). Plaintiffs argue Arielle should be appraised with residential development as the highest and best use because the 99-year open space restriction could have been removed. Mr. Underwood appraised Arielle with the assumption that development would have been prohibited on the entirety of the land underlying the easement.[43]

Arielle was developed pursuant to an Incremental Development Order, which amended and restated the Master Development Order for the Palmer Ranch DRI. DX 6, DX 18. The application for the incremental development order contained a Resource Management Plan, and the 2003 ordinance approving the development incorporated the terms of the Resource

---

[42] The Court accepts Mr. Underwood's method of determining the value of a property without development potential. Plaintiffs did not present an alternative methodology.

[43] In his appraisal, Mr. Underwood assumed that the Legacy Trail occupied 0.94 acres of Arielle, while Mr. Durrance appraised Arielle with the assumption that the easement consisted of 1.397 acres. Compare PX 22B (BB-PLTF-12579), and DX 54 (US-BB003650). After the completion of post-trial briefing, the parties agreed to use 1.397 acres as the size of the easement. Joint Status Report, Oct. 19, 2012.

Management Plan.  DX 19 (US-RB006161 to 006164).  The Resource Management Plan bound the developer and any future property owners' association to the terms of the Plan.  See DX 18 (US-RB007505) ("The habitats designated for preservation will be managed in perpetuity . . . . Palmer Ranch Holdings, Ltd., through a binding legal mechanism, will ultimately transfer the management and maintenance of the preservation areas to one or more property owners associations . . . .").  The Resource Management Plan set aside 5.06 acres of mesic hammock, 4.37 acres of wetlands, and a 30-foot upland buffer adjacent to those wetlands as areas to be perpetually preserved.  See DX 18 (US-RB007502 to 007505).

The habitat lands were designated on a map in the Conceptual Development Plan incorporated into the ordinance approving the development.  This Plan indicates that approximately half of the lands encumbered by the rail-trail corridor were designated for wetland preservation, wetland mitigation, and development.  Appendix E; DX 19 (US-RB006164).  Similarly, the plat and an aerial image of Arielle show that development was limited to the northern half of the property, and there is no development adjacent to the corridor on the southern half of the property.  Appendix D (PX 22C (BB-PLTF-51851)), Appendix F (DX 38 (US-RB006138)).

Plaintiffs have not shown it was reasonably probable that lands in Arielle designated for wetland preservation and mitigation could have been rezoned.  See United States v. 320.0 Acres of Land, 605 F.2d 762, 818-19 (5th Cir. 1979) (stating that a landowner must show a reasonable probability that a regulatory restriction would be removed to value a property for a use that would otherwise be precluded).  Importantly, Plaintiffs' expert, Ms. Allred, testified that Sarasota County would not ignore use restrictions that were aimed at habitat preservation.  Tr. 780.

Plaintiffs have the burden of proof in establishing the amount of their damages resulting from the taking, but they failed to articulate what portions of Arielle were available for development and what portions were set aside for habitat preservation, instead arguing that Arielle in its entirety was developable.  The Conceptual Development Plan is the best evidence of the amount of land available for development, and it indicates that 50% of the land underlying the corridor was set aside for habitat preservation.  Appendix E (DX 19 (US-RB006164)).[44]  As such, half of the 1.397-acre corridor, the land underlying the easement designated for wetland preservation and mitigation, should be valued at 15% of the value of the developable property, or $33,412.50 per acre.

## Just Compensation for Arielle

For Arielle, Plaintiffs seek damages only for the land encumbered by the easement, and the only dispute with respect to just compensation is the value of the land underlying the easement.  DX 54 (US-BB003650).

---

[44] The plat and aerial image of Arielle support this conclusion as they indicate the southern half of Arielle abutting the corridor is undeveloped.  Appendix F (DX 38 (US-RB006138)); Appendix D (PX 22C (BB-PLTF-51851)).

After the taking, 1.397 acres of Arielle were encumbered with the rail-trail easement. The parties agree that the conversion of the rail corridor to a recreational trail was a taking of 99% of the fee interest.  PX 22B (BB-PLTF-12579); DX 54 (US-BB003650).  They also agree that the per-acre value is the same before and after the taking.  The Court found that Arielle was worth $225,500 per acre before the taking, except for half of the land designated as a habitat preserve, meaning that half of Arielle is properly valued at $33,412.50 per acre, and half at $225,000 per acre.  Accordingly, just compensation for Arielle is the value of the 1.397 acres encumbered by the easement, $178,696.12.

## JMC

Plaintiff JMC-Real Estate Holdings owned a 229.4185 acre property ("JMC") adjacent to the corridor.  The property was not within the Palmer Ranch DRI.  In 2004, the land consisted of pasture lands, wetlands, and a lake/borrow pit.  PX 21B (BB-PLTF-13026).  In 2004, JMC's future land use designation was medium-density residential, allowing development at between five and nine dwelling units per acre, and it was zoned for manufactured homes.  PX 21B (BB-PLTF-13031).  State Road 681 and U.S. Highway 41 are immediately to the east of JMC.[45] Village Lake Drive and Sunset Avenue provide access to the property.  PX 21B (BB-PLTF-13028).  JMC is immediately across the rail-trail corridor from Mission Valley Golf Club.

JMC-Real Estate Holdings purchased JMC in 1999.  PX 21B (BB-PLTF-13029).  In 2005, JMC-Real Estate Holdings sold the property for the "base" price of $13,306,100.  Id. When the buyer subsequently obtained zoning amendments in 2007, as detailed below, the buyer made an additional payment of approximately $30,000 per acre, about $6,653,000, with further payments due if the buyer obtained additional increased development rights prior to the year 2020.  Id. (BB-PLTF-13029 to 13030).  In June 2007, the buyer of the property petitioned the County to rezone approximately 221 acres of JMC to allow development of up to 250 single-family homes, 1605 condominium/townhouse units, 20,000 square feet of office space, and 200,000 square feet of retail space.  DX 13.  Sarasota County granted the petition, and the property was developed with a 20-foot buffer where the land abutted Mission Valley Estates, a residential development, and with no buffering where JMC was adjacent to the trail.  Tr. 537-38; DX 13, 13A.

### What Is the Proper "Before Value" of JMC?

Plaintiffs' appraiser valued JMC at $100,000 per acre before the taking, and Defendant's appraiser valued it at $110,000 per acre.  The Court adopts Mr. Durrance's "before value" of $100,000 per acre as the value of JMC.

### Just Compensation for JMC

Plaintiffs seek $1,863,900 for the taking as it relates to JMC -- $756,310.50 for the land underlying the corridor and $1,109,300 in severance damages for buffering and separating JMC

---

[45] An aerial photograph of JMC is in Appendix G.

from adjacent private lands.[46]  As discussed above, the Court values JMC at $100,000 per acre before the taking.  As such, the Court awards Plaintiffs $756,310.50 for the 7.6395 acres underlying the easement.

Plaintiffs seek $1,109,300 in severance damages, representing the cost to buffer 4,000 lineal feet of the property adjacent to the corridor at $150 per lineal foot and a $500,000 diminution in the value of the remainder because of lost eastern access.  Tr. 368-39.  Plaintiffs determined that it would not be necessary to buffer the entire length of the trail -- 6,640.33 lineal feet -- because approximately 2,640 lineal feet of the corridor are adjacent to wetlands.  Tr. 367-68; PX 21B (BB-PLTF-13050).

Defendant argues that the fact that JMC was later developed as a development called Village on the Trail with no buffering except for a 20-foot wide buffer where the land is adjacent to Mission Valley Estates shows that Plaintiffs are not entitled to damages for the cost of constructing a 50-foot buffer along the length of the corridor.  Def.'s Post-Trial Br. 29 (citing Tr. 537-538; DX 13 (US-RB002571, US-RB002575)).  Plaintiffs' entitlement to severance damages is not dependent upon whether or how a developer chose to mitigate the harm.  As Mr. Durrance testified, a landowner may choose to mitigate the harm caused by the taking via buffering or another cure measure or a landowner may choose to accept the diminution in value to the remainder caused by the taking without remedying it.  Tr. 324-25.

Defendant has not identified any natural preexisting buffer on the property.  As explained above, given that this property is outside the Palmer Ranch DRI, a 25-foot buffer is warranted for areas adjacent to the Legacy Trail that do not have a natural buffer.  It is appropriate to use the cost to construct a 25-foot buffer as a means of quantifying severance damages measuring the negative impact that the Legacy Trail had on property values.  The Court awards the cost of installing a 25-foot buffer as the cost to cure the diminution in the fair market value of the JMC remainder due to the trail.  As such, the Court awards Plaintiffs $268,000, the cost to buffer 4,000 lineal feet at $67 per lineal foot.

Additionally, Plaintiffs claim the trail severed eastern access to adjoining lands, specifically Mission Valley Golf and Country Club, making the land less valuable.  Plaintiffs argue that before the taking, JMC abutted Mission Valley's golf course, wooded lands, and single family homes to the east, and the owner of JMC could have constructed access to those abutting lands.  After the taking, the eastern edge of JMC abuts the trail corridor, and the owner of JMC cannot construct access across the trail.  Mr. Durrance valued this lost access at $500,000.  Tr. 369.  When asked to explain why he attributed damages to JMC for the limited access, Mr. Durrance testified:

> Q      And in the before-taken condition when there's no rail-trail corridor, why did you make an adjustment to that property because of the adjacency to Mission Valley?  . . .

---

[46] At trial and in their post-trial briefing, Plaintiffs sought $754,600 for the part taken -- based on measuring the land underlying the corridor at 7.622 acres.  Plaintiffs later stipulated that land underlying the corridor was 7.6395 acres, increasing the amount of damages claimed by $1,710.50.  Joint Status Report, Oct. 19, 2012.

> A    Well, for a couple of reasons.  The potential for these owners or
> these properties, I should say, to connect, if so desired, that's number one, and
> there's been discussion in the past about potentially doing that.  With the taking,
> the severing here, this public corridor?  That's gone.  Number 2, [JMC] abuts, I
> guess, a desirable land use for lack of a better term, having a golf course and
> extensive frontage or abutting ownership with it.

Tr. 369-70; see also Tr. 541-43.

Plaintiffs have not demonstrated entitlement to damages for lost access to adjoining lands.  First, Plaintiffs have not established it was reasonably probable that they would have obtained access to Mission Valley Golf and Country Club from JMC before the taking when the rail corridor ran the entire length of the eastern edge of JMC, completely separating it from the country club.  See PX 21C.  No private or public roads connected JMC to the country club, and Plaintiffs did not present evidence that there was a plan or an agreement to build any roads.  Plaintiffs have not demonstrated that the conversion of the railroad corridor to the Legacy Trail affected access between JMC and the adjoining properties at all.  A plaintiff in a takings case cannot recover damages for lost potential access unless the plaintiff establishes that there was a reasonable probability that access would have been provided in the before taking scenario in the reasonably near future.  United States ex rel. TVA v. Powelson, 319 U.S. 266, 275-76 (1943); see also Bd. of Cnty Supervisors, 276 F.3d at 1365, 1368.  Plaintiffs did not offer any evidence that JMC would have had access to Mission Valley Country Club but for the rail-trail corridor.[47]

Accordingly, Plaintiffs are entitled to compensation for the land encumbered by the corridor and the cost to buffer the 4,000 lineal feet of land adjacent to the corridor at $67 per lineal foot.  As such, for the taking as it relates to JMC, the Court awards Plaintiffs $268,000 for diminished market value due to adjacency of the trail and $756,310.50 for the 7.6395 acres underlying the easement -- a total of $1,024,310.50.

## Palmer Ranch

Plaintiff Palmer Ranch Holdings owns a 123.912-acre property adjacent to the corridor ("Palmer Ranch"), which consists of vacant pasture land.  The property is within the Palmer Ranch DRI.  Tr. 837-38.  On the date of the taking, Palmer Ranch was zoned residential estate-1 and its future land use designation was moderate-density residential development, allowing one residential unit per five acres.  PX 19B (BB-PLTF-12799 to 12800).

Palmer Ranch is composed of two separately identified and platted tracts of land, tract B9 to the north and tract B10 to the south.  DX 5A; PX 19B (BB-PLTF-12814).[48]  Before the taking, the railroad easement encumbered 1,491.39 feet of the southwestern edge of the property.  DX 5A.  On the northern edge, 750 feet of the property fronts Sawyer Loop Road.  PX 19B (BB-

---

[47] Plaintiffs cite Mr. Dellos' testimony that Mission Valley lost western access because of the trail as evidence of JMC's decrease in property value because of lost access.  Pls.' Post-Trial Br. 38.  However, Mr. Dellos, the president of the Mission Valley Country Club, testified about how the trail affected the club's access -- not JMC's access.

[48] An aerial map of Palmer Ranch is in Appendix H.

PLTF-12798), PX 19D.  Palmer Ranch is north of Ridge Road and east of McIntosh Road, but neither road provided direct access to the property before the taking.  PX 19B (BB-PLTF-12798), PX 19C, PX 19D.

Palmer Ranch was developed pursuant to a 1991 Sarasota County Resolution, 91-170, which amended and restated the master development order for the Palmer Ranch DRI.  DX 6.  The resolution incorporated a document entitled "Application for Eastside Environmental Systems Analysis & [Master Development Order] Supplement."  DX 6 (US-RB008934).  The Eastside Environmental Systems Analysis pertained to the eastern portion of the Palmer Ranch DRI.  This analysis required a wildlife corridor on Palmer Ranch and identified more than 100 acres of land adjacent to the railroad corridor, including lands on other properties within the DRI, to serve this purpose.  DX 7 (US-BB007953 to 007955).  The major objectives of the wildlife corridor were to "(1) retain undeveloped lands along the identified primary Bald eagle flyways as an added protective measure and, (2) maintain contiguity of habitats whenever possible by connecting preserved areas with conservation/open space lands."  DX 7 (US-RB007953).  The Eastside Environmental Systems Analysis stated that the northern terminus of the wildlife corridor would be "the primary management zone for Bald Eagle Nest territory SA-10."  DX 7 (US-RB007954).  The primary eagle protection zone measured 660 feet, and a secondary protection zone surrounded the primary zone.  PX 19B (BB-PLTF-12798).  Residential development was prohibited within the primary protection zone.  PX 19B (BB-PLTF-12798).

### Plaintiffs' Expert's Valuation of Palmer Ranch

Mr. Durrance appraised Palmer Ranch using a comparable sales analysis of six transactions from the local Sarasota market, all used in the previously discussed appraisals.  Mr. Durrance appraised Palmer Ranch with residential development as the highest and best use.  PX 19B (BB-PLTF-12802).  The following table summarizes Mr. Durrance's findings:[49]

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 8/30/04 | 7/28/04 | 12/27/05 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $28 mil | $5.9 mil | $9.11 mil |
| **Size (Ac)** | 123.912 | 40.00 | 15.381 | 20.77 | 199.44 | 27.732 | 38.40 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $140,000 | $213,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |

---

[49] This chart reflects the data provided in the summary table in PX 19B (BB-PLTF-12802 to 12803).

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Zoning/ Future Land Use Entitlements** | RE-1/MDR | RE-1/MDR Approved units available within Palmer Ranch DRI | RSF-4/MDR Approved for 57-unit SFR subdivision | RSF-4, RMF-2, PUD & MDR / MEDR | OUE-1/MDR Approved units available within Palmer Ranch DRI | RMF-3/HDR Approved for 160-unit attached townhomes | RSF-4/MEDR Approved for 211-unit attached townhomes |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | 40-50% | 25-30% | <5% | <5% | <10% | 20-25% | 20% |
| **Easements/ Encumbrances** | Eagle protection zone | Typical | Typical | Perpetual Mitigation Easement | South Creek/Transmission Power Lines | Typical | Typical |
| | | | | | | | |
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Inferior | Similar | Superior |
| **Location** | Palmer Ranch | Similar | Inferior | Slightly Inferior | Similar | Inferior | Inferior |
| **Size (Ac)** | 123.912 | Slightly Superior | Slightly Superior | Slightly Superior | Similar | Slightly Superior | Slightly Superior |
| **Zoning/Future Land Use Entitlements** | RE-1/MDR | Similar | Superior | Superior | Similar | Superior | Superior |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | 40-50% | Slightly Superior | Superior | Superior | Superior | Slightly Superior | Slightly Superior |
| **Easements/ Encumbrances** | Eagle protection zone | Superior | Superior | Slightly Superior | Similar | Superior | Superior |

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Comparability** | -- | Slightly Superior | Inferior | Superior | Inferior | Slightly Superior | Superior |

Mr. Durrance first compared Palmer Ranch to Contract 1. Mr. Durrance rated Contract 1 as similar with respect to market conditions because the sale was contracted in July 2004, three months after the date of the taking. PX 19B (BB-PLTF-12804). He also rated the properties similar with respect to location because both were within the Palmer Ranch DRI. PX 19B (BB-PLTF-12805). Mr. Durrance assessed Contract 1 as slightly superior to Palmer Ranch in terms of size because Contract 1 was 40 acres, more than 80 acres smaller than Palmer Ranch. Id. He rated Contract 1 and the subject property similar for zoning because both properties required a rezoning to achieve moderate-density residential development. Id. Mr. Durrance determined Contract 1 was slightly superior in terms of environmental lands because 25 to 30% of Contract 1 was occupied by environmental lands, in contrast to 40 to 50% on Palmer Ranch. PX 19B (BB-PLTF-12802 to 12803). Mr. Durrance found Contract 1 to be superior in terms of easements/encumbrances because Palmer Ranch had Bald Eagle protection zones while Contract 1 did not have any easements or encumbrances that substantially affected development. PX 19B (BB-PLTF-12805). Overall, Mr. Durrance deemed Contract 1 slightly superior to Palmer Ranch.

Mr. Durrance next compared Palmer Ranch to Sale 2, which was contracted in late 2003, when market conditions were less favorable. However, the transaction also involved a $400,000 assignment fee, which reflected market prices when the contract closed in March 2004, and therefore partially mitigated these less favorable market conditions. PX 19B (BB-PLTF-12822). As such, Mr. Durrance found Sale 2 to be slightly inferior with respect to market conditions. PX 19B (BB-PLTF-12804). Mr. Durrance deemed Sale 2 inferior for location because it was on an unimproved road. PX 19B (BB-PLTF-12805). Mr. Durrance rated Sale 2 slightly superior for size because Sale 2 was just over 15 acres, making it more than 100 acres smaller than Palmer Ranch. PX 19B (BB-PLTF-12802). Mr. Durrance deemed Sale 2 superior to Palmer Ranch for zoning/future land use entitlements because Sale 2 was zoned residential single-family-4, a greater density than permitted on Palmer Ranch. PX 19B (BB-PLTF-12802 to 12803). Mr. Durrance determined Sale 2 was superior with respect to environmental lands because less than five percent of Sale 2 consisted of environmental lands, while almost half of Palmer Ranch had such lands. PX 19B (BB-PLTF-12802). Lastly, Mr. Durrance found Sale 2 to be superior for easements/encumbrances because Palmer Ranch was subject to the Bald Eagle protection areas, and Sale 2 did not have any significant easements or encumbrances. PX 19B (BB-PLTF-12805). Overall, Mr. Durrance assessed Sale 2 as inferior.

Mr. Durrance next compared Palmer Ranch to Sale 3, an assemblage of two parcels. Because the sale was contracted in 2003 when demand was weaker, Mr. Durrance rated Sale 3 as slightly inferior for market conditions. He also found Sale 3's location slightly inferior because it was adjacent to the DRI while Palmer Ranch was within it. PX 19B (BB-PLTF-12805). Because Sale 3 was just over 20 acres, Mr. Durrance rated Sale 3 slightly superior to Palmer Ranch. PX 19B (BB-PLTF-12805). Mr. Durrance deemed Sale 3 superior with respect to zoning because it was zoned for single- and multifamily residential development, and its future

land use designation was for moderate- and medium-density residential development. PX 19B (BB-PLTF-12802). Like Sale 2, Mr. Durrance found Sale 3 to be superior with respect to environmental lands because less than five percent of the property contained such lands while almost half of Palmer Ranch contained environmental lands. PX 19B (BB-PLTF-12802 to 12803). He determined that Sale 3 was slightly superior to the subject property in regard to easements/encumbrances because the northwest corner of Sale 3 was encumbered by a perpetual mitigation easement. PX 19B (BB-PLTF-12805). This easement limited development of Sale 3, but to a lesser extent than the Bald Eagle protection zones limited development on Palmer Ranch. Mr. Durrance concluded that Sale 3 was superior to Palmer Ranch.

Mr. Durrance compared Palmer Ranch to Sale 4, a 199.44-acre property within the Palmer Ranch DRI. PX 19B (BB-PLTF-12802 to 12803). Sale 4 was contracted in the spring of 2003, when market conditions were less favorable. PX 19B (BB-PLTF-12805, BB-PLTF-12827). As a result, Mr. Durrance rated Sale 4 inferior with respect to market conditions. Mr. Durrance found Sale 4 to be similar to Palmer Ranch for all but one of the remaining factors. Specifically, he deemed Sale 4 similar for location because both were within the DRI and for size because both were over 120 acres. PX 19B (BB-PLTF-12802). Mr. Durrance rated the properties similar in terms of zoning/future land use because both properties required rezoning to reach densities suitable for residential development. PX 19B (BB-PLTF-12805). Mr. Durrance found the properties to be similar in terms of easements/encumbrances because Sale 4 contained a creek, a mesic hammock, and a power line easement along the eastern 100 feet of the property, which all imposed development costs. PX 19B (BB-PLTF-12803 to 12804) However, Mr. Durrance rated Sale 4 as superior for one factor -- environmental lands -- because less than 10% of Sale 4 was occupied with wetlands or other environmentally sensitive lands, as compared to 40 to 50% of Palmer Ranch. Id. Overall, Mr. Durrance assessed Sale 4 as inferior to Palmer Ranch.

Mr. Durrance compared Palmer Ranch to Sale 5, a 27.732-acre property that was subsequently developed as a townhouse community. PX 19B (BB-PLTF-12802 to 12804). He rated Sale 5 as similar in terms of market conditions because its sale was contracted in 2004. PX 19B (BB-PLTF-12802, BB-PLTF-12804). Mr. Durrance deemed Sale 5 inferior for location because it was on an interstate. PX 19B (BB-PLTF-12805). He rated Sale 5 slightly superior for size because it was almost 100 acres smaller than the subject property. Id. Mr. Durrance found Sale 5 to be superior with respect to zoning because it was zoned for high-density residential development, while the subject property required a rezoning. Mr. Durrance determined that Sale 5 was slightly superior to Palmer Ranch for environmental lands because 20 to 25% of Sale 5 consisted of such lands, as opposed to 40 to 50% of Palmer Ranch. PX 19B (BB-PLTF-12802 to 12803). He assessed Sale 5 as superior for easements/encumbrances because it was not encumbered by any significant easements or encumbrances, while the Bald Eagle protection zones on Palmer Ranch limited development. PX 19B (BB-PLTF-12805). Mr. Durrance rated Sale 5 as slightly superior overall.

The final property in Mr. Durrance's comparable sales analysis for Palmer Ranch was Sale 6, a 38.4-acre property outside of the Palmer Ranch DRI. Sale 6 was contracted in mid-2005, and closed in December 2005, when the market was nearing its peak. As such, Mr. Durrance rated Sale 6 as superior for market conditions. PX 19B (BB-PLTF-12805). Sale 6 was located adjacent to the DRI but was bordered by an overhead transmission power line easement

and an interstate, making it inferior to Palmer Ranch. PX 19B (BB-PLTF-12805). Mr. Durrance found Sale 6 to be slightly superior with respect to size because it was approximately 80 acres smaller than the subject property. PX 19B (BB-PLTF-12802 to 12803). Mr. Durrance assessed Sale 6 as superior for zoning because greater density was permitted on Sale 6 -- 5.5 dwelling units per acre -- and it was designated for medium-density development. PX 19B (BB-PLTF-12802, BB-PLTF-12832). Mr. Durrance rated Sale 6 slightly superior in terms of environmental lands because 20% of the property contained environmental lands, 20 to 30% less than Palmer Ranch. PX 19B (BB-PLTF-12802 to 12803). Lastly, Mr. Durrance assessed Sale 6 as superior for easements/encumbrances because it did not contain any easements or encumbrances that affected the property's development potential. PX 19B (BB-PLTF-12805). Overall, Mr. Durrance deemed Sale 6 as superior to the subject property.

Based on his comparable sales analysis, Mr. Durrance concluded that Sale 1, which sold for $206,000 per acre, was slightly superior to Palmer Ranch, and Sale 2, which sold for $176,000 per acre, was inferior to Palmer Ranch. PX 19E (p. 21).[50] He appraised Palmer Ranch at $200,000 per acre before the taking.

### Defendant's Expert's Valuation of Palmer Ranch

Mr. Underwood also appraised Palmer Ranch using a comparable sales analysis with the assumption that residential development was the highest and best use for the property. Mr. Underwood compared Palmer Ranch to five area properties. Before applying any adjustments, the prices of the properties ranged from $90,000 to $259,712 per acre. The following table summarizes his analysis:[51]

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | S Side of Sawyer Loop Rd approx 980' E of Mcintosh Rd  Sarasota County | W side of Cattlemen Rd N of Richardson Rd  Sarasota County | E side of Honore Ave S of Central Sarasota Pkwy  Sarasota County | E side of Honore Ave S of Clark Rd  Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd  Sarasota County | S side of SR 681 E of US 41  Sarasota County |

[50] Pages 21 and 22 were omitted from the Bates-stamped copy of PX 19B submitted to the Court. However, these pages were included in the bound, non-Bates-stamped version of PX 19B provided to the Court. The version of Mr. Durrance's appraisal report for Palmer Ranch without Bates numbers is admitted and designated as PX 19E.

[51] This chart reflects the data provided in the table entitled "Vacant Land Sales Chart" in DX 61 at US-BB004537.

|  | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Sale Price** | N/A | $5.9 mil | $28 mil | Adjusted $5.402 mil | $5.3 mil | $19,959,100 |
| **Sale Date** | | Jul-04 | Aug-04 | Oct-04 | Nov-04 | Aug-05 |
| **Cond of Sale** | | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RE-1/MDR | RMF-3/HDR | OUE-1/MDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RMH/MDR |
| **Size (Ac)** | 123.442 | 27.732 | 199.44 | 20.80 | 25.746 | 221.77 |
| **Price/Acre** | | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| **Adjustments** | | | | | | |
| **Financing** | | 0% | 0% | 0% | 0% | 0% |
| **Time** | | 0% | 0% | -9% | -11% | -15% |
| **Time-Adjusted Sales Price** | | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |
| **Location** | | 10% | 0% | 0% | 10% | 20% |
| **Property Size** | | -20% | 15% | -20% | -20% | 15% |
| **Land Use Regulation** | | -5% | 0% | -5% | 0% | -10% |
| **Total Adjustment** | | -15% | 15% | -25% | -10% | 25% |
| **Adjusted Price/Acre** | | $180,838 | $161,452 | $177,254 | $164,892 | $95,625 |

Before making any other adjustments, Mr. Underwood first considered whether it was necessary to adjust the per-acre sales prices for time. He made adjustments for three of the properties, A-3, A-4, and A-13, by applying a 1.5% per month adjustment -- a negative nine

percent adjustment to Sale A-3, which sold in October 2004, six months after the date of valuation, a -11% adjustment to the price of A-4 because it sold in November 2004, and   -15% to the price of A-13 because its sale was contracted in March 2005, more than a year after the taking.

Mr. Underwood then analyzed each property and determined whether adjustments were necessary for location, property size, or land use regulation.  Mr. Underwood first compared Palmer Ranch to Sale A-1, a 27-acre property that was later developed into a townhouse community.  DX 61 (US-BB004535).  He adjusted the price per acre of Sale A-1 upward by 10% because it was near older homes and rental apartments, which Mr. Underwood deemed inferior to the location of Palmer Ranch.  Id.  Mr. Underwood made a 20% upward adjustment for size because Sale A-1 was almost 100 acres smaller than Palmer Ranch, and under his large-lot adjustment theory, a 100-acre difference in size corresponded with a 20% difference in price. DX 61 (US-BB004539 to 004540).  Mr. Underwood applied a negative five percent adjustment for land regulations to reflect zoning -- Sale A-1 was zoned for 5.77 dwelling units per acre, while Palmer Ranch was zoned for one dwelling unit per two acres.  DX 61 (US-BB004529, US-BB0045240).  In all, Mr. Underwood adjusted the per-acre price of Sale A-1 by -15%, resulting in an adjusted price per acre of $180,838.

Mr. Underwood next considered Sale A-2, an almost 200-acre property within the Palmer Ranch DRI.  Mr. Underwood did not make any adjustments for location because both properties were within the DRI.  DX 61 (US-BB004539).  Pursuant to his large-lot adjustment theory, Mr. Underwood applied a 15% adjustment because Sale A-2 was approximately 75 acres larger than the subject property.  DX 61 (US-BB004539 to 004540).  Mr. Underwood did not make any adjustments to reflect differences in land use regulations because the properties were zoned to permit similar levels of development.  DX 61 (US-BB004540).  Mr. Underwood applied a total adjustment of 15% to Sale A-2, for an adjusted price of $161,452 per acre.

The third property in Mr. Underwood's analysis was Sale A-3.  Mr. Underwood began with the time-adjusted price of $236,338 per acre.  He did not make any adjustment for location because both properties were within the Palmer Ranch DRI.  Mr. Underwood applied a -20% adjustment for size because Sale A-3 was 20.8 acres, approximately 100 acres smaller than the subject property.  DX 61 (US-BB004539 to 004540).  Mr. Underwood employed a negative five percent adjustment for land use regulations because Sale A-3's contract was contingent on rezoning to a density of seven dwelling units per acre, denser than allowed on Palmer Ranch. DX 61 (US-BB004540).  In sum, Mr. Underwood applied a -25% adjustment to the time-adjusted price of A-3, resulting in a total adjusted price of $177,254 per acre.

Mr. Underwood next considered Sale A-4, beginning with a time-adjusted price of $183,213 per acre.  He applied a 10% adjustment for location because Sale A-4 was in a less desirable area with older homes.  DX 61 (US-BB004539).  Mr. Underwood next adjusted the price of Sale A-4 by -20% for size because Sale A-4 was approximately 100 acres smaller than the subject property.  DX 61 (US-BB004539 to 004540).  He did not adjust the price of Sale A-4 for land use regulation because the properties had similar zoning/future land use designations. DX 61 (US-BB004540).  Mr. Underwood adjusted the time-adjusted price of Sale A-4 by an additional -10% because of location and size, for a total adjusted price of $164,892 per acre.

The final property in Mr. Underwood's analysis of Palmer Ranch was Sale A-13.  He began with the time-adjusted price of $76,500 per acre.  He then applied a 20% adjustment for location because Sale A-13 was adjacent to a mobile home park and had one access point.  DX 61 (US-BB004538).  At 221.77 acres, Sale A-13 was almost 100 acres larger than the subject property.  However, Mr. Underwood did not apply a 20% large-lot adjustment to reflect the full 100-acre difference because he found that no adjustment was needed once a property exceeded 200 acres.  As such, he applied a 15% adjustment.  DX 61 (US-BB004539 to 004540).  Finally, he applied a -10% adjustment for land use regulation because Sale A-13 was contingent on rezoning to a mixed-use development with multifamily housing.  DX 61 (US-BB004540).  These adjustments totaled 25%, resulting in a final adjusted price of $95,625 per acre.

Mr. Underwood concluded that Sale A-2, with a price of $161,452 per acre, was most similar to Palmer Ranch and gave it the most weight.  DX 61 (US-BB004541).  He found that Sales A-4 and A-13 were the least similar and gave them the least weight.  DX 61 (US-BB004541).  Based on his analysis, Mr. Underwood appraised Palmer Ranch at $165,000 per acre.  DX 61 (US-BB004541).

### What Is the Proper "Before Value" of Palmer Ranch?

Plaintiffs contend Palmer Ranch was worth $200,000 per acre on the date of valuation, while Defendant's appraiser valued the property at $165,000 per acre.  Messrs. Durrance and Underwood used three of the same properties in their analyses:  Sale 3/A-3, Sale 4/A-2, and Sale 5/A-1.  While they disagreed about how the properties compared to the subject property with respect to specific factors, they agreed that Sale 3/A-3 was superior to Palmer Ranch, that Sale 5/A-1 was moderately superior to Palmer Ranch, and Sale 4/A-2 was inferior to Palmer Ranch.

Messrs. Underwood and Durrance disagreed about how Sale 3/A-3 compared to Palmer Ranch with respect to market conditions.  Compare PX 19B (BB-PLTF-12802 to 12803), with DX 61 (US-BB004537).  Mr. Durrance determined that Sale 3/A-3 was contracted in 2003, when market conditions were less favorable, and he deemed Sale 3/A-3 inferior.  Mr. Underwood used the 2004 closing date, which did not reflect the market conditions when the price was set, resulting in Mr. Underwood undervaluing Palmer Ranch.

Additionally, Mr. Durrance noted Sale 3/A-3 was encumbered with a perpetual mitigation easement, and Sale 4/A-2 was encumbered with an overhead transmission power line easement, a creek, and a mesic hammock, making them less suitable for development than Palmer Ranch.  While Mr. Underwood considered the eagle protection zone on Palmer Ranch, he did not mention easements on the comparison properties that would affect the potential development and value, thus ignoring factors that would have decreased the value of the comparison properties.  Because Mr. Durrance accounted for these restrictions, his appraisal better reflected the value of Palmer Ranch.

For the foregoing reasons, the Court finds Mr. Durrance's appraisal of Palmer Ranch to be more persuasive.  Accordingly, $200,000 is the proper "before value" for Palmer Ranch.

### Just Compensation for Palmer Ranch

For Palmer Ranch, Plaintiffs seek $1,239,000 in damages -- $339,000 for the 1.712 acres underlying the corridor and $900,000 in severance damages for lost access.  Defendant argues

damages should be limited to the value of the land encumbered.

Because Palmer Ranch is properly valued at $200,000 per acre, Plaintiffs are entitled to $338,976 for the 1.712 acres encumbered by the rail-trail corridor.

Plaintiffs do not seek damages for buffering because wetlands and environmental lands provide natural buffering along the rail-trail corridor in Palmer Ranch.  Tr. 355.  However, Plaintiffs seek severance damages for diminished access to Palmer Ranch via McIntosh Road, a north-south artery.  Tr. 350-51; PX 19B (BB-PLTF-12814).  McIntosh Road is west of Palmer Ranch.  PX 19C; Appendix H (DX 5A).  While Palmer Ranch did not have access to McIntosh Road when the taking occurred, Plaintiffs contend that future western access was reasonably probable because it was the most advantageous access point.  PX 19B (BB-PLTF-12814).  Plaintiffs generally posit that such access would have been constructed on the southwestern portion of Palmer Ranch, where the property is closest to McIntosh Road, but did not suggest a specific location for a road.  After the taking, the Legacy Trail ran between Palmer Ranch and McIntosh Road, on the western edge of Palmer Ranch -- meaning traffic would have to cross the trail from Palmer Ranch to reach McIntosh Road.

As Plaintiffs acknowledge, the land between Palmer Ranch and McIntosh Road was owned by another party.  Nonetheless, Plaintiffs argue damages for lost access are appropriate because access via McIntosh Road was the preferred access point.  First, Plaintiffs state that access via McIntosh Road would allow Tracts B-9 and B-10 to be developed as two separate developments or two phases of one development.  PX 19B (BB-PLTF-12814).  Without McIntosh Road, access to Tract B-9 would need to be routed through B-10.  Second, Plaintiffs contend McIntosh Road is superior to the other nearby roads.  Specifically, while Palmer Ranch had potential access via Sawyer Loop Road, that road is directly south of industrial properties.  Access via McIntosh Road would be sited directly across from the TPC Prestancia Golf Course, towards the southwestern corner of Palmer Ranch, a more desirable location.  Id.  Similarly, while Ridge Road could provide access to the Palmer Ranch via the south through another residential development, such access would not provide a primary north-south thoroughfare with an entry feature.  Id.

In his appraisal of Palmer Ranch, Mr. Durrance addressed this access issue as follows:

Consultation with the primary planning/engineering firm for the Palmer Ranch DRI, Stantec (f/k/a Wilson Miller), indicates that before imposition of the new easement, access to McIntosh Road was reasonably probable.  McIntosh Road, along with Honore Avenue, is one of the primary north-south connectors through the Palmer Ranch Community.  Although there is an intervening ownership between the subject and McIntosh Road, given the particulars of the ownership, access/entry from McIntosh Road was not only probable, but the most desired access point of the available options.  Access via other connections, while adequate, would not be the preferred access points.

PX 19B (BB-PLTF-12814).

To quantify the damages associated with diminished access, Mr. Durrance consulted with WilsonMiller Stantec, a consulting firm that provides services in planning, engineering,

architecture, surveying, and project management, and undertook an analysis of two developments that differed with respect to shape, access, and abutting corridors, to determine the effect diminished access has on property values. He compared Taylor Woodrow Homes, a 78.34-acre property with two access points and no abutting corridors, and BM2, a 38.4-acre property that was adjacent to a power line corridor and an interstate with access through an adjacent subdivision. PX 19B (BB-PLTF-12811). From this comparison, Mr. Durrance concluded that a property that had indirect access, i.e., through a subdivision, and was adjacent to a corridor would sell for five percent less than a property with direct access and no abutting corridors. PX 19B (BB-PLTF-12816). Plaintiffs seek $900,000, five percent of the total "before" value, in severance damages for lost access.

At trial, Mr. Durrance offered the following explanation of why obtaining access via McIntosh road was reasonably probable:

> A    . . . It's reasonably probable in the before condition with TPC having ownership of the 50-foot strip of land and Palmer Ranch abutting that and then McIntosh Road. In the before condition, McIntosh Road is a road easement, and TPC owns the lands underneath McIntosh Road in this area because it's an easement. McIntosh Road is currently two lanes, but it's planned for four lanes, and there is right-of-way easement reserved for the eventual widening of the four lanes.

> In the before condition, the build out of McIntosh Road, this strip of land on the east side of McIntosh Road, uses that strip for the eventual four laning of this, which releases this 50-foot strip over here that is currently reserved for the widening of McIntosh Road to four lanes, so is it reasonably probable given the situation, the particulars of this property that access to McIntosh Road could be achieved for the Palmer Ranch property? My answer is yes, and I consulted also with Wilson Miller regarding that as well since they are the primary engineers and planners for this community.

> Q    And so your conclusion is based on the understanding that the road easement would be relocated from the west side of McIntosh Road on the TPC Prestancia property over to the east side of McIntosh Road on the east side of the currently-paved road, is that correct?

> A    Yes, that is.

> Q    And that would require the county to agree to that, would they not?

> A    Yes, sure.

> Q    Do you know if the county agrees to those kind of road easement relocations?

> A    Yes, they do. Again, I consulted with Wilson Miller. I didn't just operate in a vacuum and assume, and the answer is yes. Yes.

Tr. 352-53. Mr. Durrance did not identify the person with whom he consulted at WilsonMiller.

Ms. Allred, Plaintiffs' expert on long-range planning and zoning in Sarasota County, a County employee for 24 years, and currently a WilsonMiller employee, did not testify regarding the likelihood of the County agreeing to this road easement relocation.  There was no direct evidence of TPC's position on the probability of this easement relocation.

Defendant contends Plaintiffs are not entitled to severance damages for loss of access via McIntosh Road.  First, Defendant asserts any access routes to McIntosh Road would need to pass through areas of Tract B-10, which were designated as wildlife corridors when Palmer Ranch was platted and developed.  Building a road through a wildlife corridor would conflict with the objectives of retaining undeveloped lands and maintaining contiguity of habitats in the Palmer Ranch East Side Environmental Systems Analysis and incorporated into Resolution 91-170, the Resolution that governed the development of Palmer Ranch.  See DX 7 (US-RB007953). Plaintiffs disagree, arguing B-10 was not entirely encumbered by a wildlife corridor and could be developed.  Defendant further asserts that access to Tract B-10 is unnecessary as the area cannot be zoned for residential development.  Specifically, Defendant contends that the majority of B-10 has been maintained as a wildlife corridor since 1991, which demonstrates that it was not reasonably probable that it could have been zoned for residential development.  Defendant contends that because B-10 cannot be developed, sufficient access to B-9 can be provided via Sawyer Loop Road or Ridge Road.

It is well settled that a takings plaintiff can recover damages when the taking causes access to the remainder to be diminished.  Grizzard, 219 U.S. 180 (1910); Union Elec. Light & Power Co. v. Snyder Estate Co., 65 F.2d 297, 311 (8th Cir. 1933); McCann Holdings, 2013 WL 3326646, at *25-28; United States v. 711.57 Acres, 51 F. Supp. 30, 33 (N.D. Cal. 1943); see also Dep't of Transp. v. Stubbs, 285 So. 2d 1, 3 (Fla. 1973) ("Ease and facility of access constitute valuable property rights for which an owner is entitled to be adequately compensated."); Narloch v. Dep't of Transp., 340 N.W.2d 542, 550 (Wis. 1983).  However, in this case, Plaintiffs seek compensation for unspecified western access to and from Palmer Ranch that had not been constructed or planned.  In order to recover damages for a potential future use, a takings plaintiff must establish that the potential future use was reasonably probable on the date of valuation. Board of County Supervisors, 276 F.3d 1359 (Fed. Cir. 2002).  Plaintiffs failed to meet their burden here.  At the outset, the specifics of how this access via an easement relocation was to occur remain fuzzy.  The only evidence Plaintiffs adduced on the probability of access in the before condition was the conclusory opinion of Mr. Durrance without an adequate factual predicate.  This expert testified in response to a leading question that County approval would have to be given for the easement relocation and could be secured.  Tr. 353.  But the expert's only support for this conclusion was his testimony that he had contacted WilsonMiller, and some unidentified employee told him so.  Plaintiffs' other expert who had worked for Sarasota County and currently works for WilsonMiller was silent on this point.

In McCann Holdings, Ltd. v. United States, this Court articulated the type of evidence required to demonstrate that future access would have been reasonably probable in the before condition, stating:

> Here, Plaintiff has marshaled sufficient evidence to establish there was a reasonable probability that Sarasota County would have used its dedicated rights-of-way to extend Bay and Preymore Streets, which would have afforded access to McCann North at those two locations.  Plaintiff proffered plats showing the

County had dedicated rights-of-way and would not need to condemn private property to extend either street. PX 18, PX 19. Mr. Culverhouse credibly testified that based on his discussions with the county, he believed the county would have extended Bay and/or Preymore Streets. . . .

McCann Holdings, 2013 WL 3326646, at *25. Here, in contrast, there was no factual testimony on the likelihood of the County's approval, and an inadequate description of what exactly access in the before condition would have been. Moreover, as Defendant points out, the land through which access would have to pass is designated as a wildlife corridor, raising a question as to the likelihood of Sarasota County permitting road construction to provide such access. Nor did Plaintiffs present evidence that similar access had been provided in similar situations. See Bd. of Cnty. Supervisors, 276 F.3d at 1365-66. As such, Plaintiffs have not demonstrated that potential future access via McIntosh Road was reasonably probable.

The Court awards Plaintiffs $338,976 for the taking as it relates to Palmer Ranch, representing the value of the land encumbered by the easement.

## Pine Ranch East

Plaintiff, the Pine Ranch East Owners' Association, owns a 16.3798-acre triangular tract of land ("Pine Ranch East") to the east of the Pine Ranch East development and on the western side of Pine Ranch East Road. Tr. 58-59; PX 27C.[52] Pine Ranch East is a residential development with 28 homes located in the town of Osprey. Tr. 57, 60. Pine Ranch East is east of a large development called The Oaks and a few miles west of Interstate 75. Tr. 60. Pine Ranch East is not within the Palmer Ranch DRI. Almost one acre of Pine Ranch East is encumbered with a private road easement. PX 27B (BB-PLTF-12687). Pine Ranch East was designated for moderate-density residential development under the comprehensive plan, and was zoned residential estate-1, which permitted one dwelling unit per two acres. Tr. 823-24. The County zoned it for moderate-density development because the staff determined it was reasonably probable that it could be used for infill development. Tr. 828.

The 16.3798-acre tract is composed of a 13.633-acre segment designated as open space and a 2.7468-acre segment that is a vacated right-of-way. DX 55 (US-BB001803). On the plat for Pine Ranch East, the entirety of the triangular parcel was designated as open space. PX 41, DX 3 (BB-PLTF-23003). The trail is on the eastern edge of Pine Ranch East, and a barbed wire fence runs the length of the property, separating the property from the Legacy Trail. Tr. 64. The Pine Ranch East Owners' Association considered selling the tract adjacent to the trail but determined that it was not possible because the trail adversely affected ingress and egress to the property. Tr. 65-66.

### Plaintiffs' Expert's Valuation of Pine Ranch East

Plaintiffs' expert appraised Pine Ranch East with residential development as the highest and best use. Mr. Durrance appraised Pine Ranch East using a comparable sales analysis of six properties that were used in several of his appraisals discussed above. The price per acre of the

---

[52] An aerial image of Pine Ranch East is in Appendix I.

six properties ranged from $114,000 to $260,000 per acre.  The following table summarizes his findings:[53]

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04 | 3/22/04 | 10/4/04 | 11/1/04 | 8/25/04 | 12/27/05 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $5.3 mil | $2.776 mil | $9.11 mil |
| **Size (Ac)** | 15.78 | 40.00 | 15.381 | 20.77 | 25.746 | 24.260 | 38.40 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $206,000 | $114,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RE-1/MDR | RE-1/MDR Approved units available within Palmer Ranch DRI | RSF-4/MDR Approved for 57-unit SFR sub-division | RSF-4, RMF-2, PUD & MDR / MEDR | RE-1/RSF-3 & MDR/OF FMF Approved for 75 SFR and 16,200 SF Office | RE-1/OUE-2/ & MODR Approved for 96 units | RSF-4/MEDR Approved for 211-unit attached town-homes |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | <5% | 25-30% | <5% | <5% | <5% | <5% | 20% |
| **Easements/ Encumbrances** | Private Road | Typical | Typical | Perpetual Miti-gation Easement | Typical | Typical | Typical |
| | | | | | | | |

---

[53] This chart reflects the data provided in the summary table in PX 27B (BB-PLTF-12684).

|  | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Similar | Slightly Inferior | Superior |
| **Location** | Osprey | Superior | Slightly Inferior | Slightly Superior | Slightly Superior | Slightly Inferior | Inferior |
| **Size (Ac)** | 15.78 | Similar | Similar | Similar | Similar | Similar | Similar |
| **Zoning/Future Land Use Entitlements** | RE-1/MDR | Similar | Superior | Superior | Superior | Superior | Superior |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | <5% | Inferior | Similar | Similar | Similar | Similar | Inferior |
| **Easements/ Encumbrances** | Private Road | Slightly Superior | Slightly Superior | Slightly[54] Superior | Similar | Slightly Superior | Slightly Superior |
| **Comparability** | -- | Slightly Superior | Slightly Inferior | Superior | Slightly Superior | Inferior | Superior |

Mr. Durrance first compared Pine Ranch East to Contract 1. He rated the properties similar in terms of market conditions because Contract 1 was contracted in July 2004, within three months of the date of valuation. PX 27B (BB-PLTF-12686). Mr. Durrance determined Contract 1 had a superior location because it was within the Palmer Ranch DRI. PX 27B (BB-PLTF-12686). Mr. Durrance deemed Contract 1, at 40 acres, similar to the subject property, at 15.78 acres, with respect to size. PX 27B (BB-PLTF-12687).[55] He rated Contract 1 as inferior for environmental lands because 25 to 30% of it was occupied by environmentally sensitive

---

[54] The top portion of Mr. Durrance's summary table in PX 27B provides that Sale 3 has a perpetual mitigation easement. PX 27B (BB-PLTF-12684). This statement is corroborated by his narrative explanation later in the report. PX 27B (BB-PLTF-12687) ("The northwest corner of Sale 3 is encumbered with a 2.27 acre perpetual mitigation easement which prohibits development and is therefore considered to be similar to the subject."). However, the bottom half of the summary table rates Sale 3 as slightly superior with respect to easements/encumbrances and Sale 4 as similar. The Court assumes that Sale 3, not Sale 4, had the perpetual mitigation easement.

[55] Mr. Durrance appraised Pine Ranch East with the assumption that it was 15.78 acres. After trial, the parties stipulated that Pine Ranch East was 16.3798 acres. Joint Status Report, Oct. 19, 2012.

lands, as compared to less than five percent on Pine Ranch East.  PX 27B (BB-PLTF-12684).  Lastly, Mr. Durrance determined Contract 1 was slightly superior for having no easements/encumbrances while Pine Ranch East was encumbered with a private road easement.  PX 27B (BB-PLTF-12687).  Mr. Durrance concluded Contract 1 was slightly superior to Pine Ranch East.

The second property in Mr. Durrance's analysis was Sale 2, a 15.381-acre property that was also outside of the DRI.  For market conditions, Mr. Durrance rated Sale 2 as slightly inferior to Pine Ranch East because its sale was contracted in late 2002, when market conditions were less favorable.  However, because the contract included a $400,000 assignment fee that took later market conditions into account, Mr. Durrance did not rate it as fully inferior.  PX 27B (BB-PLTF-12686, BB-PLTF-12707).  He also deemed Sale 2 slightly inferior in terms of location because it was on an unimproved road.  Id.  Mr. Durrance found Sale 2 and Pine Ranch East to be similar in size because Sale 2 was only slightly smaller than Pine Ranch East.  PX 27B (BB-PLTF-12687).  Mr. Durrance rated Sale 2 superior for zoning/future land use entitlements because Pine Ranch East was zoned residential estate-1, which limited development to one unit per two acres, and Sale 2 was zoned residential single-family-4, which allowed 3.7 dwelling units per acre.  PX 27B (BB-PLTF-12684, BB-PLTF-12707).  Because both properties consisted of less than five percent environmentally sensitive lands, Mr. Durrance rated them similar for that factor.  PX 27B (BB-PLTF-12684).  Finally, Mr. Durrance rated Sale 2 as slightly superior because it did not contain any easements or encumbrances, while Pine Ranch East had a private road easement.  Mr. Durrance assessed Sale 2 as slightly inferior to Pine Ranch East.

Mr. Durrance deemed Sale 3 slightly inferior in terms of market conditions because its sale was contracted in late 2003, when demand for real estate in the area was weaker.  However, Sale 3 had a contract assignment fee in the amount of $1,891,500, which mitigated the effect of the delay.  PX 27B (BB-PLTF-12685).  Mr. Durrance determined Sale 3 was slightly superior with respect to location because it was within the Palmer Ranch DRI.  PX 27B (BB-PLTF-12686).  He found the properties were similar in size because both were within a range of 15 to 40 acres.  PX 27B (BB-PLTF-12687).  For environmental lands, Mr. Durrance rated the properties as similar because both contained less than five percent of such lands.  PX 27B (BB-PLTF-12684 to 12685).  Mr. Durrance determined Sale 3 was superior to Pine Ranch East in terms of zoning/future land use because Sale 3 could be developed at a greater density.  Id.  Finally, because Sale 3 contained a 2.27-acre perpetual mitigation easement that limited development on a corner of the property, he rated it similar.  Id.  For overall comparability, Mr. Durrance rated Sale 3 superior to Pine Ranch East.

Mr. Durrance assessed Sale 4 and Pine Ranch East as similar in terms of market conditions because Sale 4 was contracted near April 2004.  PX 27B (BB-PLTF-12686).  Mr. Durrance deemed Sale 4's location slightly superior to Pine Ranch East because it was designated as infill, meaning the County identified it as an ideal location for development.  Id.  Next, Mr. Durrance rated Sale 4 and Pine Ranch East similar for size because both properties were between 15 and 40 acres.  PX 27B (BB-PLTF-12687).  Mr. Durrance found that Sale 4 had superior zoning/future land use entitlements because residential development up to 3.21 dwelling units per acre and office development were permitted on the property.  PX 27B (BB-PLTF-12684, BB-PLTF-12713).  Mr. Durrance determined Sale 4 and the subject property were similar with respect to environmental lands because both properties had less than five percent of such

lands. PX 27B (BB-PLTF-12684). Finally, because Sale 4 did not contain any easements or encumbrances that impacted development, Mr. Durrance rated Sale 4 slightly superior to Pine Ranch East with respect to this factor. Id. Overall, Mr. Durrance concluded that Sale 4 was slightly superior to Pine Ranch East.

Mr. Durrance determined that Sale 5 was slightly inferior for market conditions because Sale 5 was contracted in late 2003 when market conditions were less favorable. However, the contract also contained a $710,000 contract assignment fee, which lessened the effect of the time gap. PX 27B (BB-PLTF-12686, BB-PLTF-12716). Mr. Durrance rated Sale 5 slightly inferior for location because Sale 5 was in Nokomis, a less desirable area, on a thoroughfare. PX 27B (BB-PLTF-12686 to 12687). He rated the properties as similar with respect to size because both fell within the range of 15 to 40 acres. PX 27B (BB-PLTF-12687). Mr. Durrance deemed Sale 5 as superior to Pine Ranch East for zoning/future land use designation because development at a density of 4.62 dwelling units per acre was permitted on Sale 5. PX 27B (BB-PLTF-12684, BB-PLTF-12716). Mr. Durrance determined that the properties were similar in terms of environmental lands because both contained less than five percent of such lands. PX 27B (BB-PLTF-12684). Lastly, Mr. Durrance rated Sale 5 slightly superior for easements/encumbrances because Pine Ranch East was encumbered with a private road easement while Sale 5 was not subject to any easements/encumbrances. Id.

Mr. Durrance rated Sale 6, a 38.4-acre property, superior for market conditions because Sale 6 was contracted in mid-2005, when demand and prices were higher. PX 27B (BB-PLTF-12686). He rated Sale 6 inferior for location because it was adjacent to an overhead transmission power line easement and the interstate. PX 27B (BB-PLTF-12687). Mr. Durrance determined that the properties were similar with respect to size because both were within the range of 15 to 40 acres. PX 27B (BB-PLTF-12687). Sale 6 was zoned residential single-family-4, and its future land use designation was medium-density residential. PX 27B (BB-PLTF-12684). Both designations provided for greater density than allowed on Pine Ranch East, leading Mr. Durrance to rate Sale 6 superior for zoning. He determined Sale 6 was inferior in terms of environmental lands because the property had 20% environmental lands, while Pine Ranch East contained less than five percent. Id. Lastly, Mr. Durrance rated Sale 6 slightly superior with respect to easements/encumbrances because it did not contain any easements that impacted potential development, while the subject property was encumbered with a private road easement. PX 27B (BB-PLTF-12687). Mr. Durrance concluded Sale 6 was superior to Pine Ranch East.

Based on his comparable sales analysis, Mr. Durrance ranked the six comparison properties and Pine Ranch East. He determined that Pine Ranch East ranked below Contract 1, which sold for $206,000 per acre, and above Sale 2, which sold for $176,000. Id. Based on this ranking, Mr. Durrance appraised Pine Ranch East at $190,000 per acre. Id.

### Defendant's Expert's Valuation of Pine Ranch East

Mr. Underwood also appraised Pine Ranch East using a comparable sales analysis. He compared Pine Ranch East with four property sales from the Sarasota area. Mr. Underwood appraised Pine Ranch East as a 69.2775-acre parcel, the size of the entire subdivision, rather than the 16.3798-acre tract upon which Plaintiffs base their claim, because common areas and right-of-ways are not sold as standalone properties. DX 55 (US-BB001803). The unadjusted sales price of the properties in Mr. Underwood's analysis ranged from $175,439 to $259,712 per acre.

The following table summarizes the properties used and the adjustments Mr. Underwood made:[56]

|  | Subject | A-1 | A-3 | A-4 | A-10 |
|---|---|---|---|---|---|
| Location | XXX Pine Ranch East Road<br><br>Sarasota County | W side of Cattlemen Rd N of Richardson Rd<br><br>Sarasota County | E side of Honore Ave S of Clark Rd<br><br>Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd<br><br>Sarasota County | S. End of Fielding Lane, 1 block north of Clark Rd.<br><br>Sarasota County |
| Sale Price | N/A | $5.9 mil | Adjusted $5.402 mil | $5.3 mil | $2.7 mil |
| Sale Date | | Jul-04 | Oct-04 | Nov-04 | Mar-04 |
| Cond of Sale | | Arm's Length | Arm's Length | Arm's Length | Arms' Length |
| Property Interest | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Zoning/Land Use | OUE-2/MODR | RMF-3/HDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RSF-4/MODR |
| Size (Ac) | 69.2775 | 27.732 | 20.80 | 25.746 | 15.39 |
| Price/Acre | | $212,751 | $259,712 | $205,857 | $175,439 |
| Adjustments | | | | | |
| Financing | | 0% | 0% | 0% | 0% |
| Time | | 0% | -9% | -11% | 0% |
| Time-Adjusted Sales Price | | $212,751 | $236,338 | $183,213 | $175,439 |
| Location | | 0% | -10% | -10% | 15% |
| Property Size | | -10% | -10% | -10% | -15% |
| Land Use Regulations | | -5% | -5% | 0% | 0% |

---

[56] This chart reflects the data provided in the table entitled "Vacant Land Sales Chart" in DX 55 at US-BB001836.

|  | Subject | A-1 | A-3 | A-4 | A-10 |
|---|---|---|---|---|---|
| **Site Characteristics** | | 0% | 0% | 0% | 0% |
| **Total Adjustment** | | -15% | -25% | -10% | 0% |
| **Adjusted Price/Acre** | | $180,838 | $177,253 | $164,892 | $175,439 |

Before making adjustments for location, property size, land use regulation, and site characteristics, Mr. Underwood determined whether adjustments for time were needed. As discussed above, Mr. Underwood determined that demand was increasing in 2004, at a rate of 1.5% per month. DX 55 (US-BB001837). As such, he adjusted the price of Sale A-3 by negative nine percent because the sale occurred six months after the date of valuation, resulting in a time-adjusted price of $236,388 per acre. Similarly, Mr. Underwood adjusted the price of A-4 by -11% because its sale occurred seven months after the date of the taking, in November 2004, resulting in an adjusted price of $183,213 per acre. DX 55 (US-BB001836).

Mr. Underwood then analyzed each property and made quantitative adjustments to reflect how the property compared to Pine Ranch East. He used a factor in the comparable sales analysis for Pine Ranch East that he used for only one other property -- site characteristics, and he provided the following explanation:

> The subject plat has a total of 66.53 acres. Based on approvals, 50% must be open space; 35% of the total land area is comprised of wetlands, open use, and common areas prior to platting. An analysis of data indicates sales with 25% or less of wetlands are not negatively impacted and no adjustment is required.

DX 55 (US-BB001839).

Mr. Underwood first compared Pine Ranch East to Sale A-1 and found no adjustment for location was needed because the properties were in similar areas of Sarasota. DX 55 (US-BB001838). Mr. Underwood next considered size. Based on his large-lot adjustment, Mr. Underwood determined a 20-acre difference necessitated a five-percent adjustment, and because Sale A-1 was approximately 40 acres smaller than Pine Ranch East, applied a -10% adjustment. DX 55 (US-BB001836). Sale A-1 was zoned to allow development at a density of 5.77 dwelling units per acre -- a higher density than allowed on Pine Ranch East. As such, Mr. Underwood applied a negative five percent adjustment. Id. Mr. Underwood did not make any adjustments for site characteristics because less than 25% of Sale A-1 consisted of wetlands or other preserve areas. DX 55 (US-BB001839). In all, Mr. Underwood applied a -15% adjustment to Sale A-1, for an adjusted sales price of $180,838 per acre.

Mr. Underwood next considered Sale A-3, beginning with the time-adjusted price. He applied a -10% adjustment for location because the property was on the east side of Honore Avenue, south of Clark Road, a better location than the subject property. DX 55 (US-BB001838). Mr. Underwood also applied a -10% adjustment for size because Sale A-3 was more than 40 acres smaller than Pine Ranch East. DX 55 (US-BB001838). Mr. Underwood adjusted the price of Sale A-3 by negative five percent to reflect the fact that it could be developed at 7.02 dwelling units per acre, two units per acre more than permitted on Pine Ranch East. DX 55 (US-BB001834, US-BB001836). Mr. Underwood did not make any adjustments for site characteristics because less than 25% of Sale A-3 was set aside as wetlands or for preservation. DX 55 (US-BB001839). After adjusting for time, Mr. Underwood adjusted the price of Sale A-3 by an additional -25%, yielding a total adjusted price per acre of $177,253.

The third property in Mr. Underwood's analysis was Sale A-4. He began with the time-adjusted price of $183,213 and did not make an adjustment for location because the properties were in similar areas. DX 55 (US-BB001836). Mr. Underwood applied a -10% adjustment to reflect the fact that Sale A-4 was more than 43 acres smaller than Pine Ranch East. DX 55 (US-BB001838). Mr. Underwood did not make any adjustments for land use regulations because the properties were zoned to allow the same density of development. Id. Finally, he did not make any adjustments for site characteristics because less than 25% of Sale A-4's land consisted of environmental lands. DX 55 (US-BB001839). Mr. Underwood determined that Sale A-4 had an adjusted sale price of $164,892 per acre.

The last property in Mr. Underwood's analysis of Pine Ranch East was Sale A-10. Mr. Underwood adjusted the price of Sale A-10 by 15% for location because it was surrounded by older construction with many "properties suffer[ing] from deferred maintenance." DX 55 (US-BB001838). Mr. Underwood applied a -15% adjustment to reflect the fact that Sale A-10 was 15.39 acres, more than 50 acres smaller than Pine Ranch East. DX 55 (US-BB001838). Mr. Underwood did not make any adjustments for land use regulations because the properties had similar designations. Id He also did not apply any adjustment for site characteristics because Sale A-10 was less than 25% environmental or wetlands. DX 55 (US-BB001839). The location- and time-based adjustments canceled one another out, resulting in a final adjusted price of $175,439 per acre.

After adjustments were applied, the prices of the properties in Mr. Underwood's analysis ranged from $164,892 to $180,838 per acre. Based on his analysis, Mr. Underwood appraised Pine Ranch East at $175,000 per acre. DX 55 (US-BB001839). However, after receiving the legal instruction from counsel, Mr. Underwood determined $175,000 per acre was not the proper "before value" of Pine Ranch East because he believed that development would not be permitted on Pine Ranch East. This assumption was based on the fact that the land was designated as open space on the plat for the development. DX 55 (US-BB001839), DX 38A. He appraised Pine Ranch East as if it were a noneconomic remainder, worth 15% of the "before value" with development potential. Accordingly, Mr. Underwood appraised Pine Ranch East at $26,300 per acre.

### What Is the Proper "Before Value" of Pine Ranch East?

Plaintiffs contend Pine Ranch East should be valued at $190,000 per acre before the taking. Defendant contends that the property should be appraised without development potential

at $26,300 per acre.   Plaintiffs acknowledge that the plat for the residential development designates the bulk of the 16.3798-acre tract as open space.   However, Plaintiffs argue that the land should be appraised without that restriction because rezoning the property for residential development was reasonably probable in 2004.   Ms. Allred testified that the entirety of Pine Ranch East was designated for denser development than land west of Pine Ranch East Road because it was identified for infill development.   Tr. 828.   Additionally, when Pine Ranch East was designated as open space, the County had a 50% open space requirement.   That policy was changed in 1989, and in 2004, the open space requirement in effect was 30%.   Tr. 774-75.

As discussed above, Plaintiffs' properties should not be appraised subject to a use restriction unless the restriction was directed at habitat preservation and the property could not be subject to unified control and ownership.   Here, the land was not designated for habitat preservation, and the Court assumes unified control and ownership pursuant to the unit rule.   Additionally, rezoning Pine Ranch East for residential development would be consistent with the property's moderate-density residential future land use designation under the County's comprehensive plan.

Even absent the consideration of development potential, the experts' appraisals differ by $15,000 per acre.   Messrs. Durrance and Underwood used three of the same properties in their appraisals: Sale 3/A-3, Sale 4/A-4, and Sale 2/A-10.   They agreed Sale 3/A-3 and Sale 4/A-4 were superior to Pine Ranch East and agreed about the relative extent of their superiority, with Sale 3/A-3 being the most superior of the properties.   Compare PX 27B (BB-PLTF-12684), with DX 55 (US-BB001836).   However, Messrs. Durrance and Underwood disagreed about how Sales 3/A-3 and 4/A-4 compared to Pine Ranch East with respect to market conditions.   Mr. Durrance based his determinations on the 2002 and 2003 contract dates, while Mr. Underwood used only the October and November 2004 closing dates, undervaluing Pine Ranch East. As discussed previously, Mr. Durrance's approach better reflected the market conditions that led to each comparable property's price, while Mr. Underwood inflated the values of the comparison properties.

Messrs. Durrance and Underwood also disagreed about how each property compared to the subject property in terms of size.   Mr. Underwood applied a -10% adjustment to Sale 3/A-3 and Sale 4/A-4 and a -15% adjustment to Sale 2/A-10 because they ranged in size from 15 to 26 acres, and he appraised Pine Ranch East at 69.2775 acres.   DX 55 (US-BB001836).   Mr. Durrance appraised Pine Ranch East at 15.78 acres and rated all three properties as similar.   PX 27B (BB-PLTF-12684).   After trial, the parties agreed that Pine Ranch East was 16.3798 acres. Joint Status Report, Oct. 19, 2012.   The Court finds Mr. Durrance's refusal to apply a size adjustment based on how Pine Ranch East compared to Sale 3/A-3, Sale 4/A-4, and Sale 2/A-10, to be appropriate because the comparable properties were sufficiently close in size to the subject property.   In applying his large-lot adjustment, Mr. Underwood undervalued Pine Ranch East.

For the foregoing reasons, the Court finds that Mr. Durrance's analysis more accurately reflected the value of the properties, and adopts his "before value" of $190,000 per acre for Pine Ranch East.

### Just Compensation for Pine Ranch East

Plaintiffs seek $832,100 in damages for Pine Ranch East, representing $491,000 for the

part taken and $341,100 in severance damages for the decrease in fair market value because of the trail. Defendant contends compensation should be limited to the land encumbered by the easement, valued without development potential at $26,300 per acre.

As discussed above, Pine Ranch East is properly valued at $190,000 per acre before the taking. As such, Plaintiffs are entitled to $516,673.08 for the 2.7468 acres encumbered by the rail-trail corridor. Additionally, Plaintiffs are entitled to severance damages for the decrease in the value of Pine Ranch East because of the taking. As discussed above, $67 per lineal foot for the cost to buffer the land adjacent to the trail is a reasonable means to quantify the impact of the trail on the property's fair market value because Pine Ranch East is not in the Palmer Ranch DRI. The rail-trail corridor is adjacent to 2,274 lineal feet of Pine Ranch East, and there is no natural buffering provided by wetlands or conservation areas. See PX 27D. As such, Plaintiffs are entitled to $152,358 in severance damages. The Court awards Plaintiffs $669,031.08 in compensation with respect to the taking of Pine Ranch East.

**Calusa Lakes**

Calusa Lakes is a residential subdivision. The Calusa Lakes Community Association owns a tract of land ("Calusa Lakes"), which is located between the Legacy Trail and a residential area.[57] The parties disagree as to the size of Calusa Lakes. Mr. Durrance appraised only the parent tract, measuring 60.673 acres, referred to as "Unit 2." PX 23B (BB-PLTF-11944). Unit 2 was composed of a drainage area, a wetlands preserve, and open space. DX 56 (US-BB001521). Mr. Underwood appraised Calusa Lakes as Units 1 and 2, which measured 138.75 acres. DX 56 (US-BB001521). Unit 1 consisted of residential lands, and it does not abut the corridor. The rail-trail corridor is adjacent to Unit 2. See DX 56 (US-BB001530); PX 23B (BB-PLTF-11961), PX 23D. Mr. Underwood combined Units 1 and 2 for analysis purposes because Unit 2 was at the northwest corner of the subdivision and Unit 1 provided access to Unit 2. DX 56 (US-BB001521). While the parties disagree about the size of Calusa Lakes, they agree that after the taking, 1.273 acres of the property was encumbered by the Legacy Trail.

In 2004, Calusa Lakes was zoned residential single-family-2 and designated for moderate-density residential development. Tr. 831. This designation permitted residential development at a maximum density of 3.5 dwelling units per acre. DX 56 (US-BB001531). The plats of the Calusa Lakes development indicate that the land adjacent to the corridor was designated as drainage area, open space, and open space with a wetland preserve. DX 36. The Covenants for Calusa Lakes identified the open spaces and drainage areas as two types of "community common areas." DX 37 (US-PR000151 to 000152). The Covenants further provided that once the community association took title to the common areas, the lands "shall not be abandoned, partitioned, alienated, released, transferred, hypothecated, or otherwise encumbered without first obtaining . . . not less than the majority of the OWNERS and a majority of the INSTITUTIONAL MORTGAGEES . . . ." DX 37 (US-PR000153). Additionally, the Covenants stated that the provisions would run with the land for 99 years. DX 37 (US-PR000173). The Calusa Lakes Covenants provided that the Covenants could be amended via a two-thirds vote of all members and the approval of a majority of the board. DX 37 (US-PR000174).

---

[57] An aerial view of Calusa Lakes is in Appendix J, and it includes Units 1 and 2.

**Plaintiffs' Expert's Valuation of Calusa Lakes**

Mr. Durrance, Plaintiffs' expert, appraised Calusa Lakes as a 60.673-acre parcel with residential development as the highest and best use.  PX 23B (BB-PLTF-11954).  Mr. Durrance conducted a comparable sales analysis using Calusa Lakes and six sales of comparable properties in western Sarasota County.  The following table summarizes his findings:[58]

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 3/22/04 | 10/4/04 | 7/28/04 | 8/25/04 | 12/10/04 | 8/30/04 |
| **Sale Price** | -- | $2.7 mil | $5.402 mil | $5.9 mil | $2.776 mil | $2.449 mil | $28 mil |
| **Size (Ac)** | 60.673 | 15.381 | 20.77 | 27.732 | 24.260 | 19.650 | 199.44 |
| **Price/Acre** | -- | $176,000 | $260,000 | $213,000 | $114,000 | $127,000 | $140,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RSF-2/MODR | RSF-4/MODR Approved for 57-unit SFR subdivision | OUE-1/MODR / & MDR Approved for 146 townhome units | RMF-3/HDR Approved for 160-unit attached townhomes | RE-1/OUE-2/ & MODR Approved for 96 units | OUE-1/MODR | OUE-1/MDR Approved units available within Palmer Ranch DRI |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | 15-20% | <5% | <5% | 20-25% | <5% | 30-40% | <10% |
| **Easements/ Encumbrances** | Typical | Typical | Perpetual Miti-gation Easement | Typical | Typical | 175-foot wide FP&L easement | South Creek/Transmission Power Lines |

---

[58] This chart reflects the data provided in the summary table in PX 23B (BB-PLTF-11955 to 11956).

|  | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Market Conditions** | Mid-2004 | Slightly Inferior | Slightly Inferior | Similar | Slightly Inferior | Slightly Superior | Inferior |
| **Location** | Nokomis | Similar | Superior | Slightly Inferior | Slightly Inferior | Slightly Inferior | Superior |
| **Size (Ac)** | 60.673 | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Inferior |
| **Zoning/Future Land Use Entitlements** | RSF-2/MODR | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Inferior | Slightly Inferior |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | 15-20% | Superior | Superior | Similar | Superior | Inferior | Superior |
| **Easements/ Encumbrances** | Typical | Similar | Slightly Inferior | Similar | Similar | Inferior | Inferior |
| **Comparability** | -- | Similar | Superior | Slightly Superior | Inferior | Inferior | Inferior |

In comparing Calusa Lakes to Sale 1, Mr. Durrance rated Sale 1 slightly inferior in terms of market conditions because its sale was contracted in late 2002, when market conditions were less favorable. PX 23B (BB-PLTF-11955 to 11956, BB-PLTF-11959). However, the contract contained a $400,000 contract assignment fee that accounted for changed market conditions. PX 23B (BB-PLTF-11957). Mr. Durrance determined that the locations of the properties were similar because Sale 1 was on an unimproved road north of Clark Road in central Sarasota, which was comparable to Calusa Lakes' location in the Nokomis area. PX 23B (BB-PLTF-11955, BB-PLTF-11959). Mr. Durrance determined that properties ranging from 15 to 25 acres in size were slightly superior to Calusa Lakes. Accordingly, because Sale 1 was 15.381 acres, he rated it slightly superior. PX 23B (BB-PLTF-11955, BB-PLTF-11959). Mr. Durrance found Sale 1 to be slightly superior with respect to zoning/future land use entitlements because Calusa Lakes was limited to moderate-density residential development, while moderate- to medium-density development was permitted on Sale 1. PX 23B (BB-PLTF-11959). Mr. Durrance rated Sale 1 superior for environmental lands because less than 5% of Sale 1's land consisted of environmental lands, while Calusa Lakes had 15 to 20% environmental lands. PX 23B (BB-PLTF-11955, BB-PLTF-11959). Lastly, Mr. Durrance determined the properties were similar in terms of easements/encumbrances because neither property contained any easements or encumbrances that negatively impacted the property's development potential. PX 23B (BB-PLTF-11959). On the whole, Mr. Durrance deemed Sale 1 similar to Calusa Lakes.

Mr. Durrance compared Calusa Lakes to Sale 2, which represented an assemblage of two contiguous parcels that were contracted in September 2003. Because Sale 2 was contracted more than six months before the date of valuation, Mr. Durrance assessed Sale 2's market conditions as slightly inferior. However, the contract involved a $1,891,500 assignment fee that accounted for the change in market conditions, lessening the effect of the delay. PX 23B (BB-PLTF-11956). Mr. Durrance rated Sale 2's location as superior to Calusa Lakes' because Sale 2 was adjacent to the Palmer Ranch DRI, a potential asset the subject property lacked. PX 23B (BB-PLTF-11959).[59] At 20.77 acres, Mr. Durrance found Sale 2 was slightly superior with respect to size. PX 23B (BB-PLTF-11955). Mr. Durrance determined the zoning/future land use designation of Sale 2 was slightly superior because moderate- to medium-density development was allowed on Sale 2, a greater density than permitted on Calusa Lakes. PX 23B (BB-PLTF-11959). Like Sale 1, Mr. Durrance deemed Sale 2 superior with respect to environmental lands because they occupied less than five percent of the property. PX 23B (BB-PLTF-11955, BB-PLTF-11959). He determined Sale 2 was slightly inferior with respect to easements/encumbrances because 2.3 acres of Sale 2 were encumbered with a mitigation easement that prohibited development. PX 23B (BB-PLTF-11956). Mr. Durrance concluded that Sale 2 was superior to Calusa Lakes.

Mr. Durrance next considered Sale 3. This sale was contracted in mid-2004, near the date of valuation, leading Mr. Durrance to deem the properties similar in terms of market conditions. PX 23B (BB-PLTF-11959). He determined Sale 3 had a slightly inferior location because it was near an interstate. Id. Mr. Durrance found Sale 3, at 27.732 acres, was slightly superior to Calusa Lakes with respect to size. PX 23B (BB-PLTF-11955, BB-PLTF-11959). Mr. Durrance rated Sale 3 as slightly superior in terms of zoning/future land use because it was designated for moderate- to medium- density development -- allowing denser development than permitted on Calusa Lakes. PX 23B (BB-PLTF-11959). Mr. Durrance found the properties were similar with respect to environmental lands because Calusa Lakes had 15 to 20% of such lands, and Sale 3 had 20 to 25%. PX 23B (BB-PLTF-11955 to 11956). Finally, he rated the properties similar in terms of easements/encumbrances because neither property had any easements/encumbrances that affected development potential. PX 23B (BB-PLTF-11959). Mr. Durrance concluded that Sale 3 was slightly superior to Calusa Lakes.

The fourth property in Mr. Durrance's analysis was Sale 4, a 24.260-acre property that was originally contracted in May 2003 and later assigned to another buyer in 2004, with a $710,000 assignment fee. PX 23B (BB-PLTF-11957 to 11958, BB-PLTF-11988). Mr. Durrance rated the market conditions of Sale 4 slightly inferior because the 2004 assignment partially mitigated the effect of the earlier contract date. PX 23B (BB-PLTF-11959). Mr. Durrance also found Sale 4 to be slightly inferior to the subject property in terms of location because it was in the Nokomis area of Sarasota on a thoroughfare. Id. Mr. Durrance assessed the size of Sale 4 to be slightly superior to Calusa Lakes because it fell within the 15 to 25-acre range. Id. Mr. Durrance rated Sale 4 slightly superior in terms of zoning/future land use because when the contract for Sale 4 closed, it was designated for moderate- to medium- density residential

---

[59] The summary table in Mr. Durrance's appraisal of Calusa Lakes rates Sale 2 as superior for location, but the narrative discussion of adjustments characterizes Sale 2's location as slightly superior, a description the Court adopts. Compare PX 23B (BB-PLTF-11955), and PX 23B (BB-PLTF-11959).

development, which permitted denser development than allowed on Calusa Lakes.  Id.  Mr. Durrance rated Sale 4 as superior for environmental lands because Sale 4 contained less than five 5% environmentally sensitive lands, while Calusa Lakes had 15 to 20%.  PX 23B (BB-PLTF-11955, BB-PLTF-11959).  For easements/encumbrances, Mr. Durrance found the properties to be similar because neither property had any easements or encumbrances that limited potential development.  PX 23B (BB-PLTF-11959).  Mr. Durrance concluded Sale 4 was inferior to Calusa Lakes .

Mr. Durrance compared Calusa Lakes to Sale 5, a 19.650-acre property in the Nokomis area of Sarasota County.  Mr. Durrance determined the market conditions of Sale 5 were slightly superior to those of Calusa Lakes because Sale 5 was contracted in late 2004, after the date of valuation, when demand and prices were higher.  PX 23B (BB-PLTF-11959).  Mr. Durrance deemed Sale 5's location slightly inferior because Nokomis was a less desirable area.  Id.  He rated Sale 5 slightly superior with respect to size because it fell within the 15 to 25-acre range.  Id.  Because Sale 5 was zoned open-use-estate-1, a designation that permitted less dense development than Calusa Lake's designation, Mr. Durrance determined that Sale 5 was slightly inferior in terms of zoning/future land use designation.  PX 23B (BB-PLTF-11955, BB-PLTF-11959).  Mr. Durrance rated Sale 5 inferior for environmental lands because it contained 15 to 25% more environmental lands than the subject property.  PX 23B (BB-PLTF-11955 to 11956).  Lastly, he found Sale 5 to be inferior with respect to easements/encumbrances because the southern boundary of the property was encumbered with a power line transmission easement.  PX 23B (BB-PLTF-11959).  Mr. Durrance concluded that Sale 5 was inferior to Calusa Lakes.

The last property in Mr. Durrance's analysis was Sale 6, a 199.44-acre property within the Palmer Ranch DRI that was developed as a community known as the Isles of Sarasota.  PX 23B (BB-PLTF-11955, BB-PLTF-11958).  Mr. Durrance rated Sale 6's market condition inferior to Calusa Lakes because its sale was contracted in 2003, when prices were lower.  PX 23B (BB-PLTF-11959).  Mr. Durrance found Sale 6's location to be superior to Calusa Lakes because Sale 6 was within the Palmer Ranch DRI.  Id.  He rated Sale 6 slightly inferior with respect to size because it was almost 200 acres, substantially larger than Calusa Lakes.  Id.  Mr. Durrance assessed Sale 6's zoning/future land use designation as slightly inferior because it was zoned open-use-estate 1, a lower density than Calusa Lakes.  PX 23B (BB-PLTF-11955, BB-PLTF-11959).  Mr. Durrance rated Sale 6 superior for environmental lands because less than 10% of Sale 6 constituted environmentally sensitive lands.  PX 23B (BB-PLTF-11955, BB-PLTF-11959).  Mr. Durrance found Sale 6 to be inferior in terms of easements/encumbrances because Sale 6 was encumbered by transmission power lines, a mesic hammock, and a creek, which imposed development constraints on the property.  PX 23B (BB-PLTF-11959).  Mr. Durrance concluded that Sale 6 was inferior to Calusa Lakes.

From this analysis, Mr. Durrance concluded that Calusa Lakes was most similar to Sale 1 which sold for $176,000 per acre.  PX 23B (BB-PLTF-11960).  He appraised Calusa Lakes at $175,000 per acre before the taking, for a total "before value" of $10,618,000 for the 60.673-acre property.  Id.

**Defendant's Expert's Valuation of Calusa Lakes**

Mr. Underwood also appraised Calusa Lakes using a comparable sales analysis.  He appraised Calusa Lakes as a 138.75-acre property, consisting of Unit 1 and Unit 2.  Mr.

Underwood determined residential development was the highest and best use for Unit 1, and open space, wetlands, and drainage as the highest and best use for Unit 2. DX 56 (US-BB001532). Mr. Underwood compared Calusa Lakes to five sales of nearby properties. Before adjustments, the sales prices ranged from $90,000 to $259,712 per acre. The following table summarizes the properties used and the adjustments that Mr. Underwood made:[60]

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | 19XX Mission Valley Blvd<br><br>Sarasota County | W side of Cattlemen Rd N of Richardson Rd<br><br>Sarasota County | E side of Honore Ave S of Central Sarasota Pkwy<br><br>Sarasota County | E side of Honore Ave S of Clark Rd<br><br>Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd<br><br>Sarasota County | S side of SR 681 E of US 41<br><br>Sarasota County |
| **Sale Price** | N/A | $5.9 mil | $28 mil | Adjusted $5.402 mil | $5.3 mil | $19,959,100 |
| **Sale Date** | | Jul-04 | Aug-04 | Oct-04 | Nov-04 | Aug-05 |
| **Cond of Sale** | | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RSF-2/MODR | RMF-3/HDR | OUE-1/MODR | OUE-1/MODR | OUE-2 & RSF-3/MODR & OFFMF | RMH/MODR |
| **Size (Ac)** | 138.75 | 27.732 | 199.44 | 20.80 | 25.746 | 221.77 |
| **Price/Acre** | | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| **Adjustments** | | | | | | |
| **Financing** | | 0% | 0% | 0% | 0% | 0% |
| **Time** | | 0% | 0% | -9% | -11% | -15% |
| **Time-Adjusted Sales Price** | | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |

_____

[60] This chart reflects the data provided in the table entitled "Vacant Land Sales Chart" in DX 56 at US-BB001539.

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| **Location** | | 0% | -10% | -10% | 0% | 10% |
| **Property Size** | | -20% | 10% | -25% | -25% | 10% |
| **Land Use Regulation** | | -5% | 0% | -5% | 0% | -10% |
| **Total Adjustment** | | -25% | 0% | -40% | -25% | 10% |
| **Adjusted Price/Acre** | | $159,563 | $140,393 | $141,803 | $137,410 | $84,150 |

He adjusted the per-acre prices of three properties for time because they sold after the date of valuation. Mr. Underwood determined that prices were increasing by approximately 1.5% per month in 2004. Because Sale A-3 sold in October 2004, six months after the date of valuation, he applied a negative nine percent adjustment to its price, yielding a time-adjusted price of $236,338 per acre. DX 56 (US-BB001539 to 001540). Similarly, Mr. Underwood adjusted Sale A-4 by -11% because its sale date was November 2004, some seven months after the taking, resulting in a time-adjusted price of $183,213 per acre. Id. Lastly, he applied a -15% adjustment to Sale A-13 because its sale was contracted in March 2005, 11 months after the date of valuation, for a time-adjusted price of $76,500. Id. Mr. Underwood did not make any time-related adjustments to the prices of Sales A-1 or A-2 because both sales occurred within four months of the date of valuation. Id.

The first property in Mr. Underwood's comparable sale analysis for Calusa Lakes was Sale A-1. Mr. Underwood did not make any adjustments related to location because Sale A-1 was located in an area with older homes and rental apartments, a location he found similar to Calusa Lakes'. DX 56 (US-BB001541). Mr. Underwood employed a large-lot adjustment and applied a 20% adjustment because Sale A-1 was approximately 110 acres smaller than Calusa Lakes. DX 56 (US-BB001542). Mr. Underwood imposed a negative five percent adjustment for land use regulations because Sale A-1 was zoned for development up to 5.77 dwelling units per acre, 2.27 more units per acre than Calusa Lakes. DX 56 (US-BB001). In sum, Mr. Underwood adjusted Sale A-1 by -25%, resulting in an adjusted price of $159,563 per acre.

Mr. Underwood next considered Sale A-2. He adjusted Sale A-2 by -10% for location because Sale A-2 was within the Palmer Ranch DRI. DX 56 (US-BB001541). Mr. Underwood applied a 10% adjustment for size because Sale A-2 was just under 200 acres, approximately 60 acres larger than Calusa Lakes. DX 56 (US-BB001542). Mr. Underwood did not apply adjustments for land use regulations because the properties had similar zoning/future land use designations. Id. The location and property size adjustments offset one another, leaving Sale A-2 with a final adjusted price of $140,393 per acre.

Mr. Underwood compared Sale A-3 to Calusa Lakes, beginning with the time-adjusted

105

price.  He applied a -10% adjustment for location because the property was within the Palmer Ranch DRI.  DX 56 (US-BB001542).  Mr. Underwood applied a 25% adjustment for size because Sale A-3 was 20.8 acres, almost 120 acres smaller than Calusa Lakes.  DX 56 (US-BB001541 to 001542).  Mr. Underwood employed a negative five percent adjustment for land use regulations because Sale A-3 was zoned for denser development than Calusa Lakes.  DX 56 (US-BB001542).  Thus, after adjusting for time, Mr. Underwood adjusted the price of Sale A-3 by an additional -40%, for a final adjusted price of $141,803 per acre.  Id.

For Sale A-4, Mr. Underwood began with the time-adjusted price of $183,213 per acre.  He determined that an adjustment for location was unnecessary because Sale A-4 was located in an area that had been developed with smaller homes, similar to the location of Calusa Lakes.  DX 56 (US-BB001538 to 0015347).  Like Sale A-4, Mr. Underwood applied a -25% adjustment for size because Sale A-4 was 25.746 acres, more than 110 acres smaller than Calusa Lakes.  DX 56 (US-BB001541 to 001542).  He did not make any adjustments to account for land use regulations because the properties were zoned to allow similar levels of development.  DX 56 (US-BB001539).  Mr. Underwood adjusted the time-adjusted price of Sale A-4 by -25%, for a total adjusted price of $137,410 per acre.

The last property in Mr. Underwood's analysis was Sale A-13.  He began with its time-adjusted price and applied a 10% adjustment for location because Sale A-13 was next to a mobile home park and had one access point near the mobile home park.  DX 56 (US-BB001541).  Mr. Underwood also applied a 10% adjustment for size because Sale A-13 was 221.77 acres, approximately 50 acres larger than Calusa Lakes.  DX 56 (US-BB001542).  Mr. Underwood determined that a -10% adjustment was necessary to account for Sale A-13 being zoned for residential multifamily and mixed-use development, superior designations to Calusa Lakes'.  Id.  Mr. Underwood adjusted the time-adjusted price of Sale A-13 upward by 10%, for a final adjusted price of $84,150 per acre.

After the adjustments, the prices of the comparison properties ranged from $84,150 to $159,563 per acre.  Mr. Underwood concluded that Sales A-1 and A-2, which sold for adjusted prices of $159,563 and $140,393 per acre, respectively, were most like Calusa Lakes, and Sales A-4 and A-13 were least like Calusa Lakes.  DX 56 (US-BB001543).  He appraised Calusa Lakes at $145,000 per acre.  Id.  However, Mr. Underwood did not accept $145,000 as the "before value" because he determined that 31.363 acres could not be developed because they consisted of designated common space and a drainage area.  DX 56 (US-BB001543 to 001545).  Following his approach for properties with restrictions, Mr. Underwood valued these 31.363 acres like a noneconomic remainder, worth 15% of land with development potential, $21,750 per acre.

### What Is the Proper "Before Value" of Calusa Lakes?

The parties disagree about the highest and best use of Calusa Lakes.  Plaintiffs, who appraised Calusa Lakes using only Unit 2, contend that the highest and best use was residential development, and value Calusa Lakes at $175,000 per acre before the taking.  Defendant appraised Calusa Lakes using Units 1 and 2, and contends that Unit 2, the land adjacent to the corridor, should be appraised without development potential because it consisted of lands designated as drainage area, open space, and open space with a wetland preserve, and that the proper "before value" is $21,750 per acre.  In determining the "before value" of Calusa Lakes,

the Court considers Unit 2 because that is the portion of Calusa Lakes adjacent to the corridor and the land for which Plaintiffs seek damages.

As discussed above, a property would be appraised as being subject to a use restriction if the restriction were aimed at habitat preservation.  Here, in Unit 2, a portion of the land adjacent to the corridor was aimed at habitat preservation -- that designated as open space with a wetland preserve in the plat and the Covenants governing the development.  This designation was to remain in effect for at least 99 years.  Thus, residential development would not have been permitted on the wetland preserve open space segment of Unit 2 in 2004.  However, a drainage area and open space are not aimed at habitat preservation, and development would not have been precluded on such areas.  Defendant did not identify the amount of acreage designated as drainage area, open space, and wetland preserve.  However, Plaintiffs only seek severance damages for buffering 302.09 lineal feet of the land adjacent to the corridor -- 27% of the 1,109.63 lineal feet adjacent to the corridor -- because "[t]here are environmentally protected land areas with existing vegetation along the new corridor that would not need buffering."  PX 23B (BB-PLTF-11972).  Because Defendant did not quantify the amount of land designated for habitat preservation, the Court accepts Plaintiffs' representation that approximately three-quarters of the land adjacent to the corridor were occupied by environmentally sensitive lands and from this concludes that development would have been precluded on three-quarters of the corridor.  As such, three-quarters of the 1.273 acres encumbered by the trail are valued without development potential at 15% of the value with development potential, and the remaining one-quarter is valued with development potential.

The parties disagree about the value of Calusa Lakes with development potential -- Plaintiffs contend that Calusa Lakes was worth $175,000 per acre before the taking, while Defendant asserts it was worth $145,000 per acre.  Messrs. Durrance and Underwood used three of the same properties in their analyses: Sale 3/A-1, Sale 6/A-2, and Sale 2/A-3, and they disagreed about how these properties compared to Calusa Lakes in several respects.  First, Mr. Durrance rated Sale 6/A-2 and Sale 2/A-3 as inferior and slightly inferior in terms of market conditions because the sales were contracted in May 2003, and September 2003, respectively, when, as the appraisers agreed, the prices and demand were lower.  PX 23B (BB-PLTF-11955 to 11956).  However, Mr. Underwood did not apply any adjustment to Sale 6/A-2 for time of sale.  As discussed above, Mr. Durrance's determinations about the market conditions were more accurate, and Mr. Underwood's focus on the closing date resulted in his improper inflation of the value of Sales 6/A-2 and 2/A-3.

Messrs. Durrance and Underwood also disagreed about how Sale 3/A-1 compared to Calusa Lakes with respect to location.  Mr. Durrance rated Sale 3/A-1 slightly inferior because it was in northern Sarasota near an interstate.  PX 23B (BB-PLTF-11959).  Mr. Underwood determined the location of Sale 3/A-1 was similar to the location of Calusa Lakes because Sale 3/A-1 was next to rental apartments on Cattleman Road in a neighborhood with older and smaller homes.  DX 56 (US-BB001541).  Mr. Underwood ignored the presence of a nearby interstate, inflating the value of Sale 3/A-1.

The experts disagreed about how Sale 6/A-2 compared to Calusa Lakes with respect to zoning/future land use designation.  Specifically, Mr. Durrance rated Sale 6/A-2 as slightly inferior, and Mr. Underwood did not make any adjustment to the property for that factor.  Compare PX 23B (BB-PLTF-11955 to 11956), and DX 56 (US-BB001539).  Mr. Durrance

107

based his determination on the fact that Sale 6/A-2 was zoned open use estate-1, which allowed development at one unit per five acres.  Mr. Underwood also analyzed Sale 6/A-2 as zoned open use estate-1, but he found no adjustment was necessary because it was similar to Calusa Lakes. However, Calusa Lakes was zoned residential single-family-2, which allowed 3.5 units per acre, a higher density than permitted on Sale 6/A-2.  PX 34.  Accordingly, Mr. Underwood undervalued Calusa Lakes with respect to density.

Finally, the experts differed in their treatment of easements and encumbrances.  Mr. Durrance noted Sale 2/A-3 was encumbered with a 2.3-acre perpetual mitigation easement and Sale 6/A-2, with an overhead transmission power line easement, and featured a creek and a mesic hammock.  Mr. Underwood did not discuss these characteristics in his analysis, which led him to improperly inflate the values of Sale 2/A-3 and Sale 6/A-2.

Mr. Durrance's findings with respect to market conditions, location, and zoning are more persuasive.  As such, the Court accepts Plaintiffs' appraisal of $175,000 per acre as the "before value" of Calusa Lakes.  However, because the use restriction would limit development for the wetlands preserve area, the Court finds that three-quarters of the land underlying the corridor on Calusa Lakes is worth 15% of its value with development potential, or $25,987.50 per acre, and the remaining one-quarter is valued at $175,000 per acre.

### Just Compensation for Calusa Lakes

Plaintiffs seek $265,800 for the taking as it relates to Calusa Lakes, representing $220,500 for the land encumbered and $45,300 in severance damages.  Defendant contends compensation should be limited to $27,473.89, representing the land encumbered by the corridor, valued without development potential.  The Court determined three-quarters of Calusa Lakes is properly valued at $25,987.50 per acre before the taking, and the remaining one-quarter at $175,000 per acre.  As such, Plaintiffs are entitled to $79,700.26 for the 1.273 acres encumbered by the corridor based on a taking of 99% of the fee interest.

While 1,108.63 lineal feet of Calusa Lakes is adjacent to the Legacy Trail, Plaintiffs seek buffering for only 302.09 lineal feet because the majority of the land abutting the trail consists of environmentally protected lands with existing vegetation, which provide buffering.  PX 23B (BB-PLTF-11972).  Plaintiffs are entitled to compensation for the 302.09 lineal feet that lack natural buffering because Plaintiffs proved that the trail negatively affects the value of land adjacent to the trail.  As discussed above, buffering at $67 per lineal foot is a reasonable means of measuring the decrease in the fair market value of Plaintiffs' property because of the trail. Buffering 302.09 lineal feet at $67 per lineal foot would cost $20,240.03.  The Court awards Plaintiffs $99,940.29 for the taking as it relates to Calusa Lakes, representing $79,700.26 for the land encumbered by the trail and $20,240.03 in severance damages.

### The Childers Property

Plaintiffs Nathan and Deborah Childers own a 10.363-acre parcel on Pine Ranch East Road ("Childers property").  When the taking occurred, the property included a 2,321-square foot home that was built in 1995.  PX 16B (BB-PLTF-12064).  The property is located on Pine Ranch East Road, in the Osprey area of Sarasota County.  PX 16B (BB-PLTF-12074).  The rail-trail corridor is on the eastern edge of the property and runs the entire length of the property,

measuring 734.21 feet.  PX 16D.  In 2004, the Childers property was in a residential estate-2 zoning district, with a future land use designation of low-density residential.

### What Is the Proper "Before Value" of the Childers Property?

Before the taking, Plaintiffs valued the Childers property at $200,000 per acre, and Defendant appraised it at $205,000 per acre.  The Court accepts Mr. Durrance's valuation of $200,000 per acre as the "before value" of the Childers property.

### Just Compensation for the Childers Property

After the taking, the Legacy Trail abutted the eastern edge of the Childers property for 734.21 lineal feet.  PX 16B (BB-PLTF-12096).  As a result, 0.843 of an acre of the Childers property is encumbered by the rail-trail easement. Plaintiffs seek a total of $277,000 in damages relating to the Childers property.  Specifically, Plaintiffs seek $166,900 for a 99% taking of the 0.843 acres underlying the Legacy Trail and $110,100 for the diminution in the value of the remainder because of the trail.  Defendant argues just compensation should be limited to the land encumbered by the easement because the trail did not affect the property's fair market value and therefore contends compensation should be $171,700.

As discussed above, the proper "before" value of the Childers property is $200,000 per acre.  Thus, Plaintiffs are entitled to $166,914 for the 0.843 acres encumbered by the trail. Further, Plaintiffs are entitled to $67 per lineal foot to mitigate the diminution in the property's value because of the trail, as reflected in the cost of installing a 734.21 lineal foot buffer, or $49,192.07.  Thus, the Court awards Plaintiffs $216,106.07 as compensation for the Childers property.

## The Marlin Property

The Dennis T. and Mary Ann Marlin Revocable Trust owns an 11.18-acre parcel of land ("Marlin property").  The property is on the corner of Pine Ranch East Road and East Bay Street. Approximately 785 feet of the property front East Bay Street, and almost 640 feet front Pine Ranch East Road.  PX 15B (BB-PLTF-12908).  The property has two man-made lakes and there is an ingress/egress easement over 25 feet of the property to provide access to Pine Ranch East Road.  PX 15B (BB-PLTF-12908 to 12909).  In April 2004, the Marlin property contained a three-bedroom home, which was built in 1985, a detached garage, and a detached greenhouse. PX 15B (BB-PLTF-12909 to 12910).  Dennis Marlin testified it was common to receive offers to purchase the property before the taking.  Tr. 1373.  Mr. Marlin testified that in 2007, the County offered to purchase his property for $3,150,000, based on a 2007 appraisal of his property.  Tr. 1373; PX 48.  The County appraised the Marlin property at 10.4 acres, which did not include the encumbered strip, at approximately $300,000 per acre in 2007.  Tr. 1375-76; PX 48 (US-BB000065).

The Marlin property was designated for low-density residential development under the comprehensive plan.  Tr. 842.  Its zoning district was open use estate-1, which permitted residential development at one unit per five acres.  PX 15B (BB-PLTF-12912).  Ms. Allred testified that the property would need to be rezoned to allow for denser development, and that rezoning was reasonably probable because it was consistent with the property's future land use designation.  Tr. 842.

### What Is the Proper "Before Value" of the Marlin Property?

Plaintiff valued the Marlin property at $200,000 per acre, and Mr. Underwood valued the same property at $205,000 per acre. The Court accepts $200,000 per acre as the "before value" of the Marlin property.

### Just Compensation for the Marlin Property

In the "after" condition, 0.737 acres of the Marlin property is encumbered by the rail-trail corridor. The trail is adjacent to the property for 641.8 lineal feet. Plaintiffs seek $242,200 in damages with respect to the Marlin property, consisting of $145,900 for the land encumbered by the easement and $96,300 for the decrease in the value of the remainder because of the Legacy Trail. Defendant argues just compensation should be limited to the land encumbered by the easement because the trail did not affect the property's fair market value.

As discussed above, the parties agree that the imposition of the recreational trail easement resulted in a 99% taking. The Court found that before the taking, the Marlin property was worth $200,000 per acre. As such, compensation for the 0.737 acres underlying the trail is $145,926. Plaintiffs seek damages for buffering to mitigate the harm to the property because of the trail. The Court found that a 25-foot buffer would sufficiently mitigate the harm due to the trail. Thus, Plaintiffs are entitled to $67 per lineal foot for a 25-foot wide buffer on the 641.8 lineal feet adjacent to the corridor, or $43,000.60, because this property is outside the Palmer Ranch DRI. The Court awards Plaintiffs $188,926.60 in just compensation for the taking as it relates to the Marlin property.

### The Davids Property

Patricia Davids owns a 13.6095-acre parcel of land in the Nokomis area of Sarasota County ("Davids property"). Joint Status Report, Oct. 19, 2012.[61] The Davids property is on the east side of Twin Lakes Avenue and the north side of Astey Drive. PX 18B (BB-PLTF-12432). The Davids property is the southernmost of Plaintiffs' properties. Tr. 1605. On the date of valuation, the property included a one-story home that was built in 1956. PX 18B (BB-PLTF-12432). The property was designated for moderate-density residential development under the comprehensive plan and zoned residential single-family-2. Tr. 841; PX 18B (BB-PLTF-12432). Under this designation, residential development from two to five units per acre was permitted. PX 18B (BB-PLTF-12445). In the "after condition," the property backs up to the Legacy Trail and is separated from it by a ditch. Tr. 89, 105.

In 2001, Ms. Davids met with the County to discuss the possibility of developing the lot with cluster zoning. Tr. 99. She believed it could be developed at the maximum density under the comprehensive plan, five units per acre. Tr. 101. In 2006, Ms. Davids listed the property for sale for $4.8 million. Tr. 99-100. She did not sell the property because the market declined.

---

[61] Mr. Durrance appraised the Davids property as a 13.579-acre parcel. See PX 18B (BB-PLTF-12428). Mr. Underwood appraised it as a 13.64-acre property. After trial, the parties stipulated that the Davids property was 13.6095 acres, and 0.7895 acres of the property were encumbered by the rail-trail corridor. Joint Status Report, Oct. 19, 2012.

### Plaintiffs' Expert's Valuation of the Davids Property

Plaintiffs' expert appraised the Davids property using a comparable sales analysis based on five nearby property sales.  The properties sold for prices ranging from $114,000 to $213,000 per acre.  Although the Davids property contained a house, Mr. Durrance appraised the property as vacant with residential development as the highest and best use.  PX 18B (PP-PLTF-12445).  The following table summarizes Mr. Durrance's findings:[62]

|  | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| **Sale Date** | -- | 3/22/04 | 6/17/04 | 7/28/04 | 8/25/04 | 12/10/04 |
| **Sale Price** | -- | $2.7 mil | $2.2 mil | $5.9 mil | $2.776 mil | $2.449 mil |
| **Size (Ac)** | 13.579 | 15.381 | 13.977 | 27.732 | 24.260 | 19.650 |
| **Price/Acre** | -- | $176,000 | $157,000 | $213,000 | $114,000 | $127,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RSF-2/MODR | RSF-4/MODR Approved for 57-unit SFR sub-division | RSF-2/MODR & MEDR | RMF-3/HDR Approved for 160-unit attached town-homes | RE-1/OUE-2/ & MODR Approved for 96 units | OUE-1/MODR |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water/ Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Easements/ Encumbrances** | Typical | Typical | Typical | Typical | Typical | 175-foot wide FP&L easement |
| **Adjustments** | | | | | | |

[62] This chart reflects the data provided in the summary table in PX 18B.  Half of the summary table was omitted from the Bates-stamped version of PX 18B that Plaintiffs provided to the Court.  The Court cites the summary table in PX 18B using the page numbers in the version of the report without Bates numbers, pages 17-18.  The version of Mr. Durrance's appraisal report for the Davids property without Bates numbers is admitted and designated as PX 18E.

|  | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| **Market Conditions** | Mid-2004 | Slightly Inferior | Similar | Similar | Slightly Inferior | Slightly Superior |
| **Location** | Nokomis | Similar | Similar | Slightly Inferior | Slightly Inferior | Slightly Inferior |
| **Size (Ac)** | 13.579 | Similar | Similar | Similar | Similar | Similar |
| **Zoning/Future Land Use Entitlements** | RSF-2/MODR | Similar | Slightly Superior | Slightly Superior | Similar | Slightly Inferior |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Similar | Similar | Inferior |
| **Comparability** | -- | Superior | Slightly Superior | Superior | Inferior | Inferior |

Mr. Durrance did not include environmental lands as a factor in his analysis of the Davids property because there was conflicting information about the presence of environmental lands. PX 18B (BB-PLTF-12449).

Mr. Durrance first compared the Davids property to Sale 1, a 15-acre property on an unimproved road. Mr. Durrance rated Sale 1 as slightly inferior for market conditions because Sale 1 was contracted in September 2002, and the contract included a $400,000 contract assignment fee. PX 18E (p. 18). The contract assignment fee partially mitigated the fact that the sale was contracted a year-and-a-half before the date of valuation. Mr. Durrance rated Sale 1 similar to the Davids property for every other factor. Sale 1's location on an unimproved road was comparable to the Davids property's location. PX 18B (BB-PLTF-12448). The difference in size was less than two acres. PX 18E (pp. 17-18). Sale 1 and the Davids property had similar zoning/future land use entitlements because both were zoned for moderate-density residential development. Lastly, neither property contained any easements that negatively impacted potential development. PX 18B (BB-PLTF-12449). Mr. Durrance concluded Sale 1 was superior to the Davids property.

Mr. Durrance next considered Sale 2, a 13.997-acre property that sold in mid-2004. He rated the properties similar for market conditions because Sale 2 was contracted near the April, 2004 valuation date. PX 18B (BB-PLTF-12448). Mr. Durrance deemed the two properties similar in terms of location because the location of Sale 2 in central Sarasota was comparable to the location of the Davids property. Id. Mr. Durrance rated Sale 2 similar for size because it was approximately half an acre larger than Davids. PX 18E (pp. 17-18). Mr. Durrance deemed Sale 2 slightly superior with respect to zoning/future land use because Sale 2 was designated for

moderate- to medium-density residential development, which allowed five to nine units per acres, as opposed to two to five units per acre allowed on Davids. PX 18B (BB-PLTF-12449), PX 37 (BB-PLTF-50493). For easements or encumbrances, Mr. Underwood assessed the properties as similar because neither property had any easements/encumbrances that negatively affected potential development. Mr. Durrance rated Sale 2 as slightly superior to the Davids property.

Mr. Durrance next compared the Davids property to Sale 3, a 27.732-acre property that was later developed into a townhouse community. Mr. Durrance rated Sale 3 as similar for market conditions because the sale was contracted near the date of the taking -- in July 2004. PX 18E (pp. 17-18). Mr. Durrance found Sale 3 slightly inferior for location because Sale 3 was proximate to an interstate. PX 18B (BB-PLTF-12449). He rated the properties similar with respect to size because Sale 3 was approximately 14 acres larger than the Davids property. PX 18E (pp. 17-18). Mr. Durrance deemed Sale 3 slightly superior for zoning/future land use because Sale 3 was designated for moderate- to medium-density residential development, which was a higher density than that allowed on the Davids property. PX 18B (BB-PLTF-12449). Lastly, Mr. Durrance rated the properties similar for easement/encumbrances because neither property had any easements or encumbrances that negatively affected potential development. PX 18B (BB-PLTF-12449). Overall, Mr. Durrance assessed Sale 3 as superior to the Davids property.

Mr. Durrance found the last two properties in his analysis, Sales 4 and 5, to be inferior to the Davids property. Mr. Durrance found the market conditions for Sale 4, which was contracted in May 2003, to be slightly inferior to the subject property because while the sale was contracted in less favorable conditions, its contract included an assignment fee that partially mitigated the lower prices. PX 18B (BB-PLTF-12448). Mr. Durrance deemed Sale 4 slightly inferior with respect to location because it was located on a primary east-west thoroughfare. PX 18B (BB-PLTF-12449). Mr. Durrance assessed Sale 4 as similar to the Davids property for all of the remaining factors because both could have moderate-density residential development and neither contained any easements or encumbrances that impacted potential development. Id. Overall, Mr. Durrance deemed Sale 4 inferior to the Davids property.

Mr. Durrance determined Sale 5, a 19.65-acre property with a contract that closed in late 2004, was slightly superior to the Davids property with respect to market conditions because the sale took place in a more favorable market with higher prices. PX 18B (BB-PLTF-12448). Mr. Durrance deemed Sale 5's location slightly inferior to the subject property because like Sale 4, it was on a primary east-west thoroughfare in the Nokomis area. PX 18B (BB-PLTF-12449). Mr. Durrance rated the properties similar for size because Sale 5 was less than 10 acres larger than the Davids property. PX 18E (pp. 17-18). Mr. Durrance rated Sale 5 slightly inferior for zoning because Sale 5 did not have residential zoning in place when the contract closed. PX 18B (BB-PLTF-12449). Lastly, he found Sale 5 to be inferior to the Davids property in terms of easements/encumbrances because Sale 5 was encumbered with an overhead power line transmission easement on its southern border. Id. Mr. Durrance assigned Sale 5 an overall comparability rating of inferior.

Based on his analysis, Mr. Durrance concluded the Davids property ranked below Sale 2, which sold for $157,000 per acre, and above Sale 5, which sold for $127,000 per acre. PX 18B (BB-PLTF-12449). Mr. Durrance appraised the Davids property at $150,000 per acre. Tr. 347.

**Defendant's Expert's Valuation of the Davids Property**

Mr. Underwood appraised the Davids property as a 13.64-acre property, with residential development at two to five dwelling units per acre as the highest and best use.  DX 67 (US-BB002875 to 002876).  Like Mr. Durrance, Mr. Underwood did not attribute any value to the existing home.  Before the adjustments, the sale prices of the comparable properties ranged from $115,104 to $212,751 per acre.  The following table summarizes the properties used and the adjustments that Mr. Underwood made:[63]

| | Subject | A-1 | A-4 | A-10 | A-15 |
|---|---|---|---|---|---|
| **Location** | 1210 Twin Lakes Avenue<br><br>Nokomis | W side of Cattlemen Rd N of Richardson Rd<br><br>Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd<br><br>Sarasota County | S. End of Fielding Lane, 1 block north of Clark Rd.<br><br>Sarasota County | SEC of Laurel Road East & Legacy Trail<br><br>Sarasota County |
| **Sale Price** | N/A | $5.9 mil | $5.3 mil | $2.7 mil | $2.210 mil |
| **Sale Date** | | Jul-04 | Nov-04 | Mar-04 | Aug-04 |
| **Cond of Sale** | | Arm's Length | Arm's Length | Arms' Length | Arm's Length |
| **Property Interest** | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| **Zoning/Land Use** | RSF-2/MODR | RMF-3/HDR | OUE-2 & RSF-3/MDR & OFFMF | RSF-4/MODR | RSF-2/MODR |
| **Size (Ac)** | 13.6400 | 27.732 | 25.746 | 15.39 | 19.20 |
| **Price/Acre** | | $212,751 | $205,857 | $175,439 | $115,104 |
| **Adjustments** | | | | | |
| **Financing** | | 0% | 0% | 0% | 0% |
| **Time** | | 0% | -11% | 0% | 0% |
| **Time-Adjusted Sales Price** | | $212,751 | $183,213 | $175,439 | $115,104 |

---

[63] The information is derived from the chart entitled Vacant Land Sales Chart in DX 67 at US-BB002908.

|  | Subject | A-1 | A-4 | A-10 | A-15 |
|---|---|---|---|---|---|
| **Location** | | -40% | -40% | -30% | 0% |
| **Property Size** | | 5% | 5% | 0% | 0% |
| **Land Use Regulation** | | -10% | 0% | 0% | 0% |
| **Other[64]** | | 0% | 0% | 0% | 0% |
| **Total Adjustment** | | -45% | -35% | -30% | 0% |
| **Adjusted Price/Acre** | | $117,013 | $119,088 | $122,807 | $115,104 |

Before making any adjustments for location, property size, land use regulation, or other, Mr. Underwood determined whether any adjustments for time were needed. He adjusted the price of Sale A-4 by -11% because that sale occurred in November 2004. DX 67 (US-BB002908). Mr. Underwood did not apply any time-based adjustments to the other three comparable properties, which sold in March, July, and August 2004.

Mr. Underwood compared the Davids property to Sale A-1, a 27.732-acre parcel in central Sarasota County. Mr. Underwood applied a -40% adjustment for location because properties in central Sarasota County typically sold at higher prices, and the Davids property was located in the Nokomis area. DX 67 (US-BB002910). Mr. Underwood adjusted the price of Sale A-1 by five percent because his analysis indicated that properties less than 20 acres sold at prices approximately five percent higher than larger properties. Id. Mr. Underwood applied a -10% adjustment for land use regulations to reflect the fact that Sale A-1 was zoned for multifamily residential housing, with an underlying future land use designation of high-density, permitting development at 13 units per acre. Id. In all, he adjusted the price of Sale A-1 by -45%, resulting in a final adjusted price of $117,013 per acre.

The second property in Mr. Underwood's analysis was Sale A-4, a 25.746-acre parcel. Mr. Underwood began with the time-adjusted price of $183,213 per acre. He applied a -40% adjustment for location because Sale A-4 was located in the central part of the County, where he deemed prices were higher. DX 67 (US-BB002910). Mr. Underwood adjusted the price of Sale A-4 by 5% to account for the fact that it was more than 10 acres larger than the Davids property. DX 67 (US-BB002908). He did not make any adjustments for land use regulations because Sale A-4 was subsequently developed at 2.49 units per acre, which is comparable to what was permitted on the subject property. Id. After adjusting for time, Mr. Underwood adjusted the price of Sale A-4 by an additional -35%, yielding a final adjusted price of $119,088 per acre.

---

[64] Mr. Underwood did not make any adjustments under the "other factor" and did not define what "other" encompassed.

Mr. Underwood then compared the Davids property to Sale A-10, a 15.39-acre property that sold in March 2004.  Mr. Underwood adjusted the price of Sale A-10 by -30% to reflect its superior location to the north of the Davids property.  DX 67 (US-BB002910).  He did not make any adjustments with respect to size because the properties differed in size by less than two acres.  Id.  He also did not make any adjustments in terms of land use regulations because Sale A-10 had approvals for approximately three units per acre, which was similar to the level of development permitted on the Davids property.  DX 67 (US-BB002911).  In all, Mr. Underwood adjusted the price of Sale A-10 by -30%, for a final adjusted price of $122,807 per acre.

The final property in Mr. Underwood's analysis was Sale A-15, a 19.2-acre property in the Nokomis area of Sarasota County.  Mr. Underwood did not make any adjustments for location because Sale A-15 was approximately 800 feet southeast of the Davids property.  DX 67 (US-BB002907 to 002908).  He noted that Sale A-15 had slightly superior access and exposure than the Davids property.  DX 67(US-BB002907).  Mr. Underwood did not make any adjustments for size because Sale A-15 was less than 10 acres larger than the subject property.  DX 67 (US-BB002908).  Lastly, Mr. Underwood did not make any adjustments for land use regulation because both properties were zoned for residential development at two to five units per acre.  DX 67 (US-BB002907 to 002908).  Mr. Underwood did not apply any adjustments to Sale A-15, leaving Sale A-15 at its original price of $115,104.  Mr. Underwood did not adjust for time unless the sale was at least 6 months before or after.

Based on his analysis, Mr. Underwood determined that Sale A-15 was most similar to the Davids property, and he gave it the most weight in his appraisal.  DX 67 (US-BB002912).  He determined that because Sales A-1 and A-4 required substantial adjustments, they represented the upper end of the value range.  Mr. Underwood appraised the Davids property at $120,000 per acre before the taking.  Id.

### What Is the Proper "Before Value" of the Davids Property?

Plaintiffs contend that the Davids property was worth $150,000 per acre before the taking, while Defendant argues it was worth $120,000 per acre.  Messrs. Durrance and Underwood each found a different property to be most similar to the Davids property.  Mr. Underwood determined that Sale A-15, which sold for an adjusted price of $115,104 per acre, was most similar to the Davids property, while Mr. Durrance concluded that Sale 2, which sold for $157,000 per acre, was most similar.  Compare DX 67 (US-BB0052912), and PX 17B (BB-PLTF-12449).  Neither expert had considered the property the other found most similar in his comparable sales analysis.

Mr. Underwood determined that Sale A-15, which was located approximately 800 feet southeast of the Davids property and zoned identically to the Davids property -- was most similar to the Davids property because of its similar location and zoning designation.  DX 67 (US-BB0052912).  While Sale A-15 had slightly superior access and was six acres larger than the Davids property, Mr. Underwood determined that these differences did not warrant any adjustment.  DX 67 (US-BB005207).  Sale A-15 closed in March 2004, and the record does not contain its contract date.

Mr. Durrance found that Sale 2, which was contracted near April 2004, was most similar to the Davids property.  Mr. Durrance rated Sale 2 similar for market conditions, location, size,

and easement/encumbrances and slightly superior for zoning.  PX 17B (BB-PLTF-12447).  Sale 2 was zoned residential single-family-2, with moderate- to medium-density residential development as its future land use designation -- meaning it could be developed at a density of five to nine units per acre.  PX 17E (p. 17), PX 37 (BB-PLTF-50493).  The Davids property was limited to two to five units per acre because it was designated for moderate-density residential development.  PX 17E (p. 17), PX 37 (BB-PLTF-50493).  While Sale 2 was zoned for denser development, Mr. Durrance noted development was limited, stating: "[t]he property contains just under 14 acres of land, of which only about seven acres are considered developable."  PX 17B (BB-PLTF-12447).    Mr. Durrance did not explain why seven acres of Sale 2 were undevelopable.

The Court is persuaded by Mr. Underwood's analysis that Sale A-15 is most similar to the Davids property.  Sale A-15 was 800 feet southeast of the Davids property and did not warrant adjustment for any factor.  DX 67 (US-BB0052908, US-BB0052912).  In contrast, Sale 2 could be developed at up to four more units per acre than the Davids property, a significant difference.  The aspects in Mr. Underwood's technique that the Court found unpersuasive with respect to his appraisal of other properties -- the large-lot adjustment, failure to address easements, encumbrances, and environmental lands, and use of the closing date -- are not pertinent here.  As such, the Court finds the Davids property is properly valued at $120,000 per acre.

### Just Compensation for the Davids Property

After the taking, 0.789 acres of the Davids property is encumbered by the rail-trail corridor.  PX 18B (BB-PLTF-12451); DX 67 (US-BB002916); Joint Status Report, Oct. 19, 2012.  Plaintiffs seek $117,200 in damages for the land encumbered by the corridor and $103,100 in severance damages for the taking as it relates to the Davids property.  Defendant contends that compensation should be limited to the land taken, a 99% taking.

A 99% taking of the 0.7895 acres encumbered by the corridor, with the land valued at $120,000 per acre, results in compensation of $93,792.60 for the land encumbered.  As discussed above, severance damages for the effect of the trail on property values can be measured by the cost of a 25-foot buffer on the land adjacent to the trail.  On the Davids property, outside the Palmer Ranch DRI, 687 lineal feet of land abuts the Legacy Trail, and buffering 687 lineal feet at $67 per lineal foot results in $46,029 in compensation.  The Court awards Plaintiffs $139,821.60 in just compensation with respect to the Davids property.

## The Mirman Property

Ilene Mirman owns a 14.478-acre property in the Nokomis area of Sarasota County ("Mirman property").  PX 17B (BB-PLTF-12182).  The property fronts Myrtle Drive and Sunset Avenue.  PX 17C.  In April 2004, the property included a two-bedroom house, which was built in 1970.  PX 17B (BB-PLTF-12186).  After the taking, the Legacy Trail bordered the Mirman property on the western edge for 678.15 lineal feet.  PX 17D.  The comprehensive plan designated the Mirman property for moderate-density residential development.  It was zoned as residential estate-one, which permitted "large lot, estate-type development."  PX 17B (BB-PLTF-12199).  The property would need to be rezoned if the developer wanted to use the property for denser residential development, and once rezoned, it could be developed at five to

nine units per acre.   PX 17B (BB-PLTF-12200).   Ms. Allred testified that rezoning was reasonably probable because of the Mirman property's moderate-density residential development designation under the comprehensive plan and the County's policy to further smart growth.  Tr. 775, 844.

### Plaintiffs' Expert's Valuation of the Mirman Property

Mr. Durrance appraised the Mirman property as vacant with residential development as the highest and best use.   He determined that residential development consistent with its medium-density future land use designation and nearby developments was appropriate and appraised the property assuming it could be rezoned to achieve density between five and nine units per acre.   PX 17B (BB-PLTF-12200).   Mr. Durrance compared the Mirman property to sales of five similar properties within western Sarasota County.   The following table summarizes his findings:

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| **Sale Date** | -- | 3/22/04 | 10/4/04 | 7/28/04 | 8/25/04 | 12/10/04 |
| **Sale Price** | -- | $2.7 mil | $5.402 mil | $5.9 mil | $2.776 mil | $2.449 mil |
| **Size (Ac)** | 14.478 | 15.381 | 20.77 | 27.732 | 24.260 | 19.650 |
| **Price/Acre** | -- | $176,000 | $260,000 | $213,000 | $114,000 | $127,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements** | RE-1/MEDR | RSF-4/MDR Approved for 57-unit SFR sub-division | RSF-4, RMF-2, PUD & MODR / MEDR | RMF-3/HDR Approved for 160-unit attached town-homes | RE-1/OUE-2/ & MODR Approved for 96 units | OUE-1/MODR |
| **Utilities Available** | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer | Water / Sewer |
| **Environmental Lands** | <5% | <5% | <5% | 20-25% | <5% | 30-40% |

118

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| **Easements/ Encumbrances** | Typical | Typical | Perpetual Mitigation Easement | Typical | Typical | 175-foot wide FP&L easement |
| | | | | | | |
| **Market Conditions** | Mid-2004 | Slightly Inferior | Slightly Inferior | Similar | Slightly Inferior | Slightly Superior |
| **Location** | Nokomis | Similar | Superior | Slightly Inferior | Slightly Inferior | Slightly Inferior |
| **Size (Ac)** | 14.478 | Similar | Similar | Similar | Similar | Similar |
| **Zoning/Future Land Use Entitlements** | RE-1/MEDR | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Superior | Slightly Inferior |
| **Utilities Available** | Water / Sewer | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | <5% | Similar | Similar | Inferior | Similar | Inferior |
| **Easements/ Encumbrances** | Typical | Similar | Slightly Inferior | Similar | Similar | Inferior |
| **Comparability** | -- | Similar | Superior | Slightly Superior | Inferior | Inferior |

Mr. Durrance first considered Sale 1, a property that was purchased, rezoned, and subsequently sold for residential development. First, Mr. Durrance deemed Sale 1 slightly superior in zoning/future use entitlements because it was designated for moderate-density development, had a density of 3.7 units per acre, and did not need to be rezoned. PX 17E (p. 21), PX 17B (BB-PLTF-12225).[65] Mr. Durrance assessed the market conditions under which Sale 1 sold as slightly inferior because the sale was contracted in late 2002, when prices and demand

---

[65] Page 21 is omitted from the Bates labeled version of Mr. Durrance's Real Estate Appraisal Report of the Mirman Property, PX 17B, that Plaintiffs provided to the Court. There is no gap in the Bates numbers (page 20 is numbered BB-PLTF-12203 and page 22 is numbered -12204). However, the bound version without Bates numbers that Plaintiffs also provided to the Court contains page 21. The Court cites page 21 of PX 17B when referring to information from that page in the bound version with no Bates number. The version of Mr. Durrance's appraisal report for the Mirman property without Bates numbers is admitted and designated as PX 17E.

were lower, but the sale included a $400,000 contract assignment fee that partially mitigated the effect. PX 17B (BB-PLTF-12225). He deemed the location of Sale 1 similar to the Mirman property because it was also on an unimproved road in the Nokomis area of the County. PX 17E (p. 21). Mr. Durrance also found Sale 1 similar to the Mirman property with respect to environmental lands because both properties contained less than five percent environmental lands and for easements/encumbrances because neither had any significant easements or encumbrances. Id. Mr. Durrance assigned Sale 1 an overall comparability rating of similar.

Mr. Durrance next compared the Mirman property to Sale 2. He found that the market conditions for Sale 2 were slightly inferior because the sale was contracted in September 2003, well before the real estate market hit its peak. However, the $1,891,500 assignment fee partially mitigated the negative effect of the September 2003 contract date. PX 17B (BB-PLTF-12202). Mr. Durrance determined that Sale 2's location was superior to the Mirman property because Sale 2 was in central Sarasota and adjacent to the Palmer Ranch DRI. PX 17E (p. 21).[66] Mr. Durrance rated Sale 2's zoning/future land use designation slightly superior because development at a density of seven dwelling units per acre was permitted on Sale 2. PX 17B (BB-PLTF-12202, BB-PLTF-12227). He assessed Sale 2 as similar with respect to environmental lands because the properties had a similar amount of such lands. PX 17E (p. 21). Finally, he deemed Sale 2 slightly inferior in terms of easements/encumbrances because Sale 2 had a perpetual mitigation easement that prohibited development on 2.3 acres of the property. Id.

Mr. Durrance compared the Mirman property to Sale 3, a property that sold in July 2004. Because Sale 3's contract was signed around the same time as the taking, Mr. Durrance rated Sale 3 as similar for market conditions. PX 17E (p. 21). He rated Sale 3 as slightly inferior for location because it was in northern Sarasota County and adjacent to the interstate. PX 17E (p. 21). Mr. Durrance found the zoning/future land use designation of Sale 3 was slightly superior to the Mirman property because 5.77 dwelling units per acre were permitted. PX 17B (BB-PLTF-12202, BB-PLTF-12230). Mr. Durrance determined that Sale 3 was inferior to the Mirman property with respect to environmental lands because almost one-fourth of Sale 3 contained such lands. PX 17E (p. 21), PX 17B (BB-PLTF-12201). Lastly, he found the properties to be similar for easements/encumbrances because neither property had any easements or encumbrances that significantly affected the properties. PX 17E (p. 21). Overall, Mr. Durrance found Sale 3 was slightly superior to the Mirman property.

Mr. Durrance compared Sale 4 to the Mirman property and found that the market conditions for Sale 4 were slightly inferior because the sale was contracted in May 2003. PX 17B (BB-PLTF-12232), PX 17E (p. 20). He also found Sale 4 slightly inferior for location because it was along the primary east-west thoroughfare in the Nokomis area. PX 17E (p. 21). Mr. Durrance deemed Sale 4 slightly superior for zoning because development at a density of 4.62 dwelling units per acre was permitted. PX 17B (BB-PLTF-12202, BB-PLTF-12232). He appraised Sale 4 as similar with respect to environmental lands because each property contained

---

[66] The summary table in Mr. Durrance's appraisal report for the Mirman property rates Sale 2 as superior for location, but the location of Sale 2 is characterized as slightly superior in the narrative discussion of adjustments, a description the Court adopts. Compare PX 17B (BB-PLTF-12202), and PX 17E (p. 21).

approximately five percent environmental lands and with respect to easements/encumbrances because neither had any encumbrances or easements that significantly impacted development on the property.  PX 17E (p. 21).  Mr. Durrance concluded Sale 4 was inferior to the Mirman property.

Finally, Mr. Durrance considered Sale 5.  He found the market conditions for Sale 5 were slightly superior to the Mirman property because Sale 5 sold in December 2004, eight months after the taking, when demand and prices were higher.  PX 17E (p. 21), PX 17B (BB-PLTF-12202).  However, like Sale 4, he found that Sale 5's location was slightly inferior because it was in Nokomis on a primary east-west thoroughfare.  Id.  Mr. Durrance assessed Sale 5's zoning and rated it slightly inferior because the property had not been rezoned and development was limited to a density of two to five dwelling units per acre.  PX 17B (BB-PLTF-12202, BB-PLTF-12234).  Sale 5 contained a substantial amount of environmental lands -- 30 to 40% -- which led Mr. Durrance to deem it inferior to the Mirman property.  PX 17E (p. 21).  He also assessed it as inferior with respect to easements/encumbrances because it was encumbered by an overhead transmission line.  Id.  Overall, Mr. Durrance appraised Sale 5 as inferior.

Based on his analysis, Mr. Durrance determined the Mirman property was most comparable to Sale 1, which sold for $176,000 per acre.  PX 17E (p. 21).  He appraised the Mirman property at $175,000 per acre before the taking.  PX 17B (BB-PLTF-12204), PX 17E (p. 21).

### Defendant's Expert's Valuation of the Mirman Property

Mr. Underwood conducted a quantitative comparable sales analysis to appraise the Mirman property, using the same four properties he used to appraise the Davids property.  He appraised the Mirman property as vacant with residential development as the highest and best use.  DX 66 (US-BB002816).  Before adjustments, the prices of the properties ranged from $115,104 to $212,751 per acre.  DX 66 (US-BB002822).  The following table summarizes the properties used and the adjustments that Mr. Underwood made:[67]

|  | Subject | A-1 | A-4 | A-10 | A-15 |
|---|---|---|---|---|---|
| Location | 307 Myrtle Drive, 1860' North of Laurel Road East<br><br>Nokomis | W side of Cattlemen Rd N of Richardson Rd<br><br>Sarasota County | NWC of Cattlemen Rd & Colonial Oaks Blvd<br><br>Sarasota County | S. End of Fielding Lane, 1 block north of Clark Rd.<br><br>Sarasota County | SEC of Laurel Road East & Legacy Trail<br><br>Sarasota County |
| Sale Price | N/A | $5.9 mil | $5.3 mil | $2.7 mil | $2.21 mil |
| Sale Date |  | Jul-04 | Nov-04 | Mar-04 | Aug-04 |

---

[67] The information is derived from the chart entitled Vacant Land Sales Chart in DX 66 at US-BB002822.

| | Subject | A-1 | A-4 | A-10 | A-15 |
|---|---|---|---|---|---|
| Cond of Sale | | Arm's Length | Arm's Length | Arms' Length | Arm's Length |
| Property Interest | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Zoning/Land Use | OUE-2/MEDR | RMF-3/HDR | OUE-2 & RSF-3/MDR & OFFMF | RSF-4/MODR | RSF-2/MODR |
| Size (Ac) | 14.4782 | 27.732 | 25.746 | 15.39 | 19.20 |
| Price/Acre | | $212,751 | $205,857 | $175,439 | $115,104 |
| Financing | | 0% | 0% | 0% | 0% |
| Time | | 0% | -11% | 0% | 0% |
| Adjustments | | | | | |
| Time-Adjusted Sales Price | | $212,751 | $183,213 | $175,439 | $115,104 |
| Location | | -40% | -40% | -30% | 0% |
| Property Size | | 5% | 5% | 0% | 0% |
| Land Use Regulation | | 0% | 10% | 10% | 10% |
| Other | | 0% | 0% | 0% | 0% |
| Total Adjustment | | -35% | -25% | -20% | 10% |
| Adjusted Price/Acre | | $138,288 | $137,410 | $140,351 | $126,614 |

Before adjusting for any other factors, Mr. Underwood first considered whether it was necessary to apply any adjustments for time.  Mr. Underwood employed the same 1.5% per month adjustment discussed above.  Accordingly, he adjusted Sale A-4 by -11% because the sale closed in November 2004, seven months after the date of valuation.  He did not apply any adjustments to Sales A-1, A-10, and A-15 because he determined that they occurred sufficiently close to the date of valuation.  DX 66 (US-BB002823).

Mr. Underwood first compared the Mirman property, in the Nokomis area, to Sale A-1, a property in central Sarasota County. Mr. Underwood applied a -40% adjustment to Sale A-1 to reflect the fact that "property values in central Sarasota County tend to be higher than those in the subject's neighborhood and surrounding area." DX 66 (US-BB002824). He applied a 5% adjustment for size because Sale A-1 was over 20 acres, while the Mirman property was 14.4782 acres. DX 66 (US-BB002822). Mr. Underwood determined Sale A-1 was zoned residential multifamily-3, which allowed 13 units per acre, but the property was actually developed at 5.77 units per acre. DX 66 (US-BB002824). He did not make any adjustments for land use regulations because the Mirman property could be developed at a similar density, five units per acre. Mr. Underwood adjusted Sale A-1 by -35%, for a final adjusted price of $138,288 per acre.

Mr. Underwood next considered Sale A-4. He began with the time-adjusted price of $183,213. He applied a -40% adjustment for location because like Sale A-1, Sale A-4 was in central Sarasota County where prices were higher. DX 66 (US-BB002824). Mr. Underwood applied a five percent adjustment to Sale A-4 because it was over 20 acres. Id. Mr. Underwood found Sale A-4 was zoned residential single-family-3 and was developed as a residential subdivision at a density of 2.49 units per acre. DX 66 (US-BB002825). Because this was a density lower than permitted on the Mirman property, he applied a 10% adjustment to reflect the Mirman property's advantage. Mr. Underwood did not say how he arrived at 10%. He applied the same percentage adjustment to A-10, which was zoned to allow three units per acre. After adjusting for time, Mr. Underwood applied a -25% adjustment, resulting in a final adjusted price of $137,410 per acre.

The third property in Mr. Underwood's analysis for the Mirman property was Sale A-10, which was located in central Sarasota County. Mr. Underwood applied a -30% adjustment for location because Sale A-10 was in a better area than the subject property, but it was not as desirable as the areas where Sales A-1 and A-4 were located. DX 66 (US-BB002824). Mr. Underwood did not apply a size-based adjustment because like the subject property, Sale A-10 was less than 20 acres. Id. Mr. Underwood employed a 10% adjustment for land use regulations because Sale A-10 had approval for development at approximately three units per acre, which was less than the five allowed on the Mirman property. DX 66 (US-BB002825). In all, Mr. Underwood adjusted Sale A-10 by -20%, for a final adjusted price of $140,351 per acre.

Sale A-15 was the final property in Mr. Underwood's analysis. He determined a location-based adjustment was not necessary because Sale A-15's location was similar to that of the subject property, as both were in the Nokomis area. DX 66 (US-BB002824). Mr. Underwood did not make any adjustment for size because both Sale A-15 and the Mirman property were less than 20 acres. DX 66 (US-BB002824). He applied a 10% adjustment for land use regulations because Sale A-15 was designated for development at 3.5 units per acre, which was less than the five units per acre permitted on the Mirman property. Mr. Underwood adjusted Sale A-15 by 10%, for an adjusted price of $126,614 per acre.

After applying these adjustments, the prices of the comparable properties ranged from $126,614 to $140,351 per acre. Mr. Underwood gave Sale A-15 the most weight because it required the least adjustment and was most similar to the Mirman property in terms of location. Mr. Underwood gave Sales A-4 and A-10 the next highest weight. Based on his analysis, Mr. Underwood appraised the Mirman property at $130,000 -- a higher value than A-15 because A-15 had an inferior land use designation.

**What Is the Proper "Before Value" of the Mirman Property?**

Plaintiffs valued the Mirman property at $175,000 per acre, and Defendant contends the proper "before value" was $130,000 per acre. Messrs Durrance and Underwood used two of the same properties in their analyses: Sale 3/A-1 and Sale 1/A-10. Mr. Durrance concluded that Sale 1/A-10 was most similar to the Mirman property, while Mr. Underwood determined that Sale A-15, a property Mr. Durrance did not use, was most similar to the Mirman property. Mr. Durrance found that Sale 1/A-10, which sold for $176,000 per acre in late March 2004, was similar to the Mirman property because the properties differed in size by less than one acre, were in similar locations, had less than five percent environmental lands, and had no easements or encumbrances that impacted potential development. PX 17B (BB-PLTF-12201 to 12202). Mr. Durrance deemed Sale 1/A-10's slightly superior zoning to be offset by Sale 1/A-10's slightly inferior market conditions.

Mr. Underwood determined that Sale 1/A-10, which he opined had an adjusted sales price of $140,351, differed from the Mirman property with respect to location and land use regulations. Mr. Underwood deemed Sale 1/A-10's location in northern Sarasota County superior and applied a -30% adjustment, but he did not explain why he viewed its location as better than that of Mirman. DX 66 (US-BB002824). Sales A-1 and A-4 were also located in northern Sarasota County, and Mr. Underwood applied a -40% adjustment to those properties without explaining why the locations of those two properties were 10% better than the location of Sale 1/A-10. Id. Additionally, when comparing Sale 1/A-10 to the Mirman property, Mr. Underwood used the March 2004 sale date, instead of the late 2002 and early 2003 contract dates, and he did not consider the fact that the buyer of Sale A-10 paid a $400,000 assignment fee. As a result, Mr. Underwood overvalued Sale 1/A-10 and undervalued Mirman.

Mr. Underwood selected Sale A-15 as the property that was most similar to the Mirman property. When comparing the Mirman property to Sale A-15, Mr. Underwood did not give sufficient weight to land use regulations. Specifically, he adjusted Sale A-15 by 10% because development at 3.5 units per acre was permitted -- less than the five to nine units permitted on the Mirman property. Mr. Underwood recognized that development at five to nine units per acre was permitted on the Mirman property, but he determined that "[c]onsidering the current zoning, the [future land use] designation would be reasonable at five units per acre, or the low end of the range." DX 66 (US-BB002815). Mr. Underwood did not explain why he determined Mirman was limited to the low end of the range. Mr. Underwood's 10% adjustment for land use regulations did not sufficiently take into account that denser development between five and nine units per acre was permitted on the Mirman property, while only 3.5 units per acre were permitted on Sale A-10. This led Mr. Underwood to undervalue the Mirman property.

As such, the Court accepts Mr. Durrance's appraisal of $175,000 per acre as the proper "before value" of the Mirman property.

**Just Compensation for the Mirman Property**

After the taking, 0.778 acres of the Mirman property were encumbered by the rail-trail corridor. The trail abuts 678.15 lineal feet of the property. Plaintiffs seek $236,500 in compensation for the taking as it relates to the Mirman property. Specifically, Plaintiffs seek $134,800 for the part taken and $101,700 in severance damages for the decrease in the property's

value because of the trail, as measured by the cost to buffer land adjacent to the corridor. Defendant argues compensation should be limited to the land taken.

As discussed above, the Mirman property was worth $175,000 per acre before the taking. The corridor encumbers 0.778 acres of the property, resulting in an award of $134,788.50 for the land encumbered. Plaintiffs have established that the Legacy Trail adversely affected property values, and that the cost of buffering the land adjacent to the trail at $67 per lineal foot to mitigate the harm to the remainder, is less than the diminution in value to the remainder. As such, the Court finds the cost of buffering is a reasonable measure of severance damages. Accordingly, Plaintiffs are entitled to $134,788.50 for the land taken and $45,436.05 (678.15 lineal feet x $67) in severance damages, for a total award of $180,224.55 for the Mirman property.

## The Glueck Property

Plaintiff, A. Merle Clark Glueck, as Trustee of the A. Merle Clark Glueck Trust, owns a 23.527-acre parcel that is located on the north side of Preymore Street in the Osprey area of Sarasota County ("Glueck property").[68] In 2004, the Glueck property was used as an automobile salvage yard, which was a non-conforming use. Its status as a non-conforming use meant the owners could continue to use the property as a salvage yard but could not expand or intensify this use. In addition, if the use ceased for one year, they would lose the right to continue the nonconforming use. Tr. 836. After the taking, the Glueck property was encumbered by the rail-trail corridor on its eastern edge. PX 20D.

The Glueck property was designated for moderate-density residential development under the comprehensive plan. Tr. 835. The property was surrounded by residential developments. It was zoned open use estate-1, but Ms. Allred testified that it was reasonably probable that it could be rezoned for denser development consistent with the comprehensive plan because the County expected to use open use estate parcels for infill development. Tr. 835-36.

### What Is the Proper "Before Value" of the Glueck Property?

Both appraisers valued the Glueck property at $200,000 per acre before the taking, a finding the Court accepts as reasonable and supported by the record. As such, the proper "before value" of the Glueck property is $200,000 per acre.

### Motion to Strike Expert Testimony Regarding Buffering on the Glueck Property

Plaintiffs moved to strike Mr. Bass' testimony about the buffering that would be required if the Glueck property were developed. At trial, Mr. Bass, Defendant's expert on land use planning, testified that a moat and vegetation on the Glueck property provided sufficient buffering. Mr. Bass testified:

Q      Have you been able to personally observe the type of perimeter buffering that surrounds the Glueck property?

---

[68] An aerial image of the Glueck property is located in Appendix K.

A       Yes. The majority of it, yes.

Q       In your opinion, would there be any need to build any sort of additional buffering around the Glueck property should it be developed as residential development, any form of residential development?

A       No.  There's no requirement for residential to residential for buffering.

Q       But let me ask you this.  If buffering were required under the Code, is that existing vegetation sufficient to comply with any buffering requirement under the Sarasota County Code?

A       I would answer that generally, yes, not having been on the property to observe exactly what all of the vegetation is on the property for compliance with the Code as far as native vegetation.

So if there's some exotics in there that would need to be pulled out, but there's adequate buffering with the moat around the property.

* * *

THE WITNESS:       Well, if you look at the graphic, the aerial photograph, you'll see a dark area between the two landscapings.

* * *

THE WITNESS:       It sort of goes around the property.

* * *

THE WITNESS:       Basically it's a canal.  It's a moat.  It's a waterway. So we have landscaping from the trail side.  We have the moat.  We have vegetation on the property on each side.

THE COURT:         So you count the moat as buffering?

THE WITNESS:       It's a buffer.  It's a setback.

Tr. 1104-06.

Plaintiffs moved to strike testimony about whether it would be necessary to install a buffer if the Glueck property were developed, arguing Mr. Bass did not discuss the moat, buffering, or berming on the Glueck property in his expert report, and his testimony should be limited to the information contained in report.  Tr. 1106-07.  Defendant contended that Mr. Bass was designated as an expert in buffering, he had testified about buffering requirements in general, and could testify about buffering requirements as they related to a specific property.   Tr. 1107-08.   Defendant argued that while Plaintiffs' counsel did not examine Mr. Bass at his deposition about buffering requirements, that should not preclude his testimony at trial.  The Court reserved ruling on the motion to strike to allow a full review of Mr. Bass' report.  Tr.

1111.[69]

Rule 26(a)(2)(B) of the Rules of the United States Court of Federal Claims ("RCFC") provides:

> **(B) Witnesses Who Must Provide a Written Report.**   Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> **(i)**     a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> **(ii)**    the facts or data considered by the witness in forming them;
>
> **(iii)**   any exhibits that will be used to summarize or support them;
>
> **(iv)**   the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> **(v)**    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> **(vi)**   a statement of the compensation to be paid for the study and testimony in the case.

RCFC 26(a)(2)(B).[70]

The Seventh Circuit articulated the requirements for an expert report:

> Rule 26(a) expert reports must be "detailed and complete."  Fed. R. Civ. P. 26 Advisory Committee's note; *see also Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996), *cert. denied*, 519 U.S. 811, 117 S. Ct. 57, 136 L. Ed. 2d 20 (1996).  A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor.  Fed. R. Civ. P. 26 Advisory Committee's note; *see also Smith v. State Farm Fire & Cas. Co.*, 164 F.R.D. 49, 53 (S.D. W.Va. 1995); *cf. Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 727 (7th Cir. 1996).   The report must be complete such that opposing counsel is not forced to depose an expert in order to

---

[69] Mr. Bass' expert report is not part of the trial record.  In response to a Court order, Defendant filed the report on January 7, 2013.  The Court uses "Bass Report" to reference Mr. Bass' expert report and citations to page numbers are to the Bates numbers.

Mr. Bass' deposition is not in the record.

[70] RCFC 26(a)(2)(B) and RCFC 37(c)(1) are identical in relevant part to Rules 26(a)(2)(B) and 37(c)(1) of Federal Rules of Civil Procedure.

avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources. *See Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir.), *cert. denied*, 516 U.S. 822, 116 S. Ct. 84, 133 L. Ed. 2d 42 (1995). Expert reports must not be sketchy, vague or preliminary in nature. Fed. R. Civ. P. 26 Advisory Committee's note; *see also Sierra Club*, 73 F.3d at 571. Disclosures must not be used as a means to extend a discovery deadline. *See id.* Expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions. *See Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).

Salgado v. Gen. Motors Corp., 150 F.3d 735, 741 n.6 (7th Cir. 1998).

The summary to Mr. Bass' expert report speaks to buffering requirements in general:

**Issue - Buffering:**

Applicable to the parcels under analysis, there are two county landscaping/buffering standards applied. For parcels approved in 2003 and before there is one set of landscaping and buffering requirements. For parcels developed or to be developed after 2004 the current zoning code applies, which was in effect in 2004.

As of the adoption of the revised Zoning Regulations in 2004, applicable to all parcels is Sarasota County Zoning Regulations, Section 7.3.4.c addressing buffering. This section indicates that no landscaping buffers are required for wetlands and preserve areas. This section applies to several of the developed parcels where the areas abutting the trail corridor are in fact wetland and preserve areas and no buffering is required.

\* \* \*

In summary, while a developer may desire to have more stringent setbacks or buffering requirements for properties adjacent to public roads, market data indicates that developers only apply county setback and buffering requirements along the trail and/or trail corridors, including development within the Palmer Ranch DRI.

Bass Report (US-RB006130 to 006131).

Mr. Bass' report for the Glueck property states in its entirety:

**GLUECK PARCEL**

**ZONING ANALYSIS**

The subject is a grandfathered nonconforming use. Its historical and present use is as a commercial salvage operation.

As a nonconforming use, the use cannot be expanded onto other portions of its

site.  Therefore, the gaining of a 50 foot wide strip along its eastern property line of 1.527. acres has no measurable benefit to the parent tract, its present use. See Article 8, Sarasota County Zoning Regulations.

Glueck's closed their US 41/Church Street location and consolidated operations at the subject location.

There is no reasonable probability that this use will discontinue in the foreseeable future.

As of 2004, there were alternative sites available for sale that did not or does not have the potential hazardous impacts as the subject site.

Attachment

Bass Report (US-RB006234).

Notably absent from Mr. Bass' expert report is any discussion of the buffering required for the Glueck property.  This absence stands in stark contrast to Mr. Bass' analysis of other properties, where he included sections specific to buffering.  For example, Mr. Bass' report on Arielle provides in pertinent part:

Rezone Petition 01-11 required Buffer "B" along the rail corridor with landscaping provided adjacent to only residential development, and only native vegetation to be retained to the area south and adjacent to wetland preservation, lake and litoral areas and other open space.  In other words, only a small portion of the frontage onto the rail corridor required buffering, about the north 1/3 of the parent tract - from the north property line to Prosperity Circle.  The balance of the parcel had no buffering requirements.

Rezone Petition 03-11 or the then existing zoning regulations did not set forth a "required" buffer width.

Bass Report (US-RB006135 to 006136).  Similarly, Mr. Bass' report on JMC states:

It is noted that the only buffering of the trail is for a limited portion along the eastern boundary line abutting (across the trail corridor) residential dwellings of Mission Estates.  Further, the buffer is limited to 20 feet [in] width.  There is no buffering indicated in the southeastern corner of the subject property abutting residence in an area (across the trail corridor) commonly referred to as Mission Valley.

Also, as per the Sarasota County Zoning Regulations, Section 7.3.4.c no landscaping buffers are required for wetlands and preserve areas.  Instead, Resource Protection requires natural buffers in these areas.

see also Bass Report (US-RB006260).

RCFC 37 provides in pertinent part:

If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure . . . and (C) may impose other appropriate sanctions, including any of the orders listed in RCFC 37(b)(2)(A)(i)–(vi).

RCFC 37(c)(1); see Rogers v. United States, 96 Fed. Cl. 472, 475 (2011); Scott Timber, Inc. v. United States, 93 Fed. Cl. 221, 226 (2010). "[C]ourts applying the counterparts to these rules in the Federal Rules of Civil Procedure have held that the sanction of exclusion is mandatory under Fed. R. Civ. P. 37(c)(1) unless the offending party can show that its violation of Fed. R. Civ. P. 26(a) was either justified or harmless." Scott Timber, 93 Fed. Cl. at 226 (citing Santiago–Diaz v. Laboratorio Clinico Y De Referencia Del Este, 456 F.3d 272, 276 (1st Cir. 2006)).

In his expert report, Mr. Bass did not discuss the buffering that would be required for residential development on the Glueck property. Nonetheless, at trial Mr. Bass proceeded to opine that there would be no need for additional buffering on the Glueck property if it were developed as residential. Mr. Bass' failure to disclose this opinion in his expert report requires the exclusion of his trial testimony. Defendant has not demonstrated that its violation of Rule 26(a) was justified or harmless. Plaintiffs' motion to strike is granted. Mr. Bass' testimony about whether buffering would be required if the Glueck property were used for residential development, at trial transcript pages 1104 through 1112, is stricken from the record. See Salgado, 150 F.3d at 742 n.6; MMG Ins. Co. v. Samsung Elecs. Am., Inc., 11-CV-430-JL, 2013 WL 2444033, *2-3 (D.N.H. June 5, 2013); In re Chantix (Varenicline) Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1303 (N.D. Ala. 2012); LaSalle Bank Nat'l Ass'n. v. CIBC Inc., No. 08 Civ. 8426 (WHP)(HBP), 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012). But see Rogers, 96 Fed. Cl. at 476-77 (denying Defendant's motion to strike expert's trial testimony on the cost of buffering and lost access as severance damages because both were disclosed in the expert's report).

### Just Compensation for the Glueck Property

After the taking, the Legacy Trail abutted the eastern edge of the Glueck property, measuring 1,330 lineal feet. PX 20B (BB-PLTF-12343). Plaintiffs seek $537,800 for the taking-- $302,300 for the part taken and $235,500 in severance damages, representing $199,500 as the cost to install a buffer 1,330 lineal feet in length, and $36,000 for increased security costs. Defendant contends compensation should be limited to the land encumbered by the easement. Defendant further argues no additional buffering would be required if the Glueck property were used for residential development because "[t]here is extensive buffering between the Trails Act easement and the Glueck property, including a large water-filled ditch or moat and vegetation of both sides of the ditch." Def.'s Post-Trial Br. 33.

Mr. Durrance testified as to why he believed damages for the cost to construct a buffer on the Glueck property were necessary:

Q       For the Glueck property, you calculated damages to their remainder based on 150 linear feet -- or $100 per linear foot for 1,330 linear feet. And that's the entire length of the property where it abuts the right-of-way. Isn't that correct?

A       That sounds about right, yes.

Q       Isn't it true at the Glueck property there is a very large moat between what is being used as a salvage yard and the railroad right-of-way?

A       There is a ditch, yes.

Q       That's a pretty big ditch, isn't it?

A       Yes. It was dug years ago, is my understanding, to help fill the property years ago, yes.

* * *

Q       And do you see on the eastern boundary this rather large ditch adjacent to the railroad corridor, correct?

A       I do, yes.

Q       And it's also true that there is extensive vegetation on the Glueck property between the ditch and the open area that's used for salvage yard purposes, correct?

A       There is vegetation along the ditch bank on the west side. That is correct.

Q       And it's also true, is it not, that there is extensive vegetation on the side adjacent to the railroad corridor? Isn't that correct?

A       There is vegetation there as well, yes, sir.

Q       And it's also true that some of that vegetation is actually on the Glueck property and not within the railroad right-of-way. Isn't that correct?

A       Yes. If this [PX 20C (aerial photograph of the Glueck property)] is an accurate representation, that would be correct.

* * *

Q       You included a damage amount for buffering even though there is already a very substantial buffer that was existing on the date of the alleged take, correct?

A       That is correct, yes. There is a ditch there, that's correct, and vegetation.

> Q      And actually, the property opposite to the east, there is a large lake and additional landscape buffering.
>
> A      Yes.
>
> Q      Additional vegetation anyway.  Isn't that right?
>
> A      Yes.  When they developed, they created that as a stormwater pond or a lake, if you refer to it that way.  And that was developed in that manner, and they dug it and put the water there. So yes.  And I'll say this also on Glueck, if it's appropriate.  I didn't value the property as commercial, which given the commercial auto salvage, we have a higher land value for a property such as this.  You would not necessarily or you wouldn't want a buffer.  You wouldn't need a buffer.  I valued it as a residential subdivision based on the comp plan and the zoning.   And consistent with that, you're going to have some type of buffer or choose not to.

Tr. 553-57.  Thus, Plaintiffs' expert acknowledged the moat and existing vegetation on both sides of the trail.  Plaintiffs have not demonstrated that there would be a need to mitigate the impact of the trail on the property's value with additional buffering because a natural buffer was already in place.  As such, Plaintiffs have not demonstrated entitlement to compensation for the cost to buffer the Glueck property.

Plaintiffs also seek $36,000 for increased security measures, costs to install security cameras, motion detectors, and monitors to prevent burglaries due to the Legacy Trail.  PX 20B (BB-PLTF-12342 to 12343).  Defendant did not specifically contest Plaintiffs' claim for security costs, but argued generally that compensation should be limited to the land underlying the corridor.

The costs of increased security because of the construction of the Legacy Trail constitute consequential damages, as they are an indirect result of the taking.  Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."); Klein v. United States, 179 Ct. Cl. 910, 916 (1967) (per curiam) ("It is settled law that . . . compensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost.").  As the Eight Circuit explained, a takings plaintiff cannot recover consequential damages:

> The taking of a tract of land or part of a tract by the government may not only deprive the landowner of his property but may also inflict upon him incidental or consequential damages.  While the rule may appear unjust, it is well settled that the landowner is not entitled, at least within the framework of a condemnation suit, to be compensated for such consequential damages as loss of business, relocation expenses, and the like.

United States v. 91.90 Acres of Land, 586 F.2d 79, 87 (8th Cir. 1978) (citing Kimball Laundry

<u>Co. v. United States</u>, 338 U.S. 1, 11-12 (1949); <u>see also</u> <u>United States v. Petty Motor Co.</u>, 327 U.S. 372, 377-78 (1946); <u>United States ex rel. TVA v. Powelson</u>, 319 U.S. 266, 281-86 (1943); <u>United States v. 967,905 Acres of Land</u>, 447 F.2d 764, 768-69 (8th Cir. 1971)); <u>see also</u> <u>Yuba Natural Res. Inc. v. United States</u>, 904 F.2d 1577, 1581 (Fed. Cir. 1990).

Plaintiffs are not entitled to compensation for the cost to buffer or increased security costs with respect to the Glueck property.  The Court awards $302,346 as compensation related to the taking of the Glueck property, representing the value of the 1.527 acres encumbered.

<u>Conclusion</u>

The Clerk is directed to enter judgment in favor of Plaintiffs in the amount of $5,751,579.73, apportioned amongst Plaintiffs as shown in the table below.

The Court does not determine what rate of interest should be applied as the parties have filed cross-motions for summary judgment on that issue.

| Plaintiff | Damages for Land Encumbered | Severance Damages |
|---|---|---|
| Mission Valley Golf & Country Club, Inc. | $413,374.50 | $139,250.12 |
| Stoneybrook Golf & Country Club of Sarasota, Inc. | $855,756.00 | $232,026.30 |
| TPC-Prestancia, Inc. | $772,794.00 | --- |
| Pulte Home Corporation | $178,696.12 | --- |
| JMC Real Estate Holdings, LLC | $756,310.50 | $268,000.00 |
| Palmer Ranch Holdings, Ltd. | $338,976.00 | --- |
| Pine Ranch East Owners Association, Inc. | $516,673.08 | $152,358.00 |
| Calusa Lakes Community Association, Inc. | $79,700.26 | $20,240.03 |
| Nathan and Deborah Childers | $166,914.00 | $49,192.07 |
| Dennis T. and Mary Ann Marlin Revocable Trusts | $145,926.00 | $43,000.60 |
| Patricia M. Davids | $93,792.60 | $46,029.00 |
| Ilene Mirman | $134,788.50 | $45,436.05 |

| | | |
|---|---|---|
| A. Merle Clark Glueck Trust | $302,346.00 | --- |

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

**Appendix A: Northern Segment of Palmer Ranch DRI**



1: Arielle

2: Palmer Ranch

3: Prestancia

4: Stoneybrook

5: Glueck

6: Pine Ranch East

7: Childers

DX 4A (with numbers added to identify subject properties)

135

**Appendix B: Southern Segment of Palmer Ranch DRI**



8:  Mission Valley

9: Calusa Lakes

10: JMC

11: Mirman

12: Davids

DX 4B (with numbers added to identify subject properties)

## Appendix C: Aerial View of TPC



**PX 26D**

**Appendix D: Aerial View of Arielle**



PX 22C (BB-PLTF-51851)

## Appendix E: Arielle Conceptual Development Plan



DX 19 (US-RB006164)

**Appendix F: Plat for Arielle**



DX 38 (US-RB006138)

## Appendix G: Aerial View of JMC



PX 21C

## Appendix H: Aerial View of Palmer Ranch



DX 5A

## Appendix I: Aerial View of Pine Ranch East



PX 27D

## Appendix J: Aerial View of Calusa Lakes



PX 23D

**Appendix K: Aerial View of the Glueck Property**



PX 20C